# EXHIBIT H

# ORIGINAL

BARRETT JOHNSTON, LLC
GEORGE E. BARRETT
DOUGLAS S. JOHNSTON, JR.
TIMOTHY L. MILES
217 Second Avenue, North
Nashville, TN 37201-1601
Telephone: 615/244-2202
615/252-3798 (fax)
gbarrett@barrettjohnston.com
djohnston@barrettjohnston.com
tmiles@barrettjohnston.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PIRELLI ARMSTRONG TIRE CORPORATION RETIREE MEDICAL BENEFITS TRUST, Derivatively on Behalf of WELLS & FARGO COMPANY, <br><br> Plaintiff, <br><br> vs. <br><br> JOHN G. STUMPF, JOHN D. BAKER II, JOHN S. CHEN, LLOYD H. DEAN, SUSAN E. ENGEL, ENRIQUE HERNANDEZ, JR., DONALD M. JAMES, RICHARD D. McCORMICK, MACKEY J. McDONALD, CYNTHIA H. MILLIGAN, NICHOLAS G. MOORE, PHILIP J. QUIGLEY, JUDITH M. RUNSTAD, STEVEN W. SANGER and | No. <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE <br><br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

[Caption continued on following page.]

SUSAN G. SWENSON,                          )
                                           )
                        Defendants,        )
                                           )
          – and –                          )
                                           )
WELLS FARGO & COMPANY, a Delaware          )
corporation,                               )
                                           )
                    Nominal Defendant.     )
                                           )
_____ )

**SUMMARY AND OVERVIEW**

1.     This is a shareholder derivative action on behalf of nominal defendant Wells Fargo & Company ("Wells Fargo" or the "Company"), against its entire Board of Directors (the "Board") and certain top officers for breach of fiduciary duty, abuse of control, gross mismanagement and corporate waste. Defendants include John G. Stumpf, John D. Baker II, John S. Chen, Lloyd H. Dean, Susan E. Engel, Enrique Hernandez, Jr., Donald M. James, Richard D. McCormick, Mackey J. McDonald, Cynthia H. Milligan, Nicholas G. Moore, Philip J. Quigley, Judith M. Runstad, Steven W. Sanger and Susan G. Swenson.

2.     More specifically, beginning at least as early as in 2009, defendants caused the Company to materially engage in the mass processing of loan ownership and servicing documents to facilitate home foreclosure actions against homeowners who had become delinquent on their home mortgage payments. Defendants' mass processing included the creation and execution of thousands of court-filed affidavits purportedly attesting to the truth and accuracy of loan documentation (including whether Wells Fargo was indeed the legal owner of the loan on which it sought to foreclose) referenced or submitted in conjunction with the affidavits. In truth, however, Wells Fargo's servicing agents rarely even read the affidavits or examined the information purporting to evidence the loan and loan ownership particulars they were attesting to.

3.     Further, when information was disclosed that Wells Fargo may have been falsifying affidavits, defendants repeatedly and defiantly denied that there were any problems with the accuracy of the Company's foreclosure affidavits, causing Wells Fargo to issue and file false and misleading statements with the Securities and Exchange Commission ("SEC").

4.     Ultimately, the Company would be forced to admit deficiencies in more than 50,000 of its court-filed foreclosure affidavits. As a result of improper, and many times false, affidavits, the Company is and has been subject to multiple lawsuits and government investigations and likely hundreds of millions of dollars in civil fines and penalties.

5.     In 2008, the United States embarked upon one of the largest economic crises in U.S. history. At the core of the U.S. financial crisis was the collapse of the housing bubble "fueled by the low interest rates, easy and available credit, scant regulation and toxic mortgages." *See Financial*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE          - 1 -

*Crisis Inquiry Report* at xvi (2011). As home values plummeted and unemployment skyrocketed in the United States and the world, the financial markets nearly came to a halt. In its wake and aftermath, hundreds of U.S. banks failed, including Lehman Brothers and American International Group ("AIG"), a renowned insurance giant.

6.     At the same time, lending institutions that held mortgages on homes on which mortgage payments became delinquent began foreclosing on homeowners that fell significantly behind on their mortgage payments. In 2009 and 2010, foreclosure actions in states where foreclosures were controlled by the court system accelerated and began to dominate banks' loan servicing units.

7.     In summer of 2010, allegations were levied that some U.S. lending institutions, including nominal defendant Wells Fargo, Ally Financial Inc. (aka GMAC Mortgage Co.), Bank of America, JPMorgan Chase, Citigroup and others were mass processing foreclosure documents, including court-filed declarations, in support of foreclosure proceedings on behalf of banks.

8.     The mass processing included robotically signing affidavits purporting to verify that the banks actually owned the mortgages and that the homeowners were in fact delinquent on the loans being foreclosed upon. In truth however, lenders and their agents executed and in many instances falsified court documents without even attempting to verify the truth or accuracy of the facts asserted therein. A euphemism for the mass processing of false documentation was quickly coined – "robo-signing."

9.     As a result of the robo-signing phenomenon, lending institutions and their loan servicing agents routinely submitted false sworn documents to courts and in many instances succeeded in removing people from their homes without legitimate documentation evidencing that the respective lending institutions had standing (legal ownership rights) to foreclose on the loans.

10.     In September 2010, as the public outcry regarding the process began to surge, certain of the large lending institutions, including Bank of America and Citigroup, issued moratoriums on foreclosures in order to investigate the propriety and veracity of allegations that said banks were engaging in robo-signing and submission of false legal documentation.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE                                    - 2 -

11. On September 22, 2010, a *Wall Street Journal* article, entitled "GMAC Spotlight on Robo-Signer," discussed some of the evidence supporting claims that robo-signing had become a routine part of the lending institutions' foreclosure processes. The article detailed specific events and deposition testimony provided by Jeffrey Stephan and Beth Cottrell, employees of GMAC Mortgage Co. and Chase Home Mortgage, respectively, wherein they each admitted to signing thousands of affidavits purportedly in support of foreclosure proceedings without even verifying the truth or accuracy of the facts stated in the affidavits:

> This week, mortgage-servicing giant GMAC Mortgage Co. halted foreclosures in 23 states due to questions about documents signed by one of its robo-signers, Jeffrey Stephan.

> \* \* \*

> *In two sworn depositions given by Mr. Stephan over the last 10 months, he said that assistants brought as many as 500 documents a day to this desk at GMAC's office in Fort Washington, Pa. Some months, he would sign more than 10,000 documents related to home foreclosures. By signing the documents, he was stating that he had personally reviewed the details of each case.*

> The problem is, according to depositions Mr. Stephan gave in December and June, he didn't really look at each case. In fact, he assumed that all the details were correct, and just signed off on each one. Mr. Stephan also noted that, when he joined GMAC in 2004, he went through a training program that lasted three days.

> \* \* \*

> *Ally Financial Inc., GMAC's parent company, said Mr. Stephan is still working there and admitted there had been irregularities.* "The entire situation is unfortunate and regrettable and GMAC Mortgage is diligently working to resolve the situation," the company said in a statement.

> Other servicers, as well, have been questioned over their practices. On May 17, Ice Legal, the Royal Palm Beach, Fla.-based law firm that first deposed Mr. Stephan last December, took a sworn deposition from Beth Cottrell, another robo-signer. *Working as an operations specialist for Chase Home Mortgage, a division of J.P. Morgan Chase & Co., she said she regularly signed off on about 18,000 foreclosure affidavits and other documents each month, without ever personally reviewing the files associated with the loans.*

12. Wells Fargo, however, notwithstanding growing evidence that it too was engaged in robo-signing, denied that any such practices were being carried out by any of its agents and boldly affirmed that its foreclosure practices were sound and its affidavits in support of foreclosures were accurate:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE

- 3 -

"Wells Fargo's policies, procedures and practices satisfy us that the affidavits we sign are accurate. We audit, monitor and review our affidavits under controlled standards on a daily basis. We will stand by our affidavits and if we find an error we will take the appropriate action."

13. By early October 2010, in addition to Ally Financial (GMAC), Bank of America and JPMorgan Chase had all ceased foreclosure operations in at least 23 states which had court-controlled foreclosure proceedings. Nevertheless, foreclosure proceedings in states where they were not court-controlled continued, notwithstanding that many of the same documentation abuses were apparent in those states.

14. On October 7, 2010, Congressman John Conyers, Jr. and Congresswoman Carolyn C. Kirkpatrick called on lenders to extend moratoriums on home foreclosures to all 50 states and, in addition to moratoriums, prevent evictions that occur after foreclosures.

15. On October 8, 2010, Bank of America announced that it had extended the moratorium on foreclosures from 23 states to all 50 states as a result of robo-signing:

**Statement from Bank of America Home Loans**

*Bank of America has extended our review of foreclosure documents to all fifty states. We will stop foreclosure sales until our assessment has been satisfactorily completed.* Our ongoing assessment shows the basis for our past foreclosure decisions is accurate. We continue to serve the interests of our customers, investors and communities. Providing solutions for distressed homeowners remains our primary focus.

16. On October 13, 2010, the National Association of Attorneys General and the Mortgage Foreclosure Multistate Group, consisting of the Attorneys General of 49 states, led by Tom Miller, Attorney General of the State of Iowa, issued a Joint Statement describing its investigation into robo-signing of foreclosure documents, including affidavits purporting to support foreclosures on mortgage loans:

**JOINT STATEMENT OF THE MORTGAGE FORECLOSURE MULTISTATE GROUP**

It has recently come to light that a number of mortgage loan servicers have submitted affidavits or signed other documents in support of either a judicial or non-judicial foreclosure that appear to have procedural defects. In particular, it appears affidavits and other documents have been signed by persons who did not have personal knowledge of the facts asserted in the documents. In addition, it appears that many affidavits were signed outside of the presence of a notary public, contrary to state law. This process of signing documents without confirming their accuracy has

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE                    - 4 -

come to be known as "robo-signing." We believe such a process may constitute a deceptive act and/or an unfair practice or otherwise violate state laws.

17. On October 14, 2010, the *Financial Times* published an article entitled "Spotlight falls on Wells Fargo foreclosure procedures." The article disclosed that notwithstanding Wells Fargo's denials about its foreclosure processes regarding the verification of mortgage foreclosure documents, one of its loan officers had sworn in a deposition that she signed as many as 500 foreclosure-related documents each day without verifying the contents of the documents other than her name and her title. The documents/affidavits were then used to support lawsuits brought by Wells Fargo to initiate and complete home foreclosures:

**Spotlight falls on Wells foreclosure procedures**

Wells Fargo, the second-biggest US mortgage servicer, has remained above the fray in recent weeks as banks have come under scrutiny for rubber-stamping thousands of mortgage documents without verifying their contents as required by law.

Unlike Bank of America, JPMorgan Chase and GMAC, Wells Fargo has not halted foreclosures and has maintained that it has no problems with its procedures.

Yet, a sworn deposition by one of its loan documentation officers suggests otherwise. Xee Moua said she signed as many as 500 foreclosure-related papers a day on behalf of the bank. Ms Moua said the only information she had verified was whether her name and title appeared correctly.

Asked whether she checked the accuracy of the principal and interest that Wells Fargo claimed the borrower owed – an important step in banks' legal actions to foreclose – Ms Moua replied: "I do not."

Ms Moua nevertheless signed affidavits, reviewed by the Financial Times, that said she had "personal knowledge of the facts regarding the sums of money which are due and owing to Wells Fargo". These affidavits were used in lawsuits brought by Wells Fargo to repossess homes.

Ms Moua said it was her understanding the foreclosure documents had been reviewed by outside lawyers before reaching her.

18. On October 27, 2010, the Company was forced to admit that contrary to prior denials, Wells Fargo's control processes were deficient, and in particular, its foreclosures processes had included the same robo-signing alleged to have afflicted other large lending institutions. Wells Fargo disclosed further that more than 50,000 foreclosure affidavits submitted on its behalf would require resubmission due to apparent robo-signing:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE                    - 5 -

**Wells Fargo Provides Update on Foreclosure Affidavits And Mortgage Securitizations**

\*        \*        \*

*As part of the company's review of its foreclosure affidavit procedures, the company has identified instances where a final step in its processes relating to the execution of the foreclosure affidavits (including a final review of the affidavit, as well as some aspects of the notarization process) did not strictly adhere to the required procedures.* The issues the company has identified do not relate in any way to the quality of the customer and loan data; nor does the company believe that any of these instances led to foreclosures which should not have otherwise occurred.

19.     Buried in the Company's 10-K, filed with the SEC on February 25, 2011, was a disclosure confirming that in addition to a multitude of lawsuits relating to its foreclosure processes, it was in fact likely the government would initiate some form of enforcement action against the Company related to the foreclosure document investigation and, as a result, the Company could be subject to significant civil penalties. The Company further acknowledged that it had established a $1.2 million loss reserve to cover potential losses regarding its foreclosure practices. The 10-K provided in part:

**MORTGAGE RELATED REGULATORY INVESTIGATIONS** Several government agencies are conducting investigations or examinations of various mortgage related practices of Wells Fargo Bank. The investigations relate to two main topics, (1) whether Wells Fargo may have violated fair lending or other laws and regulations relating to mortgage origination practices; and (2) *whether Wells Fargo's practices and procedures relating to mortgage foreclosure affidavits and documents relating to the chain of title to notes and mortgage documents are adequate. With regard to the investigations into foreclosure practices, it is likely that one or more of the government agencies will initiate some type of enforcement action against Wells Fargo, which may include civil money penalties. Wells Fargo continues to provide information requested by the various agencies.*

20.     On March 31, 2011, Wells Fargo entered into a Consent Order issued by the Office of the Comptroller of the Currency ("OCC"). The OCC found that the Company had engaged in unsound or unsafe banking practices related to its residential loan servicing and its mortgage foreclosure processing. On April 13, 2011, Wells Fargo entered into a Consent Order with the Board of Governors of the Federal Reserve. Both governmental agencies reserved the right to seek civil penalties against the Company.

21.     On May 5, 2011, the Company filed its 10-Q for the first quarter of 2011 ("1Q11"), announcing it had increased its litigation loss reserve to $1.7 million. The 10-Q further confirmed

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE                     - 6 -

the investigations by the state attorneys general and the U.S. Department of Justice were still ongoing and could result in significant fines and civil penalties.

22.     Defendants are current directors of Wells Fargo and are hostile to this action, rendering a pre-suit demand futile because they actively participated in this concerted action to obtain the financial and social benefits of such positions for themselves and to enrich and further the personal and business interests of all defendants identified herein.  As a result of defendants' wrongful acts, the Company has suffered severe damage to its reputation, goodwill and its ability to conduct future operations, and has been exposed to millions of dollars in potential liability for violating federal securities laws.

## INTRADISTRICT ASSIGNMENT

23.     A substantial part of the events or omissions which give rise to the claims in this action occurred in the county of San Francisco, and as such this action is properly assigned to the San Francisco division of this Court.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction pursuant to 28 U.S.C. §1332(b)(2), because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

25.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

26.     Venue is proper in this Court because Wells Fargo has a substantial presence in California and is headquartered in San Francisco, California.  Moreover, each defendant has had extensive contacts with California as a director and/or officer of Wells Fargo or otherwise, which makes the exercise of personal jurisdiction over them proper, and certain of the defendants reside in this District.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE                        - 7 -

# PARTIES

**Plaintiff**

27.     Plaintiff Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust is a shareholder of Wells Fargo and will adequately represent the interests of Wells Fargo in this action.[1] Plaintiff is a citizen of the State of Tennessee.

**Nominal Defendant**

28.     Nominal defendant Wells Fargo is a diversified financial services company that provides retail, commercial and corporate banking services principally in the United States. Nominal defendant Wells Fargo is a Delaware corporation with its headquarters located in San Francisco, California.

**Defendants**

29.     Defendant John G. Stumpf ("Stumpf") has served as Chairman of Wells Fargo since January 2010, as Chief Executive Officer ("CEO") since 2007, as a director since 2006 and as President since 2005. Defendant Stumpf is a citizen of the State of California.

30.     Defendant John D. Baker II ("Baker") has served as a director of Wells Fargo since 2009. Previously, Baker served as a director of Wachovia Corporation prior to it being acquired by Wells Fargo on December 31, 2008. Defendant Baker is a citizen of the State of Florida.

31.     Defendant John S. Chen ("Chen") has served as a director of Wells Fargo since 2006. Defendant Chen is a citizen of the State of California.

32.     Defendant Lloyd H. Dean ("Dean") has served as a director of Wells Fargo since 2005. Defendant Dean is a citizen of the State of California.

33.     Defendant Susan E. Engel ("Engel") has served as a director of Wells Fargo since 1998. Defendant Engel is a citizen of the State of New York.

34.     Defendant Enrique Hernandez, Jr. ("Hernandez") has served as a director of Wells Fargo since 2003. Defendant Hernandez is a citizen of the State of California.

---

[1]     At January 31, 2011, there were 201,714 holders of record of the Company's common stock.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE                - 8 -

35. Defendant Donald M. James ("James") has served as a director of Wells Fargo since 2009. Previously, James served as a director of Wachovia Corporation prior to it being acquired by Wells Fargo on December 31, 2008. Defendant James is a citizen of the State of Alabama.

36. Defendant Richard D. McCormick ("McCormick") has served as a director of Wells Fargo since 1983. Defendant McCormick is a citizen of the State of Colorado.

37. Defendant Mackey J. McDonald ("McDonald") has served as a director of Wells Fargo since 2009. Previously, McDonald served as a director of Wachovia Corporation prior to it being acquired by Wells Fargo on December 31, 2008. Defendant McDonald is a citizen of the State of North Carolina.

38. Defendant Cynthia H. Milligan ("Milligan") has served as a director of Wells Fargo since 1992. Defendant Milligan is a citizen of the State of Nebraska.

39. Defendant Nicholas G. Moore ("Moore") has served as a director of Wells Fargo since 2006. Defendant Moore is a citizen of the State of California.

40. Defendant Philip J. Quigley ("Quigley") has served as a director of Wells Fargo since 1994. Defendant Quigley is a citizen of the State of California.

41. Defendant Judith M. Runstad ("Runstad") has served as a director of Wells Fargo since 1998. Defendant Runstad is a citizen of the State of Washington.

42. Defendant Steven W. Sanger ("Sanger") has served as a director of Wells Fargo since 2003. Defendant Sanger is a citizen of the State of Minnesota.

43. Defendant Susan G. Swenson ("Swenson") has served as a director of Wells Fargo since 1994. Defendant Swenson is a citizen of the State of California.

44. Defendants Stumpf, Baker, Chen, Dean, Engel, Hernandez, James, McCormick, McDonald, Milligan, Moore, Quigley, Runstad, Sanger and Swenson, because of their positions with the Company, possessed the power and authority to control the contents of Wells Fargo's quarterly reports, press releases, and presentations to shareholders and analysts. They were provided with copies of the Company's false and misleading reports and press releases before or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE

- 9 -

available to them but not to the public, defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. Defendants are liable for the false and misleading statements and omissions pleaded herein.

45. Defendants, and each of them, acted in bad faith and breached their fiduciary duties of candor, loyalty and good faith owed to Wells Fargo by causing or permitting Wells Fargo to enter into transactions to the detriment of Wells Fargo. Defendants also acted in bad faith and breached their fiduciary duties of candor, loyalty and good faith owed to Wells Fargo by causing Wells Fargo to issue false and misleading statements concerning its business prospects and revenue and income projections.

## THE FIDUCIARY DUTIES OF WELLS FARGO'S DIRECTORS AND OFFICERS

46. Each director and officer of Wells Fargo owed Wells Fargo and its shareholders the duty to exercise the highest degree of candor, good faith and loyalty in the management and administration of the Company's affairs, as well as in the use and preservation of Wells Fargo's property and assets. Delaware law holds: "Loyalty. Good faith. Independence. Candor. These are words pregnant with obligation. The Supreme Court did not adorn them with half-hearted adjectives. Directors should not take a seat at the board table prepared to offer only conditional loyalty, tolerable good faith, reasonable disinterest or formalistic candor." *In re Tyson Foods, Inc. Consol. S'holder Litig.*, Case No. 1106-CC, 2007 Del. Ch. LEXIS 120, at *10-*11 (Del. Ch. Aug. 15, 2007).

47. The conduct of Wells Fargo's directors and officers complained of herein involves a knowing and culpable violation of their fiduciary obligations, the absence of good faith on their part, and a reckless disregard for their duties to the Company which the directors and officers were aware or should have been aware posed a risk of serious injury to the Company. The conduct of Wells Fargo's directors and officers who engaged in illegal conduct has been ratified by Wells Fargo's Board, which has failed to take any action against them, despite knowledge of such actions.

48. To discharge their fiduciary duties of candor, good faith and loyalty, Wells Fargo's directors and officers were required, among other things, to:

(a) in good faith, manage, conduct, supervise and direct the business and affairs of Wells Fargo and its subsidiaries in accordance with applicable state and federal laws;

(b) neither violate nor knowingly permit any director, officer or employee of Wells Fargo to violate applicable federal and state laws, rules and regulations or any rule or regulation of Wells Fargo;

(c) remain informed as to the status of Wells Fargo's operations, and upon receipt of notice or information of imprudent, unsound or unlawful practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or stop such practices; and

(d) ensure that Wells Fargo was operated in a diligent, honest and prudent manner in compliance with all applicable federal and state laws, rules and regulations.

49. By reason of their corporate positions and their ability to control the business and corporate affairs of Wells Fargo, defendants were required to use their ability to control Wells Fargo in a fair, just and equitable manner, as well as to act in furtherance of the best interests of Wells Fargo and not in furtherance of their own personal interests or ideology. In violation of their fiduciary duties of candor, loyalty and good faith, defendants caused Wells Fargo to conduct its business in an unsafe, imprudent, dangerous and illegal manner.

50. Defendants participated in the wrongdoing complained of herein in order to improperly benefit themselves, instead of acting in the best interests of the Company, and to remain as directors and officers of a public corporation and to continue and prolong the illusion of Wells Fargo's success and to conceal the adverse facts concerning Wells Fargo's actual financial condition so that they could protect and perpetuate their directorial and/or executive positions and increase the substantial compensation, perks and prestige they obtained thereby. Such participation involved, among other things, planning and creating (or causing to be planned and created), proposing (or causing the proposal of) and authorizing, approving and acquiescing in the illegal conduct complained of herein.

51.     During all times relevant hereto, each of the defendants occupied a position with Wells Fargo or was associated with the Company in such a manner as to make them privy to confidential and proprietary information concerning Wells Fargo and its operations, finances and financial condition.  Because of these positions and such access, each of the defendants knew that the true facts specified herein regarding Wells Fargo's business and finances had not been disclosed to and were being concealed from its shareholders and the public.  Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material adverse information regarding Wells Fargo and to take any and all actions necessary to ensure that the officers and directors of Wells Fargo did not act upon such privileged non-public information in a manner which caused the Company to violate the law.

52.     Defendants breached their duties of candor, loyalty and good faith by allowing or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein, and by failing to prevent defendants from taking such illegal actions.  Each of the defendants participated in the issuance and/or review of false and misleading statements, including the preparation of false and misleading press releases, SEC filings and reports to Wells Fargo shareholders.  In addition, as a result of defendants' illegal actions and course of conduct, the Company is the target of an investigation by the SEC.

53.     Pursuant to Wells Fargo's Director Code of Conduct, Wells Fargo expects its directors "to act in a manner that will serve the best interests of Wells Fargo; that is fair, honest and trustworthy; that is in compliance with applicable laws, rules and regulations; that will preserve confidential information; that will avoid conflicts of interest or the appearance of conflicts of interest; and that will protect and promote the proper use of Wells Fargo's assets."

54.     Under Wells Fargo's Audit and Examination Committee Charter, the members of the committee are required, among other things, to: (a) review and discuss with management the Company's annual and quarterly financial statements; (b) review annual and quarterly earnings press releases in advance of their issuance; (c) discuss or review financial information and earnings guidance provided to Wells Fargo's shareholders, securities analysts and members of the financial press; (d) review any reports by management regarding the effectiveness of, or any deficiencies in,

the design or operation of disclosure controls and procedures or internal controls, and any fraud, whether or not material, that involves management or other employees who have a significant role in Wells Fargo's internal controls; and (e) monitor compliance with the Company's Code of Ethics and Business Conduct by Wells Fargo's directors, officers, and employees. Here, the members of the Audit and Examination Committee (defendants Baker, Dean, Hernandez, Milligan, Moore, Quigley and Swenson) failed to discharge their fiduciary duties and obligations under the Audit and Examination Committee Charter.

55.     Under Wells Fargo's Corporate Responsibility Committee Charter, the members of the committee are required, among other things, to: (a) oversee the Company's policies, programs, and strategies regarding social responsibility matters, including those relating to the Company's fair and responsible mortgage lending and the Company's government relations; and (b) monitor the Company's reputation and relationships with its external stakeholders, including its customers regarding social responsibility matters. Here, the members of the Corporate Responsibility Committee (defendants Baker, Dean, Hernandez, Milligan and Runstad) failed to discharge their fiduciary duties and obligations under the Corporate Responsibility Committee Charter.

56.     Under Wells Fargo's Risk Committee Charter, the members of the committee are required, among other things, to: (a) oversee the Company's strategies, policies, procedures, and systems, established by management to identify, assess, measure and manage major risks faced by Wells Fargo; (b) review and discuss policies with respect to risk assessment and risk management, including the Company's major financial, operational, compliance or reputational risk exposures; and (c) monitor the steps management has taken to control such risk exposures. Here, the members of the Corporate Responsibility Committee (defendants Dean, Hernandez, Milligan, Moore, Quigley and Sanger) failed to discharge their fiduciary duties and obligations under the Risk Committee Charter.

## SUBSTANTIVE ALLEGATIONS

57.     On August 9, 2010, the Company filed its Form 10-Q for the period ending June 30, 2010 with the SEC. The Form 10-Q repeated the 2Q10 financial results reported in the Company's

July 21, 2010 press release and included the certification of Stumpf regarding the adequacy of the Company's internal controls over financial reporting:

I, John G. Stumpf, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2010, of Wells Fargo & Company;

\* \* \*

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrants disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation . . . .

\* \* \*

5. The registrants other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrants auditors and the audit committee of the registrants board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrants ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrants internal control over financial reporting.

58. On August 10, 2010, Wells Fargo was found liable after a trial in the United States District Court for the Northern District of California for fraudulent and unfair business practices

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE     - 14 -

under California Business and Professions Code §17200, for, among other things, misleading its customers and engineering processes designed to fraudulently maximize the overdraft fees collected from consumers for no "purpose other than profiteering." *Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1124 (N.D. Cal. 2010). With respect to the Company's misleading materials and inadequate disclosures, the Court noted Wells Fargo's intent to hide its deceptive practices:

> Given the harsh impact of the bank's high-to-low practices, the bank was obligated to plainly warn depositors beforehand. ***Instead, the bank went to lengths to hide these practices while promulgating a facade of phony disclosure.*** The bank's own marketing materials were deceptive in leading customers to expect purchases to be debited in the order made (rather than to be resequenced in high-to-low order).

*Id*. at 1112-13.

59.     The Court went further, finding that Wells Fargo's undisclosed overdraft sequencing processing constituted a gimmick and a trap to make profits off the backs of the working poor:

> *Wells Fargo constructed a trap — a trap that would escalate a single overdraft into as many as ten through the gimmick of processing in descending order. It then exploited that trap with a vengeance, racking up hundreds of millions off the backs of the working poor, students, and others without the luxury of ample account balances.*

*Id*. at 1119.

60.     Wells Fargo was enjoined from engaging in the practices alleged and ordered to pay injunctive relief totaling approximately $200 million.

61.     On September 22, 2010, a *Wall Street Journal* article, entitled "GMAC Spotlight on Robo-Signer," discussed some of the evidence supporting claims that robo-signing had become a routine part of the lending institutions' foreclosure processes. The article detailed specific events and deposition testimony provided by Jeffrey Stephan and Beth Cottrell, employees of GMAC Mortgage Co. and Chase Home Mortgage, respectively, wherein they each admitted to signing thousands of affidavits purportedly in support of foreclosure proceedings without even verifying the truth or accuracy of the facts stated in the affidavits:

> This week, mortgage-servicing giant GMAC Mortgage Co. halted foreclosures in 23 states due to questions about documents signed by one of its robo-signers, Jeffrey Stephan.
>
> Until now, Mr. Stephan was an anonymous middle manager whose job is to sign affidavits, assignments of mortgages and other documents that establish a bank's ownership of a mortgage, thus giving the bank the right to foreclose.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE

- 15 -

But, as revelations come to light about how Mr. Stephan and other robo-signers do their jobs, a picture is emerging of a foreclosure process that critics say is just as flawed as the lax lending and perverse incentives that created the lending crisis.

*In two sworn depositions given by Mr. Stephan over the last 10 months, he said that assistants brought as many as 500 documents a day to this desk at GMAC's office in Fort Washington, Pa. Some months, he would sign more than 10,000 documents related to home foreclosures. By signing the documents, he was stating that he had personally reviewed the details of each case.*

*The problem is, according to depositions Mr. Stephan gave in December and June, he didn't really look at each case. In fact, he assumed that all the details were correct, and just signed off on each one. Mr. Stephan also noted that, when he joined GMAC in 2004, he went through a training program that lasted three days.*

\* \* \*

*Now, lenders have begun withdrawing the affidavits signed by Mr. Stephan, thereby ending dozens of foreclosure proceedings across Florida, Maine and Texas.* Many lawyers who represent borrowers in foreclosure have argued that the banks trying to repossess these homes don't have the standing to do so, and are seeking to block the actions.

On Monday, GMAC confirmed that it suspended foreclosure sales and evictions in 23 states so that it can investigate its foreclosure procedures.

Mr. Stephan, a 41-year-old Penn State graduate from Sellersville, Pa., has worked at GMAC since 2004, and before that worked in collections and foreclosure processing work for ContiMortgage Corp. and Fairbanks Capital Corp. In depositions, he said that he had received a three-day training program in how to handle foreclosure paperwork when he joined GMAC.

\* \* \*

*Ally Financial Inc., GMAC's parent company, said Mr. Stephan is still working there and admitted there had been irregularities.* "The entire situation is unfortunate and regrettable and GMAC Mortgage is diligently working to resolve the situation," the company said in a statement.

Other servicers, as well, have been questioned over their practices. On May 17, Ice Legal, the Royal Palm Beach, Fla.-based law firm that first deposed Mr. Stephan last December, took a sworn deposition from Beth Cottrell, another robo-signer. *Working as an operations specialist for Chase Home Mortgage, a division of J.P. Morgan Chase & Co., she said she regularly signed off on about 18,000 foreclosure affidavits and other documents each month, without ever personally reviewing the files associated with the loans.*

62.     On or around October 1, 2010, it was reported that in an email to Housing Wire, Wells Fargo spokesman Jason Menke wrote as follows: "'Wells Fargo's policies, procedures and practices satisfy us that the affidavits we sign are accurate. We audit, monitor and review our

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE

affidavits under controlled standards on a daily basis. We will stand by our affidavits and if we find an error we will take the appropriate action.'"

63. On October 12, 2010, defendants caused the Company to issued a press release again reaffirming that its foreclosure affidavits were indeed accurate and that it would not be instituting a moratorium to investigate its processes:

**Wells Fargo Affirms Affidavit Accuracy**

*Confirms no foreclosure moratorium*

In response to media inquiries we recently received, we are confirming that Wells Fargo has no plans to initiate a foreclosure moratorium. Our affidavit procedures and daily auditing demonstrate that our foreclosure affidavits are accurate.

As always, as a standard business practice, we continually review and reinforce our policies and procedures. This includes conducting additional reviews before loans go to foreclosure sale. If we find an error or if an improvement is needed, we take action. We are satisfied that our foreclosure affidavit process is sound.

64. On October 14, 2010 the *Financial Times* published an article titled "Spotlight falls on Wells Fargo foreclosure procedures." The article disclosed that notwithstanding Wells Fargo's denials about its foreclosure processes regarding the verification mortgage foreclosure documents, one of its loan officers had sworn in a deposition that she had signed as many as 500 foreclosure-related documents each day without verifying the contents of the documents other than her name and her title. The documents/affidavits were then used to support lawsuits brought by Wells Fargo to initiate and complete home foreclosures:

**Spotlight falls on Wells foreclosure procedures**

Wells Fargo, the second-biggest US mortgage servicer, has remained above the fray in recent weeks as banks have come under scrutiny for rubber-stamping thousands of mortgage documents without verifying their contents as required by law.

Unlike Bank of America, JPMorgan Chase and GMAC, Wells Fargo has not halted foreclosures and has maintained that it has no problems with its procedures.

Yet, a sworn deposition by one of its loan documentation officers suggests otherwise. ***Xee Moua said she signed as many as 500 foreclosure-related papers a day on behalf of the bank. Ms Moua said the only information she had verified was whether her name and title appeared correctly.***

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE

- 17 -

Asked whether she checked the accuracy of the principal and interest that Wells Fargo claimed the borrower owed – an important step in banks' legal actions to foreclose – Ms Moua replied: *"I do not."*

Ms Moua nevertheless signed affidavits, reviewed by the Financial Times, that said she had "personal knowledge of the facts regarding the sums of money which are due and owing to Wells Fargo". These affidavits were used in lawsuits brought by Wells Fargo to repossess homes.

Ms Moua said it was her understanding the foreclosure documents had been reviewed by outside lawyers before reaching her.

65. On October 20, 2010, defendants caused the Company to issue its 3Q10 financial results in a press release. In addition to reporting its financial results, the Company made comments on the disclosures that certain lending institutions had been foreclosing upon mortgagees with purportedly official affidavits that had been signed by their respective agents without verifying the accuracy of the information in the affidavits to lending institutions which were filed with the relevant courts to secure foreclosures. The Company specifically denied that its servicing or foreclosure practices were unsound and stated that it was confident in its foreclosure policies and practices:

Wells Fargo & Company reported diluted earnings per common share of $0.60 for third quarter 2010 compared with $0.55 for second quarter 2010 and $0.56 for third quarter 2009. Net income was $3.34 billion in third quarter 2010 compared with $3.06 billion in second quarter 2010 and $3.24 billion in third quarter 2009. For the nine months ended September 30, 2010, net income was $8.95 billion, or $1.60 per common share, compared with $9.45 billion, or $1.69 per common share, a year ago.

*"Record earnings in the third quarter reflect the success of the Wachovia merger and the benefits of Wells Fargo's steady commitment to our core business of helping customers succeed financially,"* said Chairman and CEO John Stumpf. "We have already completed integration of many systems and lines of business, and converted banking stores in the first Eastern markets – Alabama, Tennessee and Mississippi – to Wells Fargo in September, with virtually no customer or systems issues. The foundation is solidly in place to continue conversions in the East this year and throughout 2011. While we are focused on the remaining work ahead, our results have shown that this landmark merger is a big success in terms of cost savings, revenue synergies and the quality of the integration. Throughout the conversion process, the team has kept systems and service top notch for customers.

"With respect to recent industry-wide foreclosure issues, there are several important facts to know about Wells Fargo. *Foreclosure is always a last resort, and we work hard to find other solutions through multiple discussions with customers over many months before proceeding to foreclosure. We are confident that our practices, procedures and documentation for both foreclosures and mortgage securitizations are sound and accurate. For these reasons, we did not, and have no plans to, initiate a moratorium on foreclosures."*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE

66.     Accompanying its financial report, the Company provided its 3Q10 Quarterly Supplement in a filing with the SEC.   The 3Q10 Quarterly Supplement also reiterated misrepresentations concerning the soundness of the Company's foreclosure practices:

**3Q10 Quarterly Supplement**

\*     \*     \*

**3Q10 Overview**

- Record earnings – $3.34 billion net income, up 9%

\*     \*     \*

- *We remain confident in our foreclosure and mortgage securitization policies, practices and controls and adequacy of repurchase reserve*

**Overview of foreclosure and mortgage securitization**

I.     *Foreclosure is a last resort*

\*     \*     \*

- Since January 2009, we have helped over 556,000 borrowers avoid foreclosure through active and trial loan modifictions and have forgiven $3.5 billion of principal.  During that same time period, we completed fewer than 230,000 owner-occupied foreclosure sales

\*     \*     \*

II.     *Our foreclosure and securitization documentation processes are sound*

- Our process specifies that affidavit signers and reviewers are required to be the same team members, and affidavits are properly notarized. If we find errors we fix them

- We ensure appropriate documents for loans in foreclosure are assigned in compliance with local laws and investor requirements

- Legal documents related to securitizations appropriately transferred ownership

- We have implemented additional reviews on pending foreclosures, prioritized to ensure the review is complete before the loans go to foreclosure sale

67.     On the same day, October 20, 2010, the Company held a conference call for analysts and investors.  The call was hosted by defendant Stumpf.  During the call he and other Wells Fargo officers again assured investors and shareholders that Wells Fargo's mortgage servicing processes, specifically on foreclosures, were sound and that the questions in the industry regarding robo-

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE                    - 19 -

signing, at least with respect to Wells Fargo, were overblown and that the Company's internal control processes already in place ensured reliability and accuracy:

> [Stumpf:] Now, I know we have all been hearing in recent months about business practices within our industry. I am proud of Wells Fargo's adherence to a culture of doing what is right for customers, which not incidentally benefits [our] team members, our communities, and our shareholders in the long run. *For us, this means doing the hard work early and building processes that adhere to our standards as a Company.* This is as true in our approach to merger integration as it is to our day-to-day business operations.

> *Let me quickly give you my views on the latest topic, related to mortgage foreclosures and repurchases. Howard will address this topic in more detail later on the call, but there are a couple of important points I want to make up front.*

> First, foreclosure is always a last resort, and we work hard to find other solutions for our customers. Since January 2009 we have completed over 556,000 modifications, more than twice the number of foreclosure sales completed during this period. We have forgiven $3.5 billion of principal to help customers stay in their homes.

> *Second, we are confident that our practices, procedures, and documentation for both foreclosures and mortgage securitizations are sound and accurate. Third, we did not and do not plan to initiate a foreclosure moratorium.*

> \*    \*    \*

> [Howard Atkins: Wells Fargo Senior EVP, CFO:] *Then finally, we are confident in our foreclosure and mortgage securitization policies, practices, and controls and the adequacy of our repurchase reserve.*

> \*    \*    \*

> With that, let me shift to give you an overview of the foreclosure and mortgage securitization issues. These are issues obviously that are very important to consumers, mortgage investors, and shareholders. But *we believe that these issues have been somewhat overstated and, to a certain extent, misrepresented in the marketplace.* I would like to be clear here on how they impact Wells Fargo specifically

> \*    \*    \*

> *Second, our foreclosure and securitization policies, practices, and controls in our view, are sound.* To help ensure accuracy over the years, Wells Fargo has built control processes that link customer information with foreclosure procedures and documentation requirements.

> *Our process specifies that affidavit signers and reviewers are the same team member, not different people, and affidavits are properly notarized.* Not all banks in our understanding do it this way. If we find errors, we fix them; and we fix them as promptly as we can.

> *We ensure loans in foreclosure are assigned to the appropriate party as necessary to comply with local laws and investor requirements, and legal*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE                    - 20 -

*documents related to securitizations are sound, and appropriate transfers of ownership were made.*

\* \* \*

[Nancy Bush – NAB Research – Analyst:] John, I have just got one question for you. . . . [T]here have been a couple of instances detailed in the press of Wells Fargo robo-signing etc. And there is a great deal of speculation that at some point you guys are going to cave and we are going to find out all this bad stuff about your foreclosure procedures.

Could you just comment on that? Was this robo-signing incident an isolated one? Or could you just talk about that?

[Stumpf:] Yes, you might be talking about the one that was in the press regarding Washington State. In that case the judge actually found in our favor and that we had done things properly.

. . . I don't know how other companies do it, **but in our Company our process has – the affidavit signer and reviewer are the same team member. And we believe these issues – they are properly notarized.**

And if we find an error we will fix it. I mean that is just -- humans do make errors, but that is what our process is. One reviewer, one signer, same person.

68. On October 27, 2010, the Company issued a press release admitting that the Company's foreclosure processes had in fact failed to adhere to its reported procedures and that it had permitted certain of its foreclosure documents to be submitted to the courts without the appropriate or authentic signatures on the foreclosure documents. The Company admitted that it would have to re-do more than 55,000 foreclosures:

### Wells Fargo Provides Update on Foreclosure Affidavits And Mortgage Securitizations

Wells Fargo & Company is continuing its ongoing efforts to monitor and assess its foreclosure affidavit procedures. "We understand the concern over foreclosure procedures on the part of homeowners in these difficult economic times, and want to do everything we can to assure that the procedures we have in place provide Wells Fargo borrowers and others with confidence that foreclosure proceedings we initiate are done appropriately," said Mike Heid, co-president of Wells Fargo Home Mortgage.

The company believes it has designed an appropriate process for the generation of foreclosure affidavits. *Completed foreclosure affidavits that are submitted to the courts are signed and notarized as one of the last steps in a multi-step process intended to comply with applicable law and ensure the quality of customer and loan data in foreclosure proceedings.* This customer and loan data is derived directly from the company's official systems of record. This data and its transmission to external foreclosure counsel are subject to quality controls, and audits are performed to assure the quality, accuracy, and reliability of these automated systems.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE

*As part of the company's review of its foreclosure affidavit procedures, the company has identified instances where a final step in its processes relating to the execution of the foreclosure affidavits (including a final review of the affidavit, as well as some aspects of the notarization process) did not strictly adhere to the required procedures.* The issues the company has identified do not relate in any way to the quality of the customer and loan data; nor does the company believe that any of these instances led to foreclosures which should not have otherwise occurred.

Out of an abundance of caution and to provide an additional level of assurance regarding its processes, *the company is electing to submit supplemental affidavits for approximately 55,000 foreclosures which are pending before courts in 23 judicial foreclosure states*. The process of submitting supplemental affidavits will begin immediately with a goal of having this process completed by mid-November 2010, subject to state and local requirements. If the company is unable to complete an individual court filing by the designated court review date, it will request a court extension to assure the file contains a supplemental affidavit before the judge rules on the case. Additionally, Wells Fargo reaffirms that it does not plan to institute a moratorium on foreclosure sales.

"At Wells Fargo, foreclosure is a last resort," Heid said. "In September 2010, borrowers who have completed foreclosure were on average 16 months delinquent on their payments. *When all options have been exhausted*, we believe foreclosures should not be delayed."

69. Throughout the fall, the robo-signing allegations sparked investigations by government regulators, including the Financial Fraud Enforcement Force, the Group of State Attorneys General and the Department of Housing and Urban Development.

70. On February 25, 2011, *The Wall Street Journal* published an article entitled "Banks Bristle at Mortgage Loan Plan" strongly suggesting that the Mortgage Foreclosure Multistate group along with the Obama Administration was closing in on a settlement with the banks concerning the robo-signing activities and that the banks could be fined up to $20 billion combined and be required to write down certain loans within their portfolio:

The nation's largest banks haven't yet seen a proposal that is designed to help resolve mortgage-servicing errors that affected troubled borrowers. . . .

*Though a unified settlement is uncertain and would have to appease regulators, banks and state attorneys general, some officials are pushing for banks to pay more than $20 billion in civil fines or to fund a comparable amount of loan modifications for distressed borrowers.*

71. Buried in the Company's 10-K filed with the SEC on February 25, 2011 was a disclosure confirming that in addition to a multitude of lawsuits relating to its foreclosure processes, it was in fact likely the government would initiate some form of enforcement action against the Company related to the foreclosure document investigation and, as a result, the Company could be

subject to significant civil penalties. The Company further acknowledged that it had established a $1.2 million loss reserve to cover potential losses regarding its foreclosure practices. The 10-K provided in part:

> **MORTGAGE FORECLOSURE DOCUMENT LITIGATION** Seven purported class actions and several individual borrower actions related to foreclosure document practices were filed in late 2010 and in early 2011 against Wells Fargo Bank, N.A. in its status as mortgage servicer. The cases have been brought in state and federal courts. Of the individual borrower cases, the majority are filed in state courts in California and Ohio. Two other class actions were filed against Wells Fargo Bank, but Wells Fargo is named as a defendant as corporate trustee of the mortgage trust and not as a mortgage servicer. The actions generally claim that Wells Fargo submitted "fraudulent" or "untruthful" affidavits or other foreclosure documents to courts to support foreclosures filed in the state. Specifically, plaintiffs allege that Wells Fargo signers did not have personal knowledge of the facts alleged in the documents and did not verify the information in the documents ultimately filed with courts to foreclose. Plaintiffs attempt to state legal claims ranging from wrongful foreclosure to deceptive practices to fraud and seek relief ranging from cancellation of notes and mortgages to money damages.
>
> On December 20, 2010, the New Jersey Supreme Court, the New Jersey Administrative Office of the Courts, and the Superior Court of New Jersey for Mercer County jointly began an action against Wells Fargo and other large mortgage servicing companies in state court in New Jersey. This action seeks to enjoin pending foreclosures and sales and to require servicers to certify and prove compliance with new foreclosure procedures in New Jersey, or be held in contempt of court. Wells Fargo has filed its initial response to the New Jersey action.
>
> **MORTGAGE RELATED REGULATORY INVESTIGATIONS** Several government agencies are conducting investigations or examinations of various mortgage related practices of Wells Fargo Bank. The investigations relate to two main topics, (1) whether Wells Fargo may have violated fair lending or other laws and regulations relating to mortgage origination practices; and (2) *whether Wells Fargo's practices and procedures relating to mortgage foreclosure affidavits and documents relating to the chain of title to notes and mortgage documents are adequate. With regard to the investigations into foreclosure practices, it is likely that one or more of the government agencies will initiate some type of enforcement action against Wells Fargo, which may include civil money penalties. Wells Fargo continues to provide information requested by the various agencies.*

72.     On March 31, 2011, Wells Fargo entered into a Consent Order issued by the OCC. The OCC found that the Company had engaged in unsound or unsafe banking practices related to its residential loan servicing and mortgage foreclosure processing. Under the terms of the Consent Order, Wells Fargo agreed to, among other things, (i) to establish a Compliance Committee to monitor and coordinate the Company's compliance with the Consent Order; (ii) to create a comprehensive remediation plan to achieve compliance with the Consent Order; (iii) to submit an acceptable compliance plan to ensure that its mortgage servicing and foreclosure operations,

including loss mitigation and loan modification, comply with legal requirements, OCC supervisory guidance, and the terms of the Consent Order; (iv) to submit a plan to ensure appropriate controls and oversight of the Company's activities with respect to the Mortgage Electronic Registration System; (v) to take certain other actions with respect to its mortgage servicing and foreclosure operations; and (vi) to conduct a foreclosure review through an independent consultant on certain residential foreclosure actions. The OCC reserved the right to seek civil penalties against the Company.

73.     On April 13, 2011, Wells Fargo entered into a Consent Order with the Board of Governors of the Federal Reserve. Under the terms of the Consent Order, Wells Fargo agreed, among other things, (i) to ensure the Company's compliance with the OCC Consent Order; (ii) to develop for the Federal Reserve's approval a written plan to enhance its Enterprise Risk Management with respect to oversight of residential mortgage loan servicing; (iii) to develop for the Federal Reserve's approval a written plan to enhance its enterprise-wide compliance program with respect to oversight of residential mortgage loan servicing; and (iv) to develop for the Federal Reserve's approval a written plan to enhance the internal audit program with respect to residential mortgage loan servicing. The Board of Governors reserved the right to seek civil penalties against the Company.

74.     On May 5, 2011, the Company filed its 10-Q for 1Q11, announcing it had increased its litigation loss reserve to $1.7 million. The 10-Q further confirmed that the investigations by the state attorneys general and the U.S. Department of Justice were still ongoing and could result in significant fines and civil penalties.

## DAMAGE TO WELLS FARGO

75.     Over the past several years, Wells Fargo's directors and top officers have severely injured Wells Fargo and gravely impaired its business, goodwill and reputation by breaching their fiduciary duties of candor, loyalty and good faith, which has exposed Wells Fargo to massive fines, penalties and damages, while lining their own pockets with excessive salaries and other perks not justified by Wells Fargo's dismal financial performance while under their stewardship.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE                - 24 -

76. By this action, plaintiff seeks to remedy defendants' misconduct and recover damages for Wells Fargo.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

77. In committing the wrongful acts alleged herein, defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, defendants further aided and abetted and/or assisted each other in breaching their respective duties.

78. During all times relevant hereto, defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) enhance the defendants' executive and directorial positions at Wells Fargo and the profits, power, and prestige that the defendants enjoyed as a result of holding these positions; and (ii) deceive the public, including Wells Fargo's shareholders, via false and misleading statements regarding the defendants' management of Wells Fargo's financial results and operations, and its future business prospects. In furtherance of this plan, conspiracy, and course of conduct, defendants, collectively and individually, took the actions set forth herein.

79. Each of the defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

80. Plaintiff brings this action for the benefit of Wells Fargo to redress injuries suffered, and to be suffered, by Wells Fargo as a result of defendants' violations of law, as well as the aiding and abetting thereof. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have. Wells Fargo is named as a nominal party in this action. Plaintiff will adequately represent the interests of Wells Fargo in enforcing and prosecuting its rights.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE — 25 —

81. The Wells Fargo Board currently consists of the following 15 individuals: Stumpf, Baker, Chen, Dean, Engel, Hernandez, James, McCormick, McDonald, Milligan, Moore, Quigley, Runstad, Sanger and Swenson.

82. Plaintiff has not made a pre-suit demand on the Wells Fargo Board to bring these derivative claims because such demand would be a futile and useless act and, therefore, is excused. More particularly, demand is excused as a useless and futile act for the following reasons:

(a) A pre-suit demand on the Wells Fargo Board is excused as a useless and futile act because a majority of the Board is not independent. According to Wells Fargo's Proxy Statement, the Company has already determined Stumpf is not considered an "independent director," even as defined by the lenient NASDAQ rules. Moreover, many of Wells Fargo's directors and their business or family associates have had and still have loans or commitments with the Company and its subsidiaries. In addition, the defendants have engaged in or permitted the other defendants to engage in related-party transactions with Wells Fargo, including the following: (a) defendant Hernandez is Chairman, President, CEO and a director of Inter-Con Security Systems, Inc. ("Inter-Con"). Defendant Hernandez owns a 26% interest in Inter-Con. Since 2006, Wells Fargo has paid Inter-Con over $13.3 million in exchange for guard services at certain of the Company's branches.; (b) defendant Milligan's brother has worked for Wells Fargo since 2004, as a private client advisor. His salary for 2010 was $210,000; and (c) defendant Quigley's son has worked for Wells Fargo since 2006, as an institutional relationship manager in the Company's Wholesale Banking group. His salary for 2010 was $450,000.

(b) A majority of Wells Fargo's directors knowingly participated in and authorized the wrongful acts and omissions, or recklessly disregarded the wrongs which are complained of herein. Thus, despite knowledge of the claims asserted by plaintiff, the defendants have knowingly chosen not to exercise the fiduciary duties of loyalty and due care owed to the Company and protect Wells Fargo or to rectify the illegal practices complained of herein.

(c) The acts complained of constitute waste and are violations of the defendants' fiduciary duties owed to Wells Fargo and, therefore, are not protected by the business judgment rule and/or subject to ratification by shareholders.

(d)     The defendants have not taken any legal action against themselves and/or any other director and/or current or former officers for failing to implement adequate internal controls and engaging in conduct that has exposed Wells Fargo to liability for violating state and federal laws. Any suit by the Wells Fargo Board to remedy the wrongs complained of herein would expose the defendants and their friends and business allies to significant personal liability for their breaches of fiduciary duties and other misconduct. The defendants have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors for the wrongful conduct described herein.

(e)     The defendants have close personal and business ties with each other and are, consequently, interested parties who cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves or any other member of the Wells Fargo Board. For example, the Company routinely makes charitable donations to different tax-exempt organizations on which one or more of the defendants serve as an officer, board or trustee chair and the Company purchases software from companies where defendants Chen and Swenson serve as CEOs.

(f)     Each defendant had the ability and/or opportunity to prevent the unlawful practices complained of herein. As members of Wells Fargo's Board, the defendants are responsible for overseeing the Company's compliance with legal requirements and, therefore, all directors are liable for not ensuring that the officers and employees of the Company did not expose Wells Fargo to unnecessary risk. Because the defendants are liable for approving and directing the illegal conduct described herein, demand would be futile.

(g)     Wells Fargo's officers and directors are protected against personal liability by a large directors' and officers' liability insurance policy. They caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders of Wells Fargo. However, the directors' and officers' liability insurance policy covering the defendants contains provisions which eliminate coverage for any action brought directly by Wells Fargo against these defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if these directors were to sue themselves, no insurance protection would be provided for the derivative

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY,
ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE                    - 27 -

claims. Thus, this is a further reason why the defendants will not bring such a suit, for to do so would subject them and their colleagues and/or friends to a judgment of millions of dollars that would have to be paid from their individual assets alone. On the other hand, if the claims are brought derivatively, such insurance coverage will provide a basis for the Company to effectuate a recovery.

(h)     The defendants refused to put into place adequate internal controls and adequate means of supervision to stop the wrongful conduct alleged herein despite the fact that the Board knew and/or recklessly ignored such wrongful business practices. These acts, and the acts alleged in this action, demonstrate a pattern of gross misconduct, which conduct is not taken honestly and in good faith.

83.     Plaintiff has not made any demand on shareholders of Wells Fargo to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     Wells Fargo is a publicly traded company with approximately 5.268 billion shares outstanding, and thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty

84.     Plaintiff incorporates ¶¶1-83.

85.     Each defendant owed to the Company the duty to exercise candor, loyalty and good faith in the direction and administration of Wells Fargo's business and affairs.

86.     Defendants' misconduct was not due to an honest error or misjudgment, but rather to their intentional breach or reckless disregard of the fiduciary duties they owed to the Company. Defendants intentionally breached or recklessly disregarded their fiduciary duties to protect the rights and interests of Wells Fargo.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE                    - 28 -

87. In breach of their fiduciary duties owed to Wells Fargo, defendants knowingly participated in and caused Wells Fargo to waste its valuable assets and otherwise to expend unnecessarily its corporate funds, and failed to properly direct Wells Fargo's business, rendering them personally liable to the Company for breaching their fiduciary duties.

88. As a direct and proximate result of defendants' breaches of their fiduciary obligations, Wells Fargo has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

### Against All Defendants for Abuse of Control

89. Plaintiff incorporates ¶¶1-83.

90. Defendants' misconduct constituted an abuse of their ability to control and influence Wells Fargo, for which they are legally responsible.

91. As a direct and proximate result of defendants' abuse of control, Wells Fargo has sustained significant damages.

92. As a direct and proximate result of defendants' abuse of control, Wells Fargo has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT III

### Against All Defendants for Gross Mismanagement

93. Plaintiff incorporates ¶¶1-83.

94. Defendants have grossly mismanaged Wells Fargo's business and affairs, and exposed and subjected Wells Fargo to damages, fines and penalties, by causing the Company to violate state and federal laws applicable to Wells Fargo's business.

95. By their actions, defendants breached their fiduciary duties to direct and control Wells Fargo in a manner consistent with the legal duties of directors and officers of a publicly held company.

96. As a result of the defendants' gross mismanagement, Wells Fargo has sustained and will continue to sustain damages and irreparable injury, for which it has no adequate remedy at law.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE

## COUNT IV

### Against All Defendants for Corporate Waste

97.     Plaintiff incorporates ¶¶1-83.

98.     As a result of the foregoing misconduct, defendants have caused Wells Fargo to waste valuable corporate assets.

99.     As a direct and proximate result of defendants' corporate waste, Wells Fargo has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, defendants are liable to the Company.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.     Declaring that plaintiff may maintain this action on behalf of Wells Fargo and that plaintiff is an adequate representative of the Company;

B.     Declaring that the defendants have breached and/or aided and abetted the breach of their fiduciary duties to Wells Fargo;

C.     Determining and awarding to Wells Fargo the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

D.     Determining and awarding to Wells Fargo exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

E.     Awarding Wells Fargo restitution from defendants, and each of them;

F.     Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs and expenses; and

G.     Granting such other and further equitable relief as this Court may deem just and proper.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: May 13, 2011

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS

_____
SHAWN A. WILLIAMS

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
TRAVIS E. DOWNS III
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Local Counsel for Plaintiff

BARRETT JOHNSTON, LLC
GEORGE E. BARRETT
DOUGLAS S. JOHNSTON, JR.
TIMOTHY L. MILES
217 Second Avenue, North
Nashville, TN 37201-1601
Telephone: 615/244-2202
615/252-3798 (fax)

KENDALL LAW GROUP, LLP
JOE KENDALL
JAMIE J. McKEY
3232 McKinney Avenue, Suite 700
Dallas, TX 75204
Telephone: 214/744-3000
214/744-3015 (fax)

Attorneys for Plaintiff

S:\CptDraft\Derivative\Cpt Wells Fargo Deriv (NDCA).doc

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY,
ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE

- 31 -

## VERIFICATION

I, Earl Seymour, hereby declare as follows:

I am Chairman of the Board of Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust ("Pirelli"). Pirelli is a shareholder of WELLS FARGO & COMPANY and has been during the relevant times pertinent hereto. I have retained competent counsel and I am ready, willing and able to pursue this action vigorously on behalf of the Company. I have reviewed the Shareholder Derivative Complaint for Breach of Fiduciary Duty, Abuse of Control, Gross Mismanagement and Corporate Waste (the "Complaint"). Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information and belief.

Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury that the foregoing is true and correct.

Dated: May 13, 2011

_____
EARL SEYMOUR
Chairman of the Board
Pirelli Armstrong Tire Corporation Retiree
Medical Benefits Trust

**ORIGINAL**

JS 44 (Rev. 12/07) (CAND Rev 1/10)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

PIRELLI ARMSTRONG TIRE CORPORATION RETIREE MEDICAL BENEFITS TRUST, Derivatively on Behalf of WELLS & FARGO CO.

**DEFENDANTS**

JOHN G. STUMPF, JOHN D. BAKER II, JOHN S. CHEN, (See ATTACHCMENT A)

(b) County of Residence of First Listed Plaintiff Tennessee
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

Shawn A. Williams
Robbins Geller Rudman & Dowd LLP
One Montgomery Street, Suite 1800
San Francisco, CA 94104    415/288-4545

Attorneys (If Known)

11-2369M Ed

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [ ] 2 U.S. Government Defendant
- [X] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [X] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [X] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 362 Personal Injury— | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal | [ ] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product | Med. Malpractice | [ ] 625 Drug Related Seizure | 28 USC 157 | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | Liability | [ ] 365 Personal Injury — | of Property 21 USC 881 | | [ ] 450 Commerce |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel & | Product Liability | [ ] 630 Liquor Laws | **PROPERTY RIGHTS** | [ ] 460 Deportation |
| & Enforcement of Judgment | Slander | [ ] 368 Asbestos Personal | [ ] 640 R.R. & Truck | [ ] 820 Copyrights | [ ] 470 Racketeer Influenced and |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' | Injury Product | [ ] 650 Airline Regs. | [ ] 830 Patent | Corrupt Organizations |
| [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans) | Liability | Liability | [ ] 660 Occupational Safety/Health | [ ] 840 Trademark | [ ] 480 Consumer Credit |
| | [ ] 340 Marine | **PERSONAL PROPERTY** | [ ] 690 Other | | [ ] 490 Cable/Sat TV |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 345 Marine Product Liability | [ ] 370 Other Fraud | | | [ ] 810 Selective Service |
| [X] 160 Stockholders' Suits | [ ] 350 Motor Vehicle | [ ] 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | [ ] 850 Securities/Commodities/Exchange |
| [ ] 190 Other Contract | [ ] 355 Motor Vehicle Product Liability | [ ] 380 Other Personal Property Damage | [ ] 710 Fair Labor Standards Act | [ ] 861 HIA (1395ff) | [ ] 875 Customer Challenge 12 USC 3410 |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | [ ] 720 Labor/Mgmt. Relations | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| [ ] 196 Franchise | | | [ ] 730 Labor/Mgmt.Reporting & Disclosure Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 740 Railway Labor Act | [ ] 864 SSID Title XVI | [ ] 892 Economic Stabilization Act |
| | | | [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motions to Vacate Sentence | [ ] 791 Empl. Ret. Inc. Security Act | | [ ] 894 Energy Allocation Act |
| [ ] 220 Foreclosure | [ ] 442 Employment | Habeas Corpus: | | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/Accommodations | [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 900 Appeal of Fee Determination Under Equal Access to Justice |
| [ ] 240 Torts to Land | [ ] 444 Welfare | [ ] 535 Death Penalty | | [ ] 871 IRS—Third Party 26 USC 7609 | |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 540 Mandamus & Other | **IMMIGRATION** | | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities — Other | [ ] 550 Civil Rights | [ ] 462 Naturalization Application | | |
| | [ ] 440 Other Civil Rights | [ ] 555 Prison Condition | [ ] 463 Habeas Corpus – Alien Detainee | | |
| | | | [ ] 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. §1332(b)(2)

Brief description of cause:
Verified Shareholder Derivative Complaint

## VII. REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2) (PLACE AND "X" IN ONE BOX ONLY)

[X] SAN FRANCISCO/OAKLAND    [ ] SAN JOSE    [ ] EUREKA

DATE
May 13, 2011

SIGNATURE OF ATTORNEY OF RECORD

Case 3:11-cv-02369-MEJ  Document 9-1  Filed 05/13/11  Page 2 of 9

JS 44 Reverse (Rev. 12/07)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.       **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.       **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.       **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.       **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.       **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

VI.       **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**          Example:          U.S. Civil Statute: <u>47 USC 553</u>
Brief Description: <u>Unauthorized reception of cable service</u>

VII.       **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.  **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.
**Date and Attorney Signature.** Date and sign the civil cover sheet.

Case 3:11-cv-02369-MEJ Document 1-1 Filed 05/13/11 Page 3 of 9

ATTACHMENT A

Defendants (cont.)

LLOYD H. DEAN, SUSAN E. ENGEL, ENRIQUE HERNANDEZ, JR., DONALD M. JAMES, RICHARD D. McCORMICK, MACKEY J. McDONALD, CYNTHIA H. MILLIGAN, NICHOLAS G. MOORE, PHILIP J. QUIGLEY, JUDITH M. RUNSTAD, STEVEN W. SANGER and SUSAN G. SWENSON,

Defendants,

– and –

WELLS FARGO & COMPANY, a Delaware corporation,

Nominal Defendant.