# Exhibit 5

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| TRACY JOHNSON, | ) | CASE NO: 2:25-cv-06869-SVW-PVC |
| | ) | |
| Plaintiff, | ) | CIVIL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| SABLE OFFSHORE CORP, ET AL, | ) | Monday, October 27, 2025 |
| | ) | (2:21 p.m. to 2:41 p.m.) |
| Defendants. | ) | (2:43 p.m. to 2:52 p.m.) |

HEARING RE:

MOTION FOR APPOINTMENT OF COUNSEL
AND APPOINTMENT OF LEAD PLAINTIFF [DKT.NOS.36,40,44]

BEFORE THE HONORABLE STEPHEN V. WILSON,
UNITED STATES DISTRICT JUDGE

APPEARANCES:                SEE PAGE 2

Court Reporter:        Recorded; CourtSmart

Transcribed by:        Exceptional Reporting Services, Inc.
                       P.O. Box 8365
                       Corpus Christi, TX 78468
                       361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES:**


For Plaintiff:                PHILLIP KIM, ESQ.
                              Rosen Law Firm
                              355 S. Grand Ave.
                              Suite 2450
                              Los Angeles, CA 90071

                              WILLIAM M. BRODY, ESQ.
                              BRIAN J. SCHALL, ESQ.
                              Schall Law Firm
                              2049 Century Park East
                              Suite 2460
                              Los Angeles, CA 90067

                              ADAM M. APTON, ESQ.
                              Levi & Korsinsky
                              515 S. Flower St.
                              18th & 19th Floors
                              Los Angeles, CA 90071


For Defendants:               LAUREN C. BARNETT, ESQ.
                              Latham & Watkins
                              10250 Constellation Boulevard
                              Suite 1100
                              Los Angeles, CA 90067

                              NIKKI A. LONG, ESQ.
                              Sullivan & Cromwell
                              1888 Century Park East
                              Suite 2100
                              Los Angeles, CA 90067

3

**Los Angeles, California; Monday, October 27, 2025; 2:21 p.m.**

**(Call to order)**

**THE CLERK:**  Now calling item nine, 2:25-cv-06869, *Tracy Johnson versus Sable Offshore Corp.*

Counsel, please come forward and state your appearances for the record.

**MR. APTON:**  Good afternoon, Your Honor.  Adam Apton for Plaintiff, Mr. Aggenbach.

**MR. KIM:**  Good afternoon, Your Honor.  Phil Kim, Rosen Law Firm, for the Plaintiff/Movant White.

**MR. BRODY:**  Morning, Your Honor.  Will Brody of the Schall Law Firm for Plaintiff White.

**MR. SCHALL:**  Good afternoon, Your Honor.  Brian Schall of the Schall Law Firm for the Plaintiff White.

**MS. BARNETT:**  Good afternoon, Your Honor.  This is Lauren Barnett for Defendants Sable Offshore Corporation, Flores, and Patrinely.

**MS. LONG:**  Good afternoon, Your Honor.  This is Nikki Long of Sullivan and Cromwell on behalf of the underwriter defendants; that's J.P. Morgan Securities, Jefferies, TD Securities, The Benchmark Company, Johnson Rice and Company, PEP Advisory, Roth Capital Partners, and the Tuohy Brothers.

**THE COURT:**  I assume you've announced your representation properly.  I couldn't understand a thing you said, but that's okay.

4

The -- generally speaking, the lead counsel decision is made by the party representing the largest financial interest in the outcome of this case brought under the <u>Private Securities Litigation Reform Act</u>.

That would be the firm of Levi and Korinsky (sic), correct, who represents Aggenbach; is that right?

**MR. APTON:**  Yes, Your Honor.  That's Levi and Korsinsky.

**THE COURT:**  Yeah.  And the challenge to that is made by the Rosen firm, is it?

**MR. KIM:**  That is correct, Your Honor.

**THE COURT:**  Yes.  And the Rosen Firm which represents Jimmy White -- you represent Jimmy White.

**MR. KIM:**  That is correct --

**THE COURT:**  And that would be the --

**MR. KIM:**  -- along with the Schall Law Firm.

**THE COURT:**  -- second largest stakeholder.  But beyond Aggenbach, the other two potential plaintiffs, Ludwig and White, have rather de minimis interests, but White has the larger interest.

But more to the point, the argument is that Levi and Korinsky should not be appointed because they falsely issued press releases claiming to have filed the case when they hadn't.  And that is alleged to be a violation of the California Professional Code.

5

How does Levi and Korinsky respond to that?  Would you take the lectern?

MR. APTON:  Your Honor, Adam Apton for Levi and Korsinsky.

THE COURT:  You're Matt -- you're Adam Apton.

MR. APTON:  That's correct, Your Honor.

We take the accusations very seriously.

THE COURT:  Well, that's good.  But, I mean, what happened?

MR. APTON:  We made a mistake.  We --

THE COURT:  I see.

MR. APTON:  -- made a mistake.  There were a couple of titles, too, in our press release system that were incorrect.  We had some personnel changes --

THE COURT:  But regarding the mistake -- and I'm just looking at the allegation here -- they -- the allegation is that Levi and Korinsky committed the same violation on 14 different cases in recent weeks.

MR. APTON:  Your Honor, this was absolutely not intentional.  It was inadvertent.

THE COURT:  But, I mean, how -- I mean, the argument is that how could it not be intentional when it happened over a period of weeks and in 14 different cases?

MR. APTON:  Yes, Your Honor.  I understand that.  And we've seen to the error, we've corrected it.  It is not --

6

THE COURT:  But how --

MR. APTON:  -- happening again.

THE COURT:  Describe the error again.

MR. APTON:  Sure, Your Honor.

So back in May, we had personnel changes, one employee in particular --

THE COURT:  A lawyer?

MR. APTON:  -- left the firm -- I'm sorry?

THE COURT:  Was the employee a lawyer?

MR. APTON:  She was not a lawyer but she was senior in our marketing department.

THE COURT:  The law firm has a marketing department?

MR. APTON:  Yes, we do, Your Honor.

THE COURT:  Oh, I see.

MR. APTON:  Yes.

THE COURT:  So I didn't know law firms have marketing.  Maybe they do now.

But the -- so she issued these releases, correct?

MR. APTON:  No, she does not, the lawyers do.  There was a typo in two titles of the press releases that said "files" or "filed" inadvertently.  Those titles on the press releases hung around.  We overlooked them.  It was a clerical oversight.  And when counsel --

THE COURT:  But the release itself was composed by the lawyers, not the marketing department, correct?

7

**MR. APTON:** Yes.  And but for the title, the release was a hundred percent accurate.  There was no effort to mislead any investors.  Our client was not misled --

**THE COURT:** Well what did the -- what was the body of the release beyond the title which is allegedly false?

**MR. APTON:** The body of the release has the requirements that the PSLRA specifies --

**THE COURT:** But the body say anything about the case was filed or not filed?

**MR. APTON:** It says that a case was commenced or filed.  It gives the case number, the venue, the class period --

**THE COURT:** In the release.

**MR. APTON:** Yes, Your Honor.

**THE COURT:** But that wasn't true.

**MR. APTON:** No, Your Honor, it was referencing the case that was on file.  The only inaccurate aspect of the release is the title that said my firm filed or files a release.  Nothing else about the --

**THE COURT:** So --

**MR. APTON:** -- release was inaccurate.

**THE COURT:** -- I'm not following exactly.  You're saying that there was a case filed but the case that was filed was not the case that your firm filed.

**MR. APTON:** My firm did not file a case.  Only one

EXCEPTIONAL REPORTING SERVICES, INC

8

firm filed the case.

THE COURT:  So your -- so here's what I'm putting together.  You can respond to it.  That in the press release, you said a case was filed, which is literally true, a case was filed.  But the case that you referenced was not filed by your firm, it was by another firm.

MR. APTON:  That's right, Your Honor.  There were five releases that went out that said that.

THE COURT:  But why wouldn't -- you're saying that that wasn't misleading.  Wouldn't someone who read that release think that the law firm was issuing the press release filed the case?

MR. APTON:  I don't know, Your Honor.  My client, our client, Mr. Aggenbach, was not misled because when we spoke to him before he retained us, he was well aware, he knew we did not file the case.  He --

THE COURT:  All right.

MR. APTON:  -- picked us based --

THE COURT:  Let me hear --

MR. APTON:  -- on our experience.

THE COURT:  -- from the Rosen firm.  Take the lectern if you would, please.

**(Pause)**

MR. KIM:  Yes, Your Honor.

I think the Court has really identified the issues.

EXCEPTIONAL REPORTING SERVICES, INC

9

And I just want to clarify the record.  If you actually look at the press releases that were issued, the headlines, which I would say is what most people focus on when they're scrolling or they're looking online, people see the headline and they react to the headline.

And the headline, for example, which is document 52-1 --

THE COURT:  Could -- do you have a copy?  Can you hand it up to me?

MR. KIM:  Oh, yes, I have my binder but I --

THE COURT:  Okay.  Let me see it.

MR. KIM:  Sure.  There's several of them.  As you can see, Your Honor, --

THE COURT:  Let me look at it.  Just give me --

MR. KIM:  Okay.

THE COURT:  -- a second.  But it says here not a class action was filed.  It says Levi and Korinsky files class action.

MR. KIM:  That's correct, Your Honor.  That's --

THE COURT:  And you're saying at the time this went out, there was a class action filed but it wasn't by Levi and Korinsky.

MR. KIM:  That's correct.  It was by my firm.  We filed the case.  And that's one of the five press releases we say that were false --

10

THE COURT:  And this was --

MR. KIM:  -- and misleading.

THE COURT:  -- over a period of weeks.

MR. KIM:  That's correct.

And we noted in our briefing that these press releases we believe were filed in advance of the deadline because typically with my experience, when you have the lead plaintiff deadline, people are first focused on it when the case is filed and then as the deadline approaches.

And there were four press release that were issued four weeks in advance of the lead plaintiff deadline.  I believe there was the last one that we claim is false was issued two days before the lead --

THE COURT:  Were all these --

MR. KIM:  -- plaintiff deadline.

THE COURT:  -- press releases issues in the same case?

MR. KIM:  That's correct for Sable.

And then we identified in our opposition brief 14 other cases where this mistake as they characterize it occurred.

And then in our reply papers, after we identified these false press releases and cases, in three of the cases that we identified they continued to issue the false and misleading press releases.

11

So as we noted --

THE COURT:  I mean, the way --

MR. KIM:  -- in our reply, their --

THE COURT:  -- counsel presents it, there is no issue about the falsity.  It's the argument that it was a mistake.

MR. KIM:  Well, that's -- that isn't indicated in any sworn declarations.  I mean, they first say that it was a mistake by staff.  That's the first time we're hearing about this.  The time to address that --

THE COURT:  But, I mean, even --

MR. KIM:  -- would have been in the filings.

THE COURT:  -- if it was a mistake by staff, this is in bold letters in the heading.  I mean, --

MR. KIM:  That's correct, Your Honor.

THE COURT:  -- the thought would be that it's implausible that they didn't notice this.  This isn't something in the body of the press release.  This is in bold letters.

MR. KIM:  That's correct.  And our position is, is that, you know, there were at least five --

THE COURT:  Let me ask you this.

MR. KIM:  -- that were issued in this case --

THE COURT:  What is the consequence of a finding that they issued false press releases?  In other words, under the securities law they -- the Court should appoint generally the counsel with the largest stakeholder and the plaintiff with the

12

largest stakeholder and they clearly would be that -- they have that client.

So is there any authority that -- I mean, doesn't have to be direct authority -- but that that can be overcome by certain factors?

I mean, for example, I mean, with the obvious, let's say the firm had the largest stakeholder, but the firm was shown to not have any experience in securities class actions or litigation, or inadequate experience.

But you're saying that this should be a factor.

**MR. KIM:** Yes, Your Honor. The Court is correct. Ordinarily the largest stakeholder gets appointed to be lead plaintiff and lead counsel.

**THE COURT:** But Well, but I mean, it's --

**MR. KIM:** But as the Ninth Circuit has said --

**THE COURT:** It's 7,000 against 1,000.

**MR. KIM:** That's right. But the has -- the Ninth Circuit has explained in the Cavanaugh and Mershow (phonetic) cases in order to be the presumptive lead plaintiff, the one that the court will select, not only do you have to have a large loss but you also have to be adequately and typical.

And that's where Aggenbach and the Levi firm failed in this instance, because you have a situation where Mr. Aggenbach, who did join this case, he did file a declaration. But that declaration does not indicate that he

13

didn't see these false and -- false press releases, that these press releases were the result of him going to the Levi firm. His declaration is absent of that language.

The other point I'd like to point out --

**THE COURT:** So, I mean, the way counsel described it, it would seem, I mean, what they said was he wasn't deceived. But you're saying there's no evidence beyond the argument that he wasn't deceived.

**MR. KIM:** That's correct. He filed the declaration. But the declaration -- we had raised these issues. And in response, they filed a declaration from Mr. Aggenbach. He could have easily said in his declaration I did not rely on that press release in order to find the Levi firm.

Our position has been that in this case and in others, the Levi firm issues these false press releases right before the deadline and right after the case is filed to get the maximum effect.

The other point I'd like to make, Your Honor, is that even after we filed the opposition and Mr. Aggenbach knew that the firm was issuing false press releases, his interests are conflicting with the class because what has Mr. Aggenbach and the Levi firm done in order to correct these misstatements?

You would figure that if you made these mistakes, you would issue a press release to correct the misstatements to the class. As a lead plaintiff, as a class representative, I think

14

we would all agree that the --

THE COURT:  I'm not following the argument that it prejudices the class.

What I'm focused on is Aggenbach.  In other words, if the case goes to trial, he's the lead plaintiff.  He could be a witness.  So how would this scenario affect his credibility at trial?

MR. KIM:  It would affect his credibility.  I don't think --

THE COURT:  It wouldn't or would?

MR. KIM:  It would affect --

THE COURT:  How?

MR. KIM:  -- his credibility.

THE COURT:  How?

MR. KIM:  Because --

THE COURT:  How would -- how could he be cross-examined on this?

MR. KIM:  He could be cross examined -- before he even gets to trial, it would be a class certification where he could be eliminated as a potential --

THE COURT:  Why is that?

MR. KIM:  -- class representative.

If he did not properly oversee the litigation which the statute requires.

THE COURT:  But, I mean, how can I leap from he

**EXCEPTIONAL REPORTING SERVICES, INC**

15

wouldn't oversee the litigation based upon the fact that he hasn't specifically denied that he hired or Levi or -- and Korinsky based upon the press release?  In other words, he hasn't said it one way or the other.  He hasn't responded.

MR. KIM:  But it is his burden to establish his adequacy and typicality.

And at this stage, as the Court noted in the Snap decision, when you look at adequacy and typicality, all we have to do is come forward with an arguable, unique issue or unique defense that --

THE COURT:  But why are you focused on --

MR. KIM:  -- would become a focus of the litigation.

THE COURT:  -- Aggenbach?  What about the question of the integrity of the law firm?

MR. KIM:  Yes.  I mean, I think it's pretty clear the law firm issued at least 45 false press releases, each of those press releases being a potential violation.

THE COURT:  Did it become lead counsel in some of those cases?

MR. KIM:  Some of these cases are still ongoing. And, you know, some of these cases my firm actually filed. And, frankly, you know, we were pretty offended that they would take credit from the work that we've done in the case.

And I think when clients, potential clients see these releases, --

16

THE COURT:  Well, I mean, that's --

MR. KIM:  -- they want to take note of who filed the case --

THE COURT:  -- an ethical issue, ethics issue.

And in order to disqualify Levi and Korinsky, I would have to find that their lack of honesty in what -- in these releases should disqualify them from adequately representing the class.

MR. KIM:  If the Court --

THE COURT:  If that argument -- is that an argument you're making?

MR. KIM:  My argument is, is that there doesn't have to be a specific finding.  The Court -- all the Court has to find is that there is an arguable issue that's unique either to the firm or Mr. Aggenbach with related to these releases.

They admit these releases are not accurate --

THE COURT:  Why --

MR. KIM:  -- and that they weren't honest in them.

THE COURT:  What arguable issue -- if it's an arguable issue, it has less force.  I mean, based upon what I've heard so far, I find it implausible that Levi and Korinsky wouldn't know that the press release was false.

MR. KIM:  We agree with the Court's assessment.

THE COURT:  And they allowed it.  And the implication seems to be that they did it for a reason.  It wasn't -- in

EXCEPTIONAL REPORTING SERVICES, INC

17

other words, you make a mistake, it usually is because, you know, there was no reason to do it or sometimes there's no reason to do it, it's just a mistake.

Here, this was designed to get people to sign up. That's their business.  They even said they have a marketing department.  I don't who lawyers have marketing departments, but maybe it's a new world, you know.

And so they're like, you know, any product.  Law is a product now, it's a product like drugs or, you know, pharmaceuticals or anything else.

And I'll take a brief recess.  I'll get back.

**(Pause)**

**THE CLERK:**  All rise.  This Court is in recess.

**(Recess taken from 2:41 p.m. to 2:43 p.m.)**

**THE CLERK:**  We are back on the record.

**THE COURT:**  (Inaudible) -- to your book --

**MR. SPEAKER:**  Yes.

**THE COURT:**  -- this release.  Is that part of the record?

**MR. SPEAKER:**  It is, Your Honor.  It's stamped across the top.

**THE COURT:**  (Inaudible) my finding is that the false press releases were not a mistake.  They were intentional. They were designed to attract clients on a false premise.

And given the frequency over a period of time that

18

these releases occurred and the clear evidence that they were false, I don't accept the argument that it was some former employee's clerk error.

And I think this shows a lack of honesty and integrity. And to me, that is adequate to support the argument, notwithstanding the firm's interest in the largest stakeholder, that they are not -- they are disqualified from being lead counsel.

Is there any further competition for lead counsel between Rosen and another firm?

MR. KIM: There is not. The --

THE COURT: Then I'll appoint the Rosen firm.

MR. KIM: We also ask the Schall --

MR. SPEAKER: Counsel, I need you to speak (inaudible).

MR. KIM: Oh. Our motion had asked for my firm and the Schall firm to be co-lead counsel, Your Honor.

THE COURT: Who?

MR. KIM: The Schall Law Firm who's with me.

THE COURT: Why do you need a co-counsel?

MR. KIM: If the Court feels that co-lead counsel's not --

THE COURT: Well, I mean, I've -- am I correct, your -- Rosen firm does this regularly, don't they, this securities class action stuff?

19

MR. KIM: Yes, Your Honor.

THE COURT: I've seen them before.

MR. KIM: Yes --

THE COURT: So what do you need help for? Doesn't look like a terribly complicated case. I mean, it's a period of a week of damages.

And the allegation seems to be that the Sable company -- listen to me here, would you, but then you can listen to them? That the Sable company issued a press release saying that it commenced drilling offshore when it hadn't.

If it's true and people bought the stock based upon the fact that they had commenced drilling, and then when they corrected it, the stock dropped quite a few points, a big percentage, or 14, 15 percent, then that's the alleged damage.

I mean, I don't know if you can prove that or what the back -- the comeback is. But it's not complicated. I'm not going to appoint another law firm.

MR. KIM: Understood, Your Honor. Then we'd be fine with my firm being --

THE COURT: If you don't want to represent them, I'll appoint the other firm.

MR. KIM: No, we will represent them, Your Honor.

THE COURT: All right. Then that's it, you're appointed.

What's the next step here?

20

**MR. KIM:**  I believe we'll need to confer with Defendants and set a schedule for the briefing or for the filing of --

**THE COURT:**  Well, I mean, --

**MR. KIM:**  -- a amended complaint and briefing a motion to dismiss.

**THE COURT:**  -- what is -- you represent the Sable company.  What is your name?

**MS. BARNETT:**  Yes, Your Honor.  This is Lauren Barnett from Latham and Watkins.

**THE COURT:**  Oh, Latham.  Will you take the lectern, please?

I mean, the allegation is sort of -- it's not a complicated allegation.  What is your -- how are you going to defend the case?

**MS. BARNETT:**  Respectfully, Your Honor, we would plan to file a motion to dismiss addressing the allegations in the amended complaint when we see it.

**THE COURT:**  What would the allegation, the motion to dismiss be based on?

**MS. BARNETT:**  It would likely be based on lack of a false statement, lack of scienter, lack of loss causation, and potential other defenses that we would --

**THE COURT:**  But, I mean, the way the case is -- I don't want to, you know, disallow you to make the motion.  But

21

the way the complaint reads, there -- the Sable company said -- it's a public company -- said that it was -- had commenced drilling.

It hadn't commenced drilling.  And it then -- then it corrected itself or how did the stock drop 14 percent in that week and a half period?

MS. BARNETT:  Respectfully, Your Honor, at the motion to dismiss stage we will raise arguments citing the heightened pleading standard for these kinds of cases.

My co-counsel for the underwriter defendants may raise additional arguments.  We took no position on the motion today but we --

THE COURT:  Well, underwriters are -- you know, maybe I -- maybe a slightly different position.

But, I mean, when you say lack of scienter, I mean, how -- realize it's heightened pleading.  But sometimes you don't have to write paragraphs about heightened pleading.

Something -- I mean, the allegation is blatant.  You said something happened, it didn't happen.  Unless you argue it was not material.  But, I mean, on a motion to dismiss, why would you think a motion to dismiss could be productive here?

MS. BARNETT:  Respectfully, Your Honor, motions to dismiss in securities cases are regularly granted under the heightened pleading standard --

THE COURT:  I know.  But I know they are.  But in a

22

case like this where, you know, it's not a combination of things, it's not a convoluted argument, they're saying "X" and it was "Y."

And if somebody reads "X," if someone says, oh, I -- Sable company commenced drilling, that's a good thing.  And you're saying no one bought on that information and -- I don't get the argument.

Well, look, okay, make the argument.  We'll see how it turns out.  When are you going to make the motion?

MS. BARNETT:  Your Honor, I believe the Court approved the parties' stipulation that we will meet and confer to set a briefing schedule --

THE COURT:  Well, no, no meet and confer and briefing.  File the motion within -- what's the matter?

MR. KIM:  Well, --

THE COURT:  File the motion --

MR. KIM:  Sorry.

THE COURT:  -- within 14 days.

MS. BARNETT:  Respectfully, Your Honor, I believe the newly appointed lead plaintiff intends to file an amended complaint.

MR. KIM:  Yes, Your Honor.  We intend on filing an amended complaint.

THE COURT:  How are you going to amend the complaint?

MR. KIM:  Well, there have been subsequent --

23

**MR. SPEAKER:** Counsel, you need to speak --

**MR. KIM:** Oh, sorry.

Yes, Your Honor. There have been subsequent events. I believe there was another stock price decline based on some information about the California State Court ruling and some additional damages that we would --

**THE COURT:** You mean something unrelated --

**MR. KIM:** -- add to the complaint.

**THE COURT:** -- to this?

**MR. KIM:** Something related to this but additional adverse news that caused --

**THE COURT:** When are you going to file --

**MR. KIM:** -- the price of the stock to decline.

**THE COURT:** -- the amended complaint?

**MR. KIM:** We're hoping to get 30 days to file --

**THE COURT:** I'll give --

**MR. KIM:** -- an amended complaint.

**THE COURT:** -- you 14 days.

**MR. KIM:** Fourteen?

**THE COURT:** Fourteen.

**MR. KIM:** Understood.

**THE COURT:** Okay. And then you'll make a motion to dismiss based upon the usual schedule, all right?

Daniel, give me -- you could give them an order -- you don't have to say it now. Give them an order with the

24

times.

Okay, thank you.

THE CLERK:  Your Honor, do you want to give them a certain amount of time to file the motion to dismiss after the first amended complaint?

THE COURT:  Just put it down in a written order and give it to the parties.

MS. BARNETT:  Your Honor, if possible, Defendants would request 45 days for a --

THE COURT:  No.

MS. BARNETT:  -- motion to dismiss.

THE COURT:  No.  Regular time period.

MS. BARNETT:  Thank you, Your Honor.

THE COURT:  You got -- you have a thousand lawyers in that firm.  What firm are you with, ma'am?

MS. LONG:  Sullivan and Cromwell, Your Honor.

THE COURT:  What?

MS. LONG:  Sullivan and Cromwell, Your Honor.

THE COURT:  Oh, my gosh, between the two of them you have about 3,000 lawyers.  They -- world's greatest securities experts in these firms.  You can do it.  I know you can do it.  They're both great firms.

Okay, that's it.  Thank you.

MS. BARNETT:  Thank you, Your Honor.

**(This proceeding was adjourned at 2:52 p.m.)**

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    October 31, 2025

Signed                                        Dated

*TONI HUDSON, TRANSCRIBER*