ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL J. PFEFFERBAUM (248631)
ALEX N. JILIZIAN (362307)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
dpfefferbaum@rgrdlaw.com
ajilizian@rgrdlaw.com

*Lead Counsel for Lead Plaintiff James A.
Schalter and Common Stock Class*

SAXENA WHITE P.A.
DAVID R. KAPLAN (SBN 230144)
EMILY R. BISHOP (SBN 319383)
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA  92075
Telephone:  858/997-0860
dkaplan@saxenawhite.com
ebishop@saxenawhite.com

*Lead Counsel for Lead Plaintiff Shuo-Hsien
Wang and the Derivatives Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| In re HIMS & HERS HEALTH, INC. SECURITIES LITIGATION | ) ) ) ) | Case No. 3:25-cv-05315-JD |
| | | CLASS ACTION |
| | | CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| | | DEMAND FOR JURY TRIAL |

4914-4994-8811.v1

**TABLE OF CONTENTS**

**Page**

I.      NATURE OF THE ACTION AND OVERVIEW ..................................................1

II.     JURISDICTION AND VENUE ......................................................................10

III.    PARTIES ..................................................................................................11

IV.     CONTROL PERSONS ................................................................................13

V.      BACKGROUND TO THE CLASS PERIOD ......................................................14

        A.      Hims Capitalizes on the Surge in Demand and Lack of Supply for
                Branded GLP-1 Weight Loss Drugs ..................................................14

        B.      Novo Engages in Extensive Efforts to Limit Marketing and Sales
                of Compounded Semaglutide ...........................................................19

        C.      FDA Declares GLP-1 Shortage over; Novo Declares that Mass
                Semaglutide Compounding Must Stop ..............................................20

VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
        AND OMISSIONS AND FRAUDULENT SCHEME ............................................23

        A.      Hims Announces a Strategic Partnership with Novo to Sell Name-
                Brand Wegovy on Hims' Platform ....................................................23

        B.      Hims Repeatedly Assures Investors of Alignment with Novo on
                Compounded Semaglutide Sales .......................................................28

        C.      The Truth is Disclosed: Novo Terminates the Partnership over
                Hims' Continued Mass Sales and Deceptive Marketing of
                Compounded Semaglutide ...............................................................37

VII.    RELEVANT POST CLASS PERIOD EVENTS ................................................42

        A.      Defendant Dudum Reveals Hims Never Obtained Novo's
                Agreement to Continue Uninterrupted Its Mass Sales of
                "Personalized" Semaglutide .............................................................42

        B.      Hims 2Q25 Financial Results Further Confirm that Hims Did Not
                Alter Its Business Model Following the Novo Partnership ..................44

        C.      FDA Issues Warning Letter to Hims for Misrepresenting the
                Ingredients and Efficacy of Compounded Semaglutide .....................45

        D.      Novo Nordisk Reaches Agreements with Numerous Hims
                Competitors to Sell Its Recently Approved GLP-1 Pill, but
                Declines to Partner with Hims .........................................................45

VIII.   CLASS ACTION ALLEGATIONS .................................................................46

IX.     UNDISCLOSED ADVERSE FACTS ..............................................................48

1

2                                                                                           **Page**

3
X.      NO SAFE HARBOR ...................................................................................................49

XI.     LOSS CAUSATION.................................................................................................51

XII.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-
        MARKET DOCTRINE) ...........................................................................................52

XIII.   PRAYER FOR RELIEF ...........................................................................................55

XIV.    DEMAND FOR JURY TRIAL .................................................................................55

Lead Plaintiffs James A. Schalter ("Schalter") and Shuo-Hsien Wang ("Wang") (collectively, "Lead Plaintiffs" or "Plaintiffs"), by and through their undersigned attorneys, individually and on behalf of all others similarly situated, allege the following. This Consolidated Complaint is based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts and upon information and belief as to all other matters supported by, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of public documents, conference calls, announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases, court filings, analysts' reports, and media coverage regarding defendant Hims & Hers Health Inc. ("Hims" or the "Company") and/or Novo Nordisk A/S/ ("Novo"). Plaintiffs believe that substantial evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a securities class action on behalf of all persons and entities that purchased or otherwise acquired Hims common stock or derivative securities referencing Hims common stock between April 29, 2025, and June 22, 2025, inclusive (the "Class Period"). Lead Plaintiff Schalter, on behalf of the common stock class, and Lead Plaintiff Wang, on behalf of the derivatives class, pursue claims against Hims and certain of its current officers including Andrew Dudum ("Dudum"), the Company's Chief Executive Officer, and Oluyemi Okupe ("Okupe"), the Company's Chief Financial Officer (collectively, "Defendants"), for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

2.    Founded in 2017 in San Francisco, California, Hims is an online healthcare company that connects users to licensed healthcare professionals via its websites and mobile applications. Hims sells a range of prescription and non-prescription health and wellness products and services prescribed by its affiliated physicians. Hims makes many of the medications prescribed on its platform at its own manufacturing facilities, which are large plants that mass produce compounded versions of the United States Food and Drug Administration ("FDA") approved drugs for commercial sale.

3.      Beginning in 2022, GLP-1 receptor agonist drugs ("GLP-1s"), which were originally designed for diabetes management, exploded in popularity for non-diabetic patients seeking elective weight loss.  One of the most well-known GLP-1s is Novo's name-brand Wegovy, for which it holds the patent and the exclusive right to produce and sell.  However, in 2022, the FDA determined that the unprecedented surge in demand for GLP-1s had resulted in a national shortage of Wegovy, which permitted compounding pharmacies to lawfully produce and sell non-FDA-approved compounded semaglutide, a generic version of the drug.

4.      Hims launched its weight loss business in 2023 and quickly sought to capitalize on the booming popularity of GLP-1s by offering a more affordable, compounded alternative to Wegovy and other branded medications.  Within a year, Hims was selling its generic version of compounded semaglutide to patients via its online platform for as little as $165 per month, with no insurance required.  In comparison, name-brand Wegovy cost $500 or more per month.  Hims aggressively marketed its compounded semaglutide as the superior options, claiming that patients receive the same active ingredient as Wegovy at a fraction of the price, and that Hims' version was equally safe and effective as the name-brand counterpart.

5.      Hims' strategy was enormously successful, fueling record revenues in its new weight loss business and sending its stock price soaring. In 2024, Hims recorded $225 million in weight loss revenue.  Hims' stock price rose from $8.90 per share at the end of 2023, to $24.18 per share by the close of 2024.  For 2025, the Company forecasted its annual weight loss revenue to nearly triple to $725 million.

6.      While the shortage permitted Hims to produce and sell compounded semaglutide in the same commercially available doses as Wegovy, Hims was selling most of its compounded semaglutide under a different FDA exception, the "personalization exception."  Under this traditionally narrow exception, the sale of non-FDA-approved compounded medications are permitted where a patient has a clinically demonstrated need for a version of the drug that is not commercially available.  For example, under the customary use of the exception, a patient unable to swallow could obtain a generic topical version of an oral medication from a compounding pharmacy that was otherwise unavailable on the market.

7.     According to the Company, Hims' business model focused on delivering personalized medical solutions to its users.  To this end, new patients seeking weight loss solutions on the Company's platform were prominently informed of potential side effects of GLP-1s (*e.g.*, nausea, vomiting, constipation, and diarrhea), and asked if they would like a personalized dosing plan that would mitigate these potential side effects.  If a new patient expressed interest in reducing potential side effects, doctors on the Hims platform would prescribe a personalized dose of compounded semaglutide, which was smaller than Wegovy's FDA-approved doses (for example, 0.2 mg versus 0.25 mg).  Unlike traditional compounding pharmacies where medications that are not commercially available are prepared onsite to meet an individual patient's specific clinical need, Hims produced large quantities of semaglutide in uniform vials, and patients were directed to self-administer the medication at the prescribed dose via syringe.  Approximately two-thirds of Hims' sales of compounded semaglutide were personalized doses which analysts estimated would drive revenues in excess of $100 million per quarter in 2025.

8.     Novo viewed compounding drug manufacturers with hostility and engaged in a highly publicized litigation campaign aimed at curtailing mass compounding of semaglutide.  Even while Wegovy was on the FDA's drug shortage list, Novo sent widespread cease-and-desist orders and filed over one hundred lawsuits against compounders alleging, among other things, trademark violations and deceptive marketing.  Novo's extensive litigation efforts and strident position against mass compounding was widely reported.  In early 2025, *The Wall Street Journal* published an article describing consistent litigation campaigns by Novo and Eli Lilly, another large manufacturer of branded GLP-1s, to "contain their compounding competitors."  Novo's spokesperson publicly warned compounders that they could not evade federal law under "the guise of making 'personalized' drugs."

9.     On February 21, 2025, the FDA announced that the semaglutide shortage was over and compounding pharmacies – like Hims – would no longer be able to sell compounded semaglutide in commercially available doses after May 22, 2025.  Following the FDA's decision, Hims assured its customers who were prescribed personalized semaglutide doses that their treatment would not be affected by the ending of the shortage.  Meanwhile, Novo reiterated

1  publicly its firm position that all sales of compounded semaglutide, including what they decried

2  as "mass personalization," must stop – save for the rare circumstance where a physician

3  determined that an individual patient demonstrated a clinical need for personalized medication.[1]

4        10.     Accordingly, in the months leading up to the Class Period, investors and analysts

5  were laser-focused on whether Hims would be able to sustain its record revenue growth from sales

6  of mass compounded semaglutide. For example, on April 16, 2025, Bank of America described

7  Hims' ability to continue selling compounded semaglutide beyond May 22, 2025, as "the biggest

8  near-term swing factor" for Hims' financial performance, adding that Hims' existing business

9  model put it at risk of litigation with Novo.

10        11.     The Class Period began on April 29, 2025, when Hims quelled market concern

11  regarding the future of its semaglutide business by announcing a landmark strategic partnership

12  with Novo, providing for the sale of brand-name Wegovy on Hims' website and mobile

13  applications. On that day, the Company issued a press release which trumpeted the deal as the

14  "'***first step in a long-term collaboration***'" and highlighted that the companies "'***share a vision of***

15  ***what consumer-centered healthcare looks like***.'" This collaboration apparently featured the sale

16  of name-brand Wegovy alongside Hims' personalized compounded semaglutide as Hims

17  described the addition of Wegovy on its platform as, "***build[ing] on Hims & Hers' existing suite***

18  ***of weight loss solutions***." The partnership appeared to be a win for both companies. Hims gained

19  the credibility of offering name-brand Wegovy while continuing to offer compounded semaglutide

20  with the backing of one of the world's largest pharmaceutical companies, and Novo obtained

21  access to Hims' growing user-base. Moreover, the deal signaled to investors that Hims and Novo

22  had reached a mutual understanding regarding Hims' continued marketing and sale of

23  compounded semaglutide, assuaged market concern regarding the sustainability of Hims' lucrative

24  weight loss business, removed the overhang of potential litigation and regulatory pressure and

25  represented the start of a new business model for Hims in which it partnered with major

26  pharmaceutical companies to offer name-brand medications.

27

28
___
[1]    Unless otherwise noted, all emphasis is added.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:25-cv-05315-JD
4914-4994-8811.v1

- 4 -

1        12.    Market reaction to the deal was instantly positive.  For example, that same day,

2  Bank of America applauded the partnership as "validation of HIMS' direct-to-consumer model as

3  a platform for broader drug partnerships."   Leerink Partners hailed the deal as "a meaningful

4  evolution" and "an extremely important validation" of Hims' business model, which "remove[d]

5  a significant amount of concern[]" about the sustainability of the Company's weight loss revenues

6  and provided an "updated pathway" forward for the Company.  Further assuaging market concern,

7  Needham reported that the deal, as represented by Hims, signaled that Novo is "okay with HIMS

8  current practices."

9        13.    Hims' announcement of its strategic partnership with Novo caused the prices of

10  Hims securities to soar.  The price of Hims common stock rose from closing $28.48 per share on

11  April 28, 2025, to $35.04 per share on April 29, 2025, an increase of approximately 23%, the price

12  of HIMS ETFs (defined below) surged from $12.18 per share on April 28, 2025, to $17.61 per

13  share on April 29, 2025, an increase of approximately 46%, and the prices of Hims stock options

14  and other derivative securities also increased substantially.  Hims' common stock, ETFs, stock

15  options, and other derivative securities continued to trade at artificially inflated prices over the

16  next seven-plus weeks.

17        14.    A week later, on May 5, 2025, Defendants continued to hype the deal with Novo

18  while announcing Hims' 2025 first quarter financial results ("1Q25").  In a press release and

19  accompanying earnings conference call, Defendants touted the deal as a sign of "*trust*" from a

20  major drug company, and a "*blueprint*" for future deals.  Dudum reinforced the foundation of the

21  partnership by emphasizing the significant amount of time Hims spent negotiating the deal with

22  Novo and "*really aligning on what we think the future of healthcare looks like*."  In response to

23  analyst questioning whether Novo had agreed to Hims' continued sale of personalized

24  compounded semaglutide, Dudum assured investors that Hims and Novo had discussed that

25  personalized semaglutide would remain on Hims' platform but its sales would be "*limited*" and

26  "*additive to the ecosystem*" – giving the impression that Hims would reduce its reliance on sales

27  of personalized semaglutide in favor of Novo's branded Wegovy.  Dudum specifically told

28  analysts that Hims and Novo extensively discussed the personalization exception and the two

1    companies were in "**alignment for what we believe to be blue-chip use of that [personalization]**

2    **compounding exemption**."

3         15.      Defendants' statements reaffirming the benefits of Hims' deal with Novo and the

4    companies' purported alignment on Hims' sale of personalized semaglutide provided the market

5    with clarity about the deal and propelled the price of Hims securities to new highs. Analysts

6    reported that fewer Hims patients would receive personalized doses, but Hims would realize

7    financial, reputational, and strategic benefits from the deal and obtain a competitive advantage in

8    the telehealth industry. For example, in a May 5, 2025 report, Truist wrote that Hims and Novo

9    "are aligned philosophically with what their providers believe is clinical necessity." BTIG echoed

10    this sentiment, specifying that: "HIMS will continue to offer personalized compounded GLP-1s

11    but do so on a case-by-case basis for members who truly need it for clinical reasons, due mainly

12    to adverse side effects." BTIG praised Hims' "good relationship" with Novo, which resulted in

13    "minimal" litigation risk and opened the door for Novo "to use HIMS as a platform" to sell

14    additional product. Likewise, in a May 6, 2025 report, TD Cowen reported that Hims answered

15    the "key question" of whether the Company would be "allowed to personalize compounded

16    semaglutide even when the company partners with Novo," conveying that "the option will exist . . .

17    but it will not be a large portion of HIMS's weight loss offering." Leerink Partners concurred:

18    "HIMS and NVO agreed to continue to allowing HIMS to offer personalized semaglutide to

19    patients that have proven clinical need for personalization."

20         16.      In direct response to Hims' statements concerning the terms of its deal with Novo

21    and the companies' purported alignment around compounded semaglutide, the price of Hims'

22    securities continued their steep ascent. The price of Hims common stock increased significantly

23    to $49.47 per share on May 6, 2025, from $41.88 per share on May 5, 2025, an increase of 18%,

24    on unusually large trading volume. Similarly, the price of HIMS ETFs surged from $24.54 per

25    share on May 5, 2025, to $33.29 per share on May 6, 2025, a 36% increase, on large trading

26    volume. That same day, the market prices of Hims stock options and other derivative securities

27    also increased substantially.

28

17.     Unknown to investors, Defendants' statements touting Hims' deal with Novo were materially false and misleading and omitted critical facts.  First, Defendants falsely portrayed the deal as enabling Hims to sell name-brand Wegovy as an "additional option for subscribers" that would "complement" its "personalized semaglutide."  But Hims had never obtained Novo's agreement that it could offer Wegovy while continuing its uninterrupted sale of personalized compounded semaglutide – which comprised approximately two-thirds of its compounded semaglutide sales and generated $100 million per quarter in revenue.  In fact, Hims had agreed to Novo's demand that it stop "mass compounding" semaglutide, which it knew Novo expected to apply to virtually all of Hims' sales of compounded semaglutide, but Hims unilaterally applied it only to its smaller segment of sales of commercially available doses.

18.     Second, Defendants falsely claimed to be "philosophically" aligned with Novo on the permissible use of the personalization exception, *i.e.*, only under the "blue chip" scenario where a physician determined that an individual patient demonstrated clinical necessity for a personalized dose due to "intolerable" side effects of a commercial dose.  In truth, Hims had no intention of altering its prescribing practices or patients' prescriptions despite knowledge that Novo considered Hims' current sale of personalized compounded semaglutide to be unlawful "mass personalization," and that Hims' existing patients must be transitioned to Wegovy.  Defendants furthered this false impression by claiming that personalized compounded semaglutide would be limited and "additive" when in fact it represented the significant majority of its current and ongoing sales of semaglutide.

19.     Third, while Defendants claimed that Hims' alignment with Novo was the product of extensive negotiations, including that the companies were "spending quite a bit of time together" in furtherance of their "shared vision," Defendants would later admit that Novo expressed in negotiations its position that all sales of compounded semaglutide must stop but Defendants failed to engage in "hearty debate" over this fundamental issue.  Tellingly, Defendants never claimed their negotiations yielded Novo's consent that Hims could continue unchanged in its existing marketing, prescription, and mass sale of personalized semaglutide alongside Wegovy.

20.     Fourth, Defendants' statements trumpeting Hims' partnership with Novo as a "the first step in a long-term collaboration," and "blueprint for future partnerships" gave investors the false impression that Hims was transitioning toward a business model focused on collaborations with major pharmaceutical manufacturers to sell name-brand medications alongside limited sales of its compounded products.  In truth, Hims was doubling-down on growth through its generic compounding business via mass sales of personalized medications, placing it further at odds with these potential partners.  As a result, it was a virtual certainty that Novo would terminate the partnership, Hims' potential for future partnerships with name-brand pharmaceutical manufacturers would be dramatically reduced or eliminated, the Company would be at a competitive disadvantage to telehealth companies with successful partnerships and name-brand offerings, and the risk of litigation and regulatory action would be reintroduced.

21.     On May 22, 2025, the grace period for compounding semaglutide under the shortage exception came to an end.  Yet, Hims continued to aggressively market its generic version of personalized semaglutide on its platform at a steep discount of 66% or more compared to Wegovy and made no meaningful effort to transition patients on personalized prescriptions to commercially available doses of Wegovy.  As Defendants knew, but concealed from investors, Hims' failure to change its business model and personalized semaglutide sales and marketing practices imperiled its partnership with Novo.

22.     Then, on June 23, 2025 – less than two months after Hims' announced the groundbreaking partnership – Novo stunned the market with a harshly worded press release openly accusing Hims of violating the law and terminating the short-lived partnership, effective immediately. The release dispelled Defendants' false and misleading assurances to investors that the companies were "aligned" on Hims' continued mass sales of compounded semaglutide under the personalization exception.  Indeed, in the release, Novo expressly accused Hims of failing to stop "mass sales of compounded drugs under the false guise of 'personalization'" and "disseminating deceptive marketing that put patient safety at risk."

23.     The same day, *Bloomberg* published an article reporting that Hims had agreed with Novo to stop "mass compounding" semaglutide by May 22, 2025, but – according to Novo – Hims

1    failed to abide by the agreement.  The article quoted Novo's Executive Vice President of Product

2    and Portfolio Strategy, who stated: "'***The big issue with Hims is that we had an agreement that***

3    ***the mass compounding would stop and unfortunately it didn't stop*** . . . . ***That's why we ended***

4    ***the partnership***.'"

5         24.    Hims never denied that it continued to engage in mass sales of "personalized"

6    semaglutide or claimed that Novo had agreed to such an arrangement.  Instead, defendant Dudum

7    took to X (formerly Twitter) and later gave interviews in the mainstream media revealing that,

8    despite Defendants' repeated announcement of a "long-term collaboration" with Novo and

9    repeated assurances that the companies were "aligned" on Hims' sale of compounded semaglutide

10   alongside Wegovy, Hims had never been aligned with Novo and Hims never changed its business

11   model.  As Dudum admitted in a July 14, 2025 *Washington Post* article, Novo executives expressed

12   their expectation that Hims "steer patients to Wegovy" rather than Hims' generic compounded

13   semaglutide and specifically told Defendants that Novo was "***dissatisfied***" with Hims' mass

14   compounding of personalized dosages and that it wanted Hims to "***drop[] compounded***

15   ***semaglutide altogether***."  And, despite his prior assurances that "teams across both organizations

16   have been spending quite a bit of time together" and were "really aligning" on their "shared vision"

17   for the "future of healthcare," Dudum now claimed "***there really was no hearty debate***" between

18   the companies at all on Hims' continued sale of compounded semaglutide.

19        25.    On these disclosures, the Company's share price collapsed from $64.22 per share

20   on June 20, 2025, to $41.98 per share on June 23, 2025 (the next trading day), ***a stunning 34.6%***

21   ***decline*** – the largest single day percentage stock price decline in the Company's history – on

22   massive volume.  The price of HIMS ETF similarly plunged, falling from $50.64 per share on June

23   20, 2025, to a mere $15.81 per share on June 23, 2025 – ***a massive 68.8% decline*** – on unusually

24   large volume.  The prices of Hims stock options and other derivatives securities also declined

25   precipitously.

26        26.    Securities analysts immediately linked Hims' stock price plunge to the loss of its

27   partnership with Novo.  Analysts reported that the breakup damaged the Company's competitive

28   position and reputation in the industry, reduced the likelihood of future partnerships with Novo

1    and other name-brand drug makers, and re-introduced litigation and regulatory risk. For example,

2    on June 23, 2025, Needham wrote "we believe HIMS is now at a competitive disadvantage as both

3    Lilly and Novo maintain partnerships with HIMS competitors," and Deutsche Bank punctuated

4    the negative impact of the short-lived partnership to Hims' shareholders, reporting that "HIMS

5    shares closed up 23% on the initial partnership news and dropped ~33% on the split news intraday

6    today. The news marks the end of the month-old relationship that once seemed promising for

7    HIMS." Deutsche Bank underscored that the breakup of the Novo deal indicated that Hims was

8    not moving toward long-term partnerships with major pharmaceutical companies, as Defendants

9    had claimed, but in fact was moving away from them by pushing the boundaries of the personalized

10   compounding "*to a scale we have not previously seen*." On June 24, 2025, *Forbes* reported on

11   the market's "brutal reaction," and stated that the "dramatic sell-off reflects not just the immediate

12   loss of a key business relationship, but *fundamental questions about the company's long-term*

13   *viability in the weight loss market*."

14        27.    Members of the putative classes purchased Hims securities at artificially inflated

15   prices on account of Defendants' wrongful acts alleged herein and seek to recover their damages

16   suffered upon the disclosure of the Company's true business operations, condition, and financial

17   outlook.

18   **II.    JURISDICTION AND VENUE**

19        28.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the

20   Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R.

21   §240.10b-5.

22        29.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of

23   the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

24        30.    Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C.

25   §78aa, and 28 U.S.C. §1391(b). Many of the acts and transactions that constitute the alleged

26   violations of law, including the dissemination to the public of untrue statements of material fact,

27   occurred in this District. The Company's headquarters are located in this District at San Francisco,

28   California.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:25-cv-05315-JD
4914-4994-8811.v1

1    31.    In connection with the acts alleged in this Consolidated Complaint, Defendants,

2    directly or indirectly, used the means and instrumentalities of interstate commerce, including, but

3    not limited to, the mails, interstate telephone communications, and the facilities of the national

4    securities markets.

5    **III.    PARTIES**

6    32.    Lead Plaintiff James A. Schalter purchased Hims common stock during the Class

7    Period, and suffered damages as a result of the federal securities law violations alleged herein.

8    ECF 21-3.

9    33.    Lead Plaintiff Shuo-Hsien Wang purchased Defiance Daily Target 2X Long HIMS

10   ETF ("HIMS ETF") during the Class Period, and suffered damages as a result of the federal

11   securities law violations alleged herein.   ECF 37-2.   HIMS ETF is a non-diversified, exchange-

12   traded fund designed to provide 200% of the daily percentage change in the per share price of

13   Hims common stock, utilizing equity derivative securities such as listed options contracts and

14   swaps agreements to achieve this leveraged exposure.

15   34.    Defendant Hims & Hers Health Inc. is a telehealth company that provides remote

16   medical consultations and prescriptions, sourcing its drugs from both third-party pharmacies and

17   in-house facilities.   It is incorporated under the laws of Delaware with its principal executive

18   offices located in San Francisco, California.   Hims' common stock trades on the New York Stock

19   Exchange ("NYSE") under the symbol "HIMS,"   HIMS ETFs trade on the Nasdaq National

20   Market ("NASDAQ") under the symbol "HIMZ," and Hims stock options trade on multiple

21   national exchanges, including the NASDAQ Options Market ("NASDAQ OMX"), the NYSE

22   ARCA, and the Chicago Board Options Exchange ("CBOE").

23   35.    During the Class Period, Hims, through its officers and directors, engaged in a

24   scheme to defraud and made public statements and deceptive acts which, as alleged herein,

25   contained material misrepresentations and omissions that artificially inflated the price of the

26   Company's common stock, HIMS ETFs, and other derivative securities.   The Company has

27   established and regularly publicizes the availability of a website at www.hims.com, on which it

28   maintains an "Investor Relations" section where SEC filings, press releases, conference call

1   recordings, investor presentations, shareholder letters, financial statements and information,

2   corporate governance policies, descriptions of its business, and other information about the

3   Company are made available to investors.

4       36.    Defendant Andrew Dudum is, and at all relevant time was, the Company's co-

5   founder, Chief Executive Officer, and a member of the board of directors. In his position, Dudum

6   exercised substantial control over the Company's operations, business strategy, public disclosures,

7   and communications with investors. Dudum participated in the alleged scheme to defraud and

8   made or approved statements disseminated to the market, including statements made during

9   earnings calls and other investor conference calls, which were materially false and misleading

10   when made. By virtue of his position, authority, and direct involvement in the Company's affairs,

11   Dudum is responsible for, and participated in, the wrongful acts and omissions alleged herein.

12       37.    Defendant Oluyemi Okupe is, and at all relevant times was, the Company's Chief

13   Financial Officer ("CFO"). As CFO, Okupe exercised substantial control over the Company's

14   operations, business strategy, public disclosures, and communications with investors. Okupe

15   participated in the alleged scheme to defraud and made or approved statements disseminated to

16   the market, including statements made during earnings calls and other investor conference calls,

17   which were materially false and misleading when made. By virtue of his position, authority, and

18   direct involvement in the Company's affairs, Okupe is responsible for, and participated in, the

19   wrongful acts and omissions alleged herein.

20       38.    Defendants Dudum and Okupe are collectively referred to as the "Individual

21   Defendants", and with Hims as "Defendants."

22       39.    The Individual Defendants, because of their positions within the Company,

23   individually and collectively possessed the power and authority to control the alleged fraudulent

24   conduct as well as the contents of Hims' reports to the SEC, press releases and public presentations

25   to securities analysts, money and portfolio managers, and investors. Each of the Individual

26   Defendants were provided with copies of the Company's reports, press releases, and prepared

27   statements alleged herein to be misleading prior to or shortly after their issuance, and had the

28   ability and opportunity to prevent their issuance or cause them to be corrected. Because of their

1   positions and access to material non-public information, the Individual Defendants knew that the

2   adverse facts specified herein had not been disclosed to, and were being concealed from, the public,

3   and that the positive representations made were thus materially false and/or misleading.

4          40.    As alleged herein, certain of the Company's SEC filings, press releases, and

5   quarterly reports, contained material misrepresentations and omissions when issued.  In addition,

6   throughout the Class Period, the Individual Defendants participated in the Company's quarterly

7   and/or annual earnings conference calls wherein they made material misrepresentations, omitted

8   material information, and/or failed to correct the material misstatements or omissions of others.

9   **IV.    CONTROL PERSONS**

10         41.    As officers and/or directors and controlling persons of a publicly held company

11  whose common stock is traded on the NYSE and governed by the provisions of the federal

12  securities laws, the Defendants had a duty to promptly disseminate accurate and truthful

13  information with respect to the Company's financial condition, performance, growth, operations,

14  financial statements, business, markets, management, earnings, and present and future business

15  prospects; not to make material misrepresentations with respect thereto or to omit material facts

16  necessary to make the statements contained therein not misleading; and to correct any previously

17  issued statements that had become materially misleading or untrue, so that the market price of the

18  Company's common stock and derivative securities referencing the Company's common stock

19  would be based upon truthful and accurate information.    The Individual Defendants'

20  misrepresentations and omissions during the Class Period violated these specific requirements and

21  obligations.

22         42.    The Individual Defendants, because of their positions of control and authority as

23  officers and/or directors of the Company, were able to, and did, control the content of the various

24  SEC filings, press releases, and other public statements pertaining to the Company during the Class

25  Period.  Each Individual Defendant was provided with copies of the documents alleged herein to

26  be misleading before or shortly after their issuance, participated in conference calls with investors

27  during which false and misleading statements were made, and/or had the ability and/or opportunity

28  to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:25-cv-05315-JD                                                    - 13 -
4914-4994-8811.v1

1   is responsible for the accuracy of the public statements detailed herein, and is, therefore, primarily

2   liable for the representations contained therein.

3       43.     Each of the Individual Defendants acted and/or made the statements detailed herein

4   in his capacity as an officer and/or director of Hims.  Each of the Individual Defendants was

5   directly involved in the management and day-to-day operations of the Company at the highest

6   levels and was privy to confidential proprietary information concerning the Company and its

7   business, operations, services, and present and future business prospects.  In addition, the

8   Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the

9   false and misleading statements and information alleged herein, were aware of, or recklessly

10  disregarded, the false and misleading statements being issued regarding the Company, and

11  approved or ratified these statements, in violation of the federal securities laws.

12  **V.      BACKGROUND TO THE CLASS PERIOD**

13          **A.      Hims Capitalizes on the Surge in Demand and Lack of Supply for
                 Branded GLP-1 Weight Loss Drugs**
14

15      44.     Hims is an online healthcare company that provides remote medical consultations,

16  prescriptions, and medications through its websites (hims.com and forhers.com) and mobile

17  applications.  The Company sources pharmaceutical drugs from both third-party pharmacies and,

18  more recently, in-house compounding pharmacies.  Hims does not accept health insurance; instead,

19  users pay cash in a direct-to-consumer business model.  Prescriptions are typically written and

20  fulfilled with generic formulations, often at lower cost than brand-name alternatives.  By avoiding

21  insurance reimbursement, Hims maintains control over pricing, product bundling, and patient

22  access through its proprietary platform, while marketing its services as a convenient alternative to

23  traditional in-network medical care.

24      45.     Founded in 2017 as "Hims, Inc.," the company initially focused on prescription

25  treatments for a narrow set of men's health conditions, including erectile dysfunction and hair loss.

26  In 2018, Hims launched "Hers," expanding into women's health.  Over time, the Company

27  broadened its offerings to include mental health services, dermatology treatments, wellness

28  products, and other telehealth services.  Hims' marketing emphasizes the Company's ability to

1   provide patients with personalized care, not only in the form of individualized treatment plans and

2   on-call physicians, but also personalized medication to fit the patient's clinical needs.   For

3   example, Hims marketed its ability to combine medication to treat a patient's hair loss and erectile

4   dysfunction in a single tablet.

5        46.   In late-2023, Hims announced that it was expanding its telehealth platform to

6   include weight-loss treatments and hailed the new business segment as a significant growth

7   opportunity for the Company.  At the time Hims entered the weight-loss market, demand for GLP-

8   1 receptor agonist drugs – particularly injectable semaglutide – was surging, driven largely by

9   individuals seeking elective weight loss.

10        47.   Semaglutide is widely recognized as one of the most effective GLP-1 therapies for

11  weight loss.   The only FDA-approved injectable semaglutide products are Novo Nordisk's

12  Wegovy and Ozempic, which Novo holds the exclusive right to produce.  By 2022, unprecedented

13  demand for GLP-1s, particularly for elective weight loss, had resulted in a nationwide shortage of

14  Wegovy. As a result, the FDA placed Wegovy on its official drug-shortage list.

15        48.   Because Wegovy and Ozempic were officially on the FDA's drug-shortage list,

16  licensed compounding pharmacies were permitted to produce copies, *i.e.*, "compounded" versions,

17  of semaglutide to address unmet demand, available to any patient who would have qualified for a

18  brand-name semaglutide prescription.   Under §503B of the FDCA, 21 U.S.C. §353(b),

19  compounding pharmacies may produce copies of an FDA-approved drug while the brand-name

20  version remains in shortage, even though the compounded product itself is not FDA-approved.

21        49.   In contrast to the shortage exception, §503A of the FDCA, 21 U.S.C. §353(b),

22  provides for a personalization exception which allows compounders to produce non-FDA-

23  approved generic alternatives to a drug when a patient has a clinical need which necessitates a

24  compounded alternative to the commercially available options.  Compounding under §503A must

25  occur on a patient-specific basis and is subject to restrictions prohibiting mass production and

26  compounding that is "essentially a copy" of a commercially available drug absent a documented

27  clinical difference for the individual patient.  The personalization exception exists independent of

28  whether a drug is in shortage or not.

50.     In May 2024, Hims began offering compounded injectable semaglutide, capitalizing on the regulatory exemptions.  This marked the Company's first large-scale offering of injectable weight-loss medications and its initial entry into the rapidly expanding GLP-1 market. Hims marketed its compounded semaglutide as a convenient, affordable, effective, and safe alternative to branded GLP-1 drugs.  Indeed, Hims sold its compounded semaglutide for as little as $165 per month, with no insurance required.  In comparison, name-brand semaglutide, including Wegovy, cost upwards of $500 per month.  Hims' compounded GLP-1 offerings immediately became the centerpiece of the Company's weight loss business and its single most important growth driver.  Hims repeatedly touted its new offering of injectable GLP-1 medications as integral to Hims' weight-loss business, boasting that its weight-loss segment, driven by GLP-1 therapies, was "growing faster than any specialty in the company's history."

51.     In the lead up to the Class Period, Hims reported exceptionally strong financial results, driven largely by explosive demand for Hims' "personalized" compounded semaglutide. Hims' reported revenue growth of 95% year-over-year for fourth quarter 2024.  Full-year revenue surged 69% to $1.5 billion, and the Company's subscriber base grew by 2.2 million, a 45% increase over the prior year.  By the start of the Class Period, GLP-1s were the Company's primary growth driver, representing nearly 40% of the Company's total revenues in 1Q25.  Notably, the substantial majority of Hims' weight loss revenue was attributable to its "personalized" compounded injectable semaglutide.  Analysts estimated that revenue from personalized dosages of semaglutide alone was generating approximately $100 million per quarter by late 2024.  On the strength of this growth, Hims projected that weight-loss revenue would nearly triple to $725 million in 2025.  As weight loss revenue surged, so did Hims' stock price, soaring from $8.90 per share at the end of 2023 to $24.18 per share by the close of 2024.

52.     While semaglutide was officially on the FDA shortage list, and Hims was therefore legally allowed to mass produce compounded versions of semaglutide to meet demand, in anticipation that the FDA would (at some point in time) determine the shortage to be over, Hims promoted its "personalized" compounded semaglutide.  Hims' platform steered patients toward "personalized" medications which Hims could manufacture and sell at a steep discount to its name-

1  brand counterparts, thus generating substantially larger profits for the Company than by providing

2  branded treatment options.

3      53.    To facilitate sales of the Company's generic "personalized" semaglutide, new

4  patients seeking weight loss solutions on Hims' platform were presented with a series of intake

5  questions highlighting the well-known potential side effects of GLP-1s.  For example, Hims'

6  platform informed prospective patients that nausea, vomiting, constipation, and diarrhea were

7  common with GLP-1 weight-loss drugs and claimed that personalized dosing was clinically proven

8  to reduce such side effects without compromising weight loss results.  Patients were prompted to

9  consider how these and other potential side effects, such as muscle loss, might impact their daily

10 lives, and asked whether they wanted a personalized dosing plan to mitigate these risks.  Hims'

11 intake questions steered prospective patients toward a personalized dose, which purported to offer

12 the dual advantages of a lower risk of side effects at a fraction of the price compared to branded

13 options.

14     54.    Based on intake forms which promoted personalized dosing regimens, physicians

15 on the Hims platform would then prescribe "personalized" doses of semaglutide, even before

16 determining whether patients were able to tolerate commercially available doses without

17 experiencing side effects.  Hims' "personalized" semaglutide differed from commercially

18 available Wegovy only in their dosing amounts.  Wegovy was available in 0.25 mg, 0.5 mg, 1 mg,

19 1.7 mg, and 2.4 mg doses, with patients typically starting at the lowest dose and moving up at

20 proscribed intervals as necessary.  Meanwhile, physicians on the Hims platform typically

21 prescribed compounded semaglutide in 0.2 mg, 0.4 mg, 0.75 mg, and 1.25 mg doses, and followed

22 the same escalation schedule.  Hims did not manufacture semaglutide in these specific doses;

23 Hims' patients received a standard vial of compounded semaglutide and syringes to fill and self-

24 administer weekly injections at their prescribed amounts.  Hims did not combine any additional

25 drugs or vitamins to address potential side effects of semaglutide users.

26     55.    Hims' approach to providing mass-produced, "personalized" semaglutide

27 prescriptions differed from the traditional use of the personalization exception.  Hims claimed its

28 practices represented the future of individually customized medicine.  Hims emphasized its

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:25-cv-05315-JD                                                    - 17 -
4914-4994-8811.v1

1    commitment to physician autonomy when prescribing medications, assuring investors that all

2    patients on personalized compounded semaglutide had a demonstrated clinical need for a non-

3    commercial dose. Hims did not publicly reveal the ratio of patients receiving commercial vs non-

4    commercial doses of semaglutide, but analysts estimated that personalized GLP-1 revenue

5    represented 47% of the Company's weight loss revenue versus just 23% for commercial doses –

6    *i.e.*, two-thirds of the compounded semaglutide prescriptions were for personalized doses.[2] Hims

7    would later reveal that the "significant majority" of its 1Q25 semaglutide revenue was from

8    personalized prescriptions.

9        56.    Further driving Hims' dramatic growth, Hims engaged in a coordinated and high-

10   profile marketing campaign to assure patients and investors that its compounded semaglutide was

11   the same quality as Wegovy and other branded options. Prior to, and during, the Class Period,

12   Hims' website contained numerous statements that trumpeted the safety and efficacy of

13   compounded drugs, claiming that they are equally safe and as effective as their name-brand

14   counterparts. For example, Hims' website provides a side-by-side comparison of semaglutide and

15   Wegovy which uses identical descriptions for its compounded semaglutide as it did for Wegovy,

16   adding only: "Semaglutide is the active ingredient in the brand-name medication Wegovy®. The

17   information below is about brand name Wegovy®." Hims did not even bother to change the dosing

18   information for its compounded semaglutide – which was the ***only*** differentiator – instead

19   inaccurately listing its semaglutide as being offered in the same commercially available doses as

20   Wegovy.

21       57.    Hims' websites included other articles and FAQ responses that equated

22   compounded semaglutide to name-brand options. For instance, the article "Compounded GLP-1s:

23   What Are They and Are They Safe?" sought to answer potential patient questions:

24       What is compounded semaglutide? ***Compounded semaglutide contains the same***
         ***active ingredient as the brand-name drugs Ozempic and Wegovy***.
25

                                 *       *       *
26

27   ---
     [2]    The remaining 30% of the Company's weight loss revenues were derived from oral
28   medications and liraglutide.

Is compounded semaglutide safe?  Compounded semaglutide can be safe if you get it from a licensed compounding pharmacy.

58.     The article even suggested that Hims' standards "go above and beyond what's required by law."  Another article on Hims' website, "Semaglutide Side Effects: What You Need To Know," equated the compounded and branded offerings and described Hims' compounded semaglutide as being a product of FDA-regulated pharmacies: "While compounded semaglutide hasn't been FDA-approved, compounded drugs from state-licensed pharmacies that stick to the FDA's Current Good Manufacturing Practice (CGMP) guidelines are considered safe."

59.     Hims' extensive campaign to reassure consumers and investors alike on the safety and efficacy of its compounded products included a February 9, 2025, television advertisement during NFL Super Bowl LIX that criticized major pharmaceutical companies' medications as "priced for profits, not patients," and touted Hims' weight loss treatments as "affordable, doctor-trusted, and formulated in the USA" – indeed, "the future of healthcare."  Novo would respond to this commercial shortly after it aired, describing it as "irresponsible and misleading advertising."

### B.     Novo Engages in Extensive Efforts to Limit Marketing and Sales of Compounded Semaglutide

60.     Notwithstanding the FDA's determination that semaglutide was in active shortage – a finding that expressly permitted mass compounding of generic medication – Novo engaged in extensive efforts to suppress the compounded semaglutide market.  In particular, Novo pursued a sweeping, strident, and public litigation strategy designed to halt or materially limit sales of semaglutide by compounding pharmacies, particularly targeting compounders whose marketing referenced Novo's trademarked brand names, described their products as equivalent to name-brand Wegovy, or utilized Novo's clinical data.

61.     In furtherance of this strategy to curtail the use of compounded semaglutide, in June 2023, Novo issued a press release warning consumers of the risks related to compounded semaglutide, which they warranted, "do not have the same safety, quality and effectiveness assurances as our FDA-approved drugs."  That press release also announced Novo's initiation of legal proceedings against compounding pharmacies, marking the first of what would ultimately

1   become more than 100 separate actions against compounding pharmacies and other entities

2   unlawfully marketing and selling compounded semaglutide.

3          62.    Novo executives repeatedly stated their position that compounding pharmacies

4   were unlawfully mass producing and illicitly marketing compounded semaglutide as equivalent to

5   Wegovy, and asserted that these compounded versions were dangerous knock-offs made with

6   unsafe and untested ingredients.  For example, on August 8, 2024, a Novo executive stated:

7   "there's only one [semaglutide] and that's produced by Novo Nordisk. . . . . *So I don't think*

8   *compounding is a way forward generally to serve patients*."

9          63.    On November 7, 2024, Novo held a conference call for UK analysts, where they

10  declared that they were not willing to support compounding and would not work with telehealth

11  companies providing compounded drugs:

12          So I think that is the best way that we can ensure that what is out there of
        semaglutide is well quality checked and approved and according to the pharma
13      standards, which we cannot guarantee on any compounding.  And that's basically
        our concern.  *And therefore, we would also not be collaborating with*
14      *compounding companies*.

15         64.    On February 5, 2025, Novo acknowledged the growing popularity of compounded

16  semaglutide but stated that is was committed to limiting its availability to patients, in part by

17  increasing supply to get it off the FDA shortage list as quickly as possible:

18          [W]e are still listed on the drug shortage list. . . .  Of course, as we increase the
        resilience in our supply that has an impact on our ability to get off the drug shortage
19      list, and we are focused on doing that as fast as possible *as we believe this will help*
        *our further actions to curtail compounding in the future*.

20     **C.    FDA Declares GLP-1 Shortage over; Novo Declares that Mass**
21            **Semaglutide Compounding Must Stop**

22         65.    On February 21, 2025, the FDA announced that the semaglutide shortage was over

23  and ordered all compounding pharmacies to cease production of compounded semaglutide in

24  commercially available doses by May 22, 2025.  With the shortage designation removed and the

25  transition deadline approaching, analysts openly questioned the legality of Hims' personalization

26  practices and whether the Company could continue compounding, marketing, and selling

27  personalized doses at current levels.

28

66.    Also on February 21, 2025, Leerink Partners issued a report titled: "FDA Ends Wegovy/Ozempic Shortage - HIMS Stock Price Discovery Commences" which noted that Hims was expected to continue pursuing sales through the personalization exception after the shortage was declared over as it was the only avenue that remained open to the Company:

> HIMS has been positioning itself to continue to sell compounded semaglutide using personalized doses after the shortage officially ended. It is now critical to understand HIMS' legal pathway to selling personalized doses since it has to be the primary mechanism to sell semaglutide going forward.

67.    On February 21, 2025, Morgan Stanley issued an analyst report titled: "Semaglutide injections removed from FDA shortage list" which stated that Hims would likely pursue the personalization exception to continue selling semaglutide to customers, but noted that its case appeared to be weakened by the fact that Hims' "personalized" semaglutide did not contain any patient-specific additives:

- Hims will argue that documentation it's collecting from consumers regarding side effects is a justification that the compounded product results in a significant difference for the patient and the company can utilize 503A manufacturing.

- Given that Hims offers Semaglutide base with no additives to assist with side effects such as muscle loss or nausea, that could weaken the case for personalization.

68.    In response to the FDA's announcement, Hims' stock price declined to a close of $49.28 per share on February 21, 2025, from a close of $66.41 per share on February 20, 2025, a decline of 25% on significantly elevated trading volume.[3]

69.    On March 2, 2025, defendant Dudum issued a statement on X (formerly Twitter) stating that Hims' patients on commercial doses of semaglutide would no longer be able to obtain their prescriptions from Hims, but those on personalized doses would be unaffected:

> For customers currently on a commercially available dose of compounded semaglutide your medication will no longer be available through Hims & Hers after mid-May.

---

[3]    Hims insiders timed their sales of personally held shares ahead of the ruling. *See* "Imitation weight-loss drugs boosted Hims & Hers. Executives cashed in. A temporary business in cheap versions of a weight-loss drug generated gains for executives before the FDA turned off the spigot." Available at www.washingtonpost.com/business/2025/05/01/ozempic-wegovy-weight-loss-drugs-hims/.

* * *

For customers who have worked with their provider on a personalized dosing regimen of compounded semaglutide treatment to meet their individual need, ***your prescribed treatment will continue to be available through the Hims & Hers platform with no change***.

70.     On April 16, 2025, Bank of America published an analyst report titled: "March data: Observed sales growth slows; Still pointing to a beat in 1Q'25," which noted that the end of the shortage exception for semaglutide created significant uncertainty for Hims' lucrative weight loss business.  The Bank of America analysts underscored this dynamic was "[t]he biggest near-term swing factor" for Hims' financial performance, and added that Hims' existing business model put it at risk of litigation with Novo and regulatory action by the FDA:

> The biggest near-term swing factor is still the extent to which HIMS can compound semaglutide beyond May 22nd . . . .  While our conversations with attorneys suggest that the personalized GLP-1 opportunity through 503A will be limited in scale, meaningful semaglutide contributions beyond 2Q could readily de-risk the guide and create upside potential to our model.  If HIMS does sell personalized semaglutide at scale beyond April 22nd, we expect Novo Nordisk to take legal action and anticipate the FDA will challenge the scale of personalized GLP-1 sales as well. . . .

71.     This growing market concern was reflected in the mainstream media.  For example, on March 19, 2025, *The Wall Street Journal* published an article titled: "Sale of Ozempic Knockoffs Is Supposed to End Soon. Telehealth Companies Aren't Happy," reporting that Novo and other major pharmaceutical companies were escalating their legal efforts to combat mass compounding by telehealth companies, lambasting such practices as unlawfully selling generic semaglutide under the "guise" of personalization:

> Since ramping up production, Eli Lilly, which makes Mounjaro and Zepbound, and Novo Nordisk, manufacturer of Ozempic and Wegovy, have been sending cease-and-desist letters and filing lawsuits to contain their compounding competitors.
>
> ***Compounders can't evade federal law under "the guise of making 'personalized' drugs,"*** said a Novo Nordisk spokeswoman. She said the company has filed 105 lawsuits in federal courts alleging the unlawful marketing and selling of fake or illegitimate knockoffs.

72.     Just days before the start of the Class Period, on April 25, 2025, Novo issued a press release highlighting a federal court decision upholding the FDA's determination that the semaglutide shortage was over and ruling against the compounders who filed suit over the FDA's

determination.  Novo claimed the victory in court would end compounded semaglutide production under *both* the shortage exception and the personalization exception in all but "rare" exceptions:

> With the FDA's resolution of the shortage of Ozempic® and Wegovy®, as left in place by this court ruling, *it is illegal under US compounding laws to make or sell knockoff "semaglutide drugs," with rare exceptions.*

> In light of the court's decision today, FDA may immediately take action against 503A pharmacies compounding knockoff versions of Novo Nordisk's FDA-approved semaglutide medicines.  *The ruling also means the grace period for 503B outsourcing facilities to compound semaglutide injectable drugs will expire on May 22, 2025, and FDA may take enforcement action against these entities after that date.*

73.    Accordingly, given the removal of semaglutide from the FDA's shortage list and the strident efforts by Novo to shutdown mass compounders, in the run-up to the Class Period, investors and analysts were laser focused on whether Hims would be able to sustain the record revenue growth in its weight loss business driven by mass sales of compounded semaglutide.

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS AND FRAUDULENT SCHEME

### A.    Hims Announces a Strategic Partnership with Novo to Sell Name-Brand Wegovy on Hims' Platform

74.    The Class Period begins on April 29, 2025, when Hims issued a press release pre-market, announcing that the companies had entered into a strategic partnership whereby Novo's Wegovy would be sold on Hims' platform.  The deal signaled to investors that the two companies – who had loudly staked out opposing positions on compounded semaglutide – had reached an agreement regarding Hims' marketing and sale of Wegovy and compounded semaglutide going forward.  The deal additionally would open new potential revenue streams for Hims through its first-of-a-kind partnership with a name-brand drug maker – with the potential for more such arrangements – and indicated a de-escalation between Hims and Novo that minimized the risk of litigation and regulatory action.

75.    Titled "Hims & Hers and Novo Nordisk Team Up to Expand Affordable Access to Care," the press release made it clear that Hims and Novo had resolved their differences over Hims' marketing and sale of compounded semaglutide and reached a shared vision for providing healthcare:

"Bringing our teams together and continuing to explore ***our shared commitment and focus on delivering the future of healthcare*** has been inspiring. ***We share a vision of what consumer-centered healthcare looks like, and this is just the first step towards delivering that future***."

76.    The press release emphasized that this agreement was the beginning of a "long-term collaboration" between the companies, further cementing the impression that Hims and Novo had resolved their differences over Hims' sale of personalized compounded semaglutide and laid the groundwork for future deals:

A bundled offering of Novo Nordisk's FDA-approved Wegovy® on the Hims & Hers platform marks ***the first step in a long-term collaboration roadmap***, pairing innovative treatments with a leading care platform to elevate the impact of obesity care for today's consumer.

*        *        *

SAN FRANCISCO – (BUSINESS WIRE) – Hims & Hers Health, Inc. (NYSE: HIMS) today announced ***a long-term collaboration with Novo Nordisk*** designed to make proven obesity care and treatments more accessible, more affordable, and more connected for millions of Americans.

77.    The press release also signaled to investors that Hims' deal with Novo included the continued sale of personalized semaglutide on the Hims platform, as the Company stated that Wegovy would be available ***in addition*** to – *i.e.*, "***build on***" rather than limit – Hims' existing semaglutide offerings, while omitting any agreement to restrict or change Hims' compounded semaglutide offering to existing and prospective patients. This created the materially false impression that Novo had agreed to permit Hims to continue its marketing and mass sales of compounded semaglutide alongside Novo's branded Wegovy:

***This new offering builds on Hims & Hers' existing suite of weight loss solutions*** and provides access to all dose strengths of Wegovy® in a high-quality pen for self-pay patients. The platform will continue to offer access to other medications, oral kits, protein, nutrition kits, and clinically-backed care plans, giving patients more ways to start and sustain their health journey based on their needs, goals, and eligibility.

78.    Each of the foregoing statements in the Company's April 29, 2025, press release concerning: (i) the terms of the agreement reached between Hims and Novo to sell Wegovy in addition to Hims' other weight loss solutions (¶¶76-77); (ii) the shared vision of Hims and Novo for delivering healthcare (¶75); and (iii) the deal representing the beginning of a long-term partnership between Hims and Novo (¶¶75-76) were materially false and misleading when made,

1    omitted material facts, and furthered Defendants' scheme to defraud, because Defendants knew or

2    were deliberately reckless in not knowing, and failed to disclose the following:

3                 (a)    Hims had not reached agreement, and was not in alignment with Novo to

4    sell Wegovy on its platform while Hims did not significantly change its marketing, prescription,

5    and sale of personalized compounded semaglutide to its current and future patients which

6    comprised the substantial majority of the Company's semaglutide revenues;

7                 (b)    Hims had agreed that it would stop mass compounding semaglutide, but

8    unilaterally applied this only to its sales of commercially available doses, which it knew conflicted

9    with Novo's position that Hims must cease selling all compounded semaglutide other than in rare

10   instances in which a physician determined that an individual patient demonstrated a clinical

11   necessity for a personalized dose due to side effects;

12                (c)    Hims did not engage in extensive discussions, and was not aligned, with

13   Novo on the applicability of the personalization exception for compounded semaglutide despite

14   Hims' knowledge that Novo considered Hims to be engaged in unlawful "mass personalization"

15   and that Hims' existing patients receiving personalized compounded semaglutide must be

16   transitioned to Wegovy;

17                (d)    Hims' agreement with Novo did not signal a shift in Hims' business model

18   that would have promoted long-term or expanded partnerships with Novo or other name-brand

19   pharmaceutical manufacturers because Hims intended to continue to grow its generic

20   compounding business via sales of personalized medications, making its prospects more – not less

21   – dependent on its interpretation of the personalization exception and placing it at odds with

22   potential future branded pharmaceutical partners; and

23                (e)    As a result of the foregoing in (a)-(d), as well as those reasons set forth in

24   ¶93, below, it was a virtual certainty that Novo would terminate the partnership over Hims'

25   continued sale of personalized compounded semaglutide to existing and new patients which would

26   stop revenue from sales of Wegovy, as well as limit new potential revenues streams from future

27   partnerships, result in reputational harm to Hims' business, place Hims at a competitive

28

1  disadvantage as compared to other telehealth companies who successfully partnered with name-

2  brand manufacturers, and reintroduce the risk of litigation and regulatory action.

3      79.    Unaware of the true facts, analysts widely hailed Hims' announcement of a strategic

4  partnership with Novo as a positive development for Hims – a "clear win" for the Company.

5  Indeed, numerous analysts issued reports raising their rating and price targets on Hims shares,

6  emphasizing that the groundbreaking partnership expanded Hims' platform by allowing the

7  Company to sell branded Wegovy, and thus retain and attract new customers in a "mutually

8  beneficial environment for both parties."  Analysts also praised the deal as an "extremely important

9  validation" and "meaningful evolution" of Hims' direct-to-consumer model, underlining that the

10  deal both opened avenues for new and "broader drug partnerships" with Novo and other leading

11  pharmaceutical companies, while minimizing legal and regulatory risk attendant to Hims'

12  marketing and sale of compounded semaglutide.

13      80.    For example, on April 29, 2025, Leerink Partners issued an analyst report titled:

14  "HIMS Partners w/Novo On Wegovy Bundling - Shift In Go-Forward Model" in which it

15  described the deal as representing "an extremely important validation" and "a meaningful

16  evolution" of Hims' business model that "remove[d] a significant amount of concern" about the

17  sustainability of the Company's weight loss revenues.  According to Leerink Partners, this "clear

18  win" for the Company meant that Hims would shift its weight loss business away from sales of its

19  own compounded medications and transition to selling branded offerings, like Wegovy – a

20  fundamental shift in Hims' business model that provided "an updated pathway for the path forward

21  for the business":

22          Today's announced partnership with Novo Nordisk (NVO; NC) **is an
           extremely important validation of the HIMS business model and also removes a**
23         **significant amount of concerns on the path to maintaining weight management
           revenue.  It's important to note that this is a meaningful evolution of the model**
24         **too, shifting to a brand sales effort in partnership with an existing manufacturer.**
           It also removes the ongoing friction with the existing brand manufacturer.  We need
25         to see how this will develop relative to unit economics for HIMS, **as this agreement
           appears to have the company serving as a front door to access and not using its**
26         **own compounding facility**. . . .  But either way – this is a **clear win for the company
           and helps give an updated pathway for the path forward for the business**.

27

28

81.     Also on April 29, 2025, Bank of America issued a report that increased its price target for Hims and commented that the partnership between Hims and Novo was validation of Hims' business model, would result in Hims shifting customers from compounded semaglutide to Wegovy, and provided a platform for an expanded business relationship and new revenue streams:

> Today's partnership creates a ***clear incentive for HIMS to shift patients from its own compounded version of semaglutide to Novo Nordisk's Wegovy***. This incentive could act to deter Novo Nordisk from taking legal action against HIMS by creating a mutually beneficial environment for both companies. . . . Today's announcement also ***provides further validation of HIMS' direct-to-consumer model as a platform for broader drug partnerships***.

82.     While the Company did not forecast or otherwise specify the deal's precise impact on Hims' compounded semaglutide revenues, analysts estimated that significant numbers of Hims' patients would transition to branded Wegovy. For example, on April 29, 2025, Piper Sandler issued an analyst report which estimated that the agreement with Novo would result in half of Hims' current compounded semaglutide patients switching to Wegovy:

> Assuming some patients switched to Liraglutide and other options, while some users fall off due to the higher price point, ***we think it is reasonable to think about half of patients could return to this new Wegovy offering.***

83.     Similarly, on April 29, 2025, Needham issued an analyst report underlining that the deal "alleviates investor concerns" about Hims' ability to meet its lofty revenue guidance for the weight loss business, and directly linked the sharp rise in Hims' stock price that day to the deal's announcement. Titled "Big Pharma Goes For A Rebrand; HIMS Announces Partnership with Novo Nordisk," Needham also commented that as a result of the partnership, Hims' revenues would be less dependent on sales of the Company's compounded semaglutide:

> Shares are up meaningfully today, and rightfully so, as the partnership alleviates investor concerns around HIMS' ability to hit its $725mm weight loss revenue guidance for FY25, making the company less reliant on generating revenue via its interpretation of the 503A personalization exemption in a post-shortage world.
>
>                     *      *      *
>
> [W]e believe this helps alleviate the legal pressure HIMS' could face from big pharma as they explore patent infringement against compounders, suggesting Novo Nordisk is okay with HIMS current practices.

84.     In response to Hims' announcement of its deal with Novo, including the false and misleading statements and omissions therein, the price of Hims stock increased significantly to

close at $35.04 per share on April 29, 2025, up from a close of $28.48 per share on April 28, 2025, an increase of approximately 23%, on massive volume of 152 million shares traded. Similarly, the price of HIMS ETF surged from $12.18 per share on April 28, 2025, to $17.61 per share on April 29, 2025, an increase of nearly 46%, on high volume of 3.8 million shares traded. That same day, the prices of Hims stock options and other derivative securities also increased substantially.

**B.    Hims Repeatedly Assures Investors of Alignment with Novo on Compounded Semaglutide Sales**

85.    On May 5, 2025, Hims issued a press release filed with the SEC attached to a Form 8-K announcing its results of operations for the quarter ended March 31, 2025. The press release touted the Company's financial results for 1Q25, reaffirmed the Company's full year 2025 guidance targets, and highlighted the Company's expectation of more collaborations like the Novo deal.

86.    The same day, Hims issued a shareholder letter, filed with the SEC attached to a Form 8-K, which falsely touted the Company's partnership with Novo as being compatible with its continued offering of "personalized semaglutide" alongside Wegovy. Despite agreeing to end "mass compounding" and failing to obtain Novo's approval to continue uninterrupted its sale of personalized semaglutide, Hims' shareholder letter falsely portrayed the deal as a "blueprint" for future partnerships:

> Additionally, ***in April we announced a long-term collaboration with Novo Nordisk*** to expand affordable access to proven obesity care. . . . This collaboration pairs our customer-centric platform with Novo Nordisk's innovative pipeline, allowing us to serve more customers, broaden access to clinically proven treatments, and drive stronger outcomes. ***More importantly, beyond this initial launch, we are developing a broader roadmap together with Novo Nordisk, as well as a blueprint for future partnerships*** . . . .

87.    On May 5, 2025, Hims held its 1Q25 earnings conference call for investors. Defendants Dudum and Okupe appeared on behalf of the Company and spoke in depth about the Company's partnership with Novo, and responded to analyst questioning about the terms and implications of the deal on the Company's operations and financial performance. The Company also provided PowerPoint slides to accompany the call, which like Hims' website, further assured

1   investors about the safety and efficacy of the Company's compounded semaglutide by touting the

2   Company's purported manufacturing in "FDA and state regulated facilities and third party testing."

3       88.    During this call, Dudum and Okupe trumpeted the Novo partnership as a "pivotal

4   milestone," "the start of a long-term collaboration," and "blueprint for future partnerships" that

5   would underpin the Company's growth.  Indeed, Defendants cast the deal's structure as enabling

6   Hims to sell name-brand drugs and, to a limited extent, Hims' cheaper compounded generics

7   together on the same platform – as a model going forward, while omitting that Hims had no

8   intention of reducing sales of its own personalized compounded semaglutide at scale despite

9   Novo's position that these sales were unlawful:

10          [Dudum:] ***Branded Wegovy will be an additional option for subscribers
            and will complement our oral kit offering liraglutide and personalized***
11          ***semaglutide options.  Teaming up with Novo Nordisk is a pivotal milestone. . . .***
            ***This collaboration also signals something important, trust from a major***
12          ***pharmaceutical leader, and it sets the blueprint for future partnerships that can***
            ***expand both our reach and our relevance***.

13                              *       *       *

14          [Okupe:] We are excited to offer our weight loss subscribers access to an expanding
15          portfolio of solutions through ***the start of a long-term collaboration with Novo***
            ***Nordisk***, . . . In the near term, this unlocks another compelling option for
16          subscribers of commercially available dosages of semaglutide to transition to.  ***It's***
            ***a meaningful validation of our model*** and a powerful first step in expanding access
17          to effective obesity care across the country.

18      89.    Hims' head of investor relations, Bill Newby, read a question submitted by multiple

19   Hims' investors seeking further information on the Novo partnership and Defendants' view of that

20   partnership going forward.  In response, Dudum emphasized that the companies were aligned in

21   their approach to providing healthcare, noting the significant amount of time the companies had

22   been spending with each other in furtherance of their "shared vision."  Dudum reiterated that the

23   Company's collaboration with Novo on semaglutide was a "blueprint" for additional, long-term

24   partnerships across a range of treatment categories:

25          [Bill Newby, Head of Investor Relations:]  Can you elaborate on the future road
            map Hims & Hers and Novo Nordisk are developing together?   And what do you
26          see as the next possible steps on this road map?

27          [Dudum:] So on the Novo side, this is a collaboration we're excited by ***the teams***
            ***across both organizations have been spending quite a bit of time together, sharing***
28          ***meals and really aligning on what we think the future of healthcare looks like,***

*and I think there's real excitement around that shared vision.* So when I step back, I think there's a real set of opportunities, hopefully, across categories, across Novo product lines, potentially across geographies that we are brainstorming. . . .

*Generally, I think this type of a partnership, though, is a blueprint for what we think the next 5 and 10 years could look like across categories, right?*

90.     In light of the strident positions taken by Novo on the nontraditional use of the personalization exception by telehealth companies, analysts asked whether personalized semaglutide would continue to be a growth opportunity for Hims. In response, defendant Dudum assured investors that Hims and Novo agreed on Hims' use of the personalization exception, which would be limited to situations of clinical necessity as determined by a physician on a case-by-case basis. Indeed, defendant Dudum expressly described these permitted sales of personalized compounded semaglutide as "limited" and "additive," which given that they comprised a substantial majority of current semaglutide sales, misled investors into believing that Hims was reducing its reliance on the personalized prescriptions and shifting its users to branded Wegovy:

[Analyst:] And maybe I'd ask a bit more tactically, it seems like very clear near-term opportunity for you to shift subscribers to commercial dosages, but it's also pretty clear that the manufacturers will be watching your positioning on personalized GLP-1s closely. So how do you approach the opportunity for growth in personalized? Is that a growth opportunity versus the opportunity to grow via brand partnership?

[Dudum:] I think we've said this from the beginning, we aim in all of our ventures to be extremely blue chip and play by the rules. And with regard to compounding and the personalization exemption, the rules are extremely straightforward and clear. *So we continue to expect to personalize semaglutide to exist on the platform, that's something we've shared as of last call and it's something we shared early with Novo.*

*But we also believe that the necessity of that should be limited to when providers feel it is clinically needed. And so the ability to do hyper-personalization for side effect mitigation, whether this is nausea, vomiting, muscle loss, et cetera, is something that we continue to allow on the platform to continue to give providers that flexibility and the tools to make that type of personalization. But generally, we think of it as relatively additive to the ecosystem because for the most part, these are patients that, frankly, just cannot use commercial doses or a lot of them have actually tried the commercial dose and then have churned off due to the high side effect rate.*

*And so we think it's really additive as part of the mix.*

91.     An analyst sought further detail on personalized semaglutide and whether Hims and Novo agreed to place specific caps on the number of personalized prescriptions on the Hims

platform.  Defendant Dudum did not answer whether the companies had agreed to specific

percentages, but reassured investors that Hims' use of the personalization exception was discussed

"early" and that the companies were "philosophically" aligned on its permissible use, namely, only

under the "blue-chip" scenario where a physician determined that an individual patient

demonstrated clinical necessity for a personalized dose due to "intolerable" side effects from a

commercial dose.  This response furthered the false impressions both that Hims would be reducing

its sales under the personalization exception in favor of name-brand Wegovy and that its actions

were consistent with an agreement it reached with Novo:

> [Analyst:] I'm curious if you can provide what percent of folks who are on
> commercially available doses transition to personalized doses.  And when you were
> inking the partnership with Novo, was there any discussion around limiting the
> uptick of personalized doses that you're offering?  And then finally, just given some
> recent lawsuits that were filed against competitors of yours, can you just put a finer
> point for us on how Hims, the corporate entity, interacts with its affiliated-provider
> groups when making medical decisions?

> [Dudum:] On the commercial doses that transition to non-commercial, I don't think
> that's something we disclose, unfortunately, Daniel.  ***On the personalized
> semaglutide standpoint, one of the things that we did talk about with Novo early
> is just what we believe is appropriate use of personalization and aligned
> philosophically with what our providers believe is that clinical necessities.  So
> there is an alignment for what we believe to be blue-chip use of that compounding
> exemption.***

> ***And again, it is for patients that are suffering from some type of
> intolerable dynamic where a commercial-available dose is just not actually an
> option for them.  So this is side effect sensitivities, nausea, vomiting, muscle loss,
> et cetera.  This is all super well documented***. . . .

92.    When an analyst expressed concern over the potential for Novo to end the deal if

Hims sold too much personalized semaglutide – which Defendants knew was a virtual certainty

given Hims' failure to change its compounded semaglutide sales practices – defendant Dudum

avoided the question and falsely reiterated the companies' "foundational appreciation" of provider

independence and that they were "philosophically" in agreement that the regulations allow for

personalized dosing, without disclosing that Hims had not reached an agreement regarding the

continuation of its current business practices.  In fact, Novo expected Hims to transition existing

patients on personalized doses to Wegovy and viewed their "personalized" prescriptions as

unlawful:

[Analyst:] I wanted to come back to Daniel's question about the relationship between Novo and Hims. And I guess, there's kind of this natural tension between the dispensing of the personalized product in the commercial Wegovy that you guys are selling. So was there any like interaction or any discussion around like a ratio of the dispensing of the personalized products versus the commercial product?

And Andrew, I'd really be interested in the background. ***Is there any risk that like Novo would ever pull the commercial relationship with you guys if personalized kind of sold too well?*** Do we just kind of love the background of the discussions around that?

[Dudum:] Yes, again, ***I think there's within both organizations, a foundational appreciation for the fact that clinical decision-making is truly independent.*** And I truly cannot emphasize that enough.

*        *        *

So this idea, even of ratios and things of that sort, that is business impacting clinical decision-making in a way that is something we're definitely not comfortable with, nor do I think, frankly, any organization would be comfortable with because it's stepping on the toes of provider discretion. ***Well, we agreed to philosophically was what the regulation allows for, right? And we made this very clear***.

93.    Each of the statements set forth in the Company's May 5, 2025, press release, shareholder letter, and earnings conference call concerning: (i) the extent of negotiations between Hims and Novo (¶¶89, 91-92); (ii) the terms of the agreement reached between Hims and Novo with respect to the continued sale of personalized compounded semaglutide alongside Wegovy (¶¶86, 88-92); (iii) the companies' alignment concerning the requirements for, and frequency of, sale of personalized compounded semaglutide on Hims' platform (¶¶88, 90-92); (iv) the companies' alignment on physician independence to prescribe personalized compounded semaglutide (¶¶90-92); and (v) the Novo deal as a model for future partnerships with Novo and other name-brand pharmaceutical makers (¶¶86, 88-89) were materially false and misleading when made, and furthered Defendants' fraudulent scheme, because Defendants knew or deliberately disregarded and failed to disclose the following:

(a)    Hims had not reached agreement, and was not in alignment with Novo to sell Wegovy on its platform while Hims did not significantly change its marketing, prescription, and sale of personalized compounded semaglutide to its current and future patients, which comprised the substantial majority of the Company's semaglutide revenues;

1    (b)    Hims had agreed that it would stop mass compounding semaglutide, but

2    unilaterally applied this only to its sales of commercially available doses, which it knew conflicted

3    with Novo's position that Hims must cease selling all compounded semaglutide other than in rare

4    instances which a physician determined that an individual patient demonstrated a clinical necessity

5    for a personalized dose due to side effects;

6    (c)    Hims did not engage in extensive discussions, and was not aligned with

7    Novo on the applicability of the personalization exception, despite Hims' knowledge that Novo

8    considered Hims to be engaged in unlawful "mass personalization" and that Hims' existing

9    patients receiving personalized compounded semaglutide must be transitioned to Wegovy;

10    (d)    Hims' sale of personalized compounded semaglutide would not be limited,

11    additive, or rare but comprised the substantial majority of its semaglutide sales and Hims refused

12    to steer current or future patients from personalized semaglutide to branded Wegovy on the

13    purported basis of physician autonomy;

14    (e)    Hims' agreement with Novo did not signal a shift in Hims' business model

15    that would have promoted long-term or expanded partnerships with Novo or other name-brand

16    pharmaceutical manufacturers because Hims intended to continue to grow its generic

17    compounding business via sales of personalized medications, making its prospects more – not less

18    – dependent on its interpretation of the personalization exception and placing it at odds with

19    potential future branded pharmaceutical partners;

20    (f)    Novo viewed Hims' marketing of compounded semaglutide as violating

21    FDA regulations by claiming that compounded semaglutide contained the same active ingredients

22    as name-brand Ozempic and Wegovy, that its ingredients were clinically proven and FDA-

23    approved; and

24    (g)    As a result of the foregoing in (a)-(f), it was a virtual certainty that Novo

25    would terminate the partnership over Hims' continued marketing, prescription and mass sale of

26    personalized compounded semaglutide to existing and new patients.  Novo's termination of the

27    partnership would significantly harm Hims' business operations, condition, and financial prospects

28    by, among other things, ending all revenue from sales of Wegovy, limit new potential revenues

1    streams from future partnerships, result in reputational harm to Hims' business, place Hims at a

2    competitive disadvantage as compared to other telehealth companies who successfully partnered

3    with name-brand manufacturers, and reintroduce the risk of litigation and regulatory action.

4           94.    In response to Hims' statements concerning its "pivotal" deal with Novo, and

5    reassurances of the parties' in-depth discussions and alignment on how commercial-dose versus

6    personalized-dose semaglutide would be offered and provided via Hims' platform, the price of

7    Hims stock rose significantly to close at $49.47 per share on May 6, 2025, up from a close of

8    $41.88 per share on May 5, 2025, an increase of 18%, on massive volume of 157 million shares

9    traded.  Similarly, the price of HIMS ETFs soared from $24.54 per share on May 5, 2025, to $33.29

10   per share on May 6, 2025, a 36% increase.  That same day, prices of Hims stock options and other

11   derivative securities also increased substantially.  Hims common stock, ETFs, stock options, and

12   other derivative securities traded at artificially inflated prices going forward.

13         95.    Analyst reaction to the May 5, 2025 disclosures was positive.  For two days,

14   analysts issued reports on Hims that favorably described the terms of the Hims-Novo partnership,

15   the companies' philosophical alignment on permissible sales of GLP-1s, and the resultant positive

16   impact on Hims' weight loss business and overall prospects.  For example, on May 5, 2025, Truist

17   published an analyst report emphasizing that Hims' and Novo's alignment on when personalized

18   semaglutide is appropriate was the key to Hims continuing to sell compounded semaglutide:

19           While HIMS believes there are many customers that will benefit from a
     personalized dose of GLP-1s, the company will "play by the rules" and allow

20         providers to personalize Semaglutide based on what they feel is clinically
     needed. . . . ***Meanwhile, according to HIMS, the company and Novo (NVO, NR)***

21         ***are aligned philosophically with what their providers believe is clinical necessity.***

22         96.    Also on May 5, 2025, BTIG published an analyst report titled "Excellent 1Q:25

23   Results driven by Weight Management; 2025 Guide Likely Conservative" which similarly

24   reported that Hims would only prescribe personalized doses in cases which a patient truly needs

25   it.  BTIG emphasized that the strong relationships Hims had developed with Novo and Eli Lilly

26   under its landmark partnership agreements minimized the risk of litigation and laid the foundation

27   for further partnerships:

28           HIMS will continue to offer personalized compounded GLP-***1s but do so on a case-***

*by-case basis for members who truly need it for clinical reasons*, due mainly to adverse side effects. ***We like how HIMS has a good relationship with both LLY and NVO, and we expect litigation risk to be minimal, as LLY and NVO may want to use HIMS as a platform to sell product***.

97.     On May 6, 2025, TD Cowen published an analyst report titled "1Q25 EPS: Impressive 1Q25 Beat But Expectations Remain Elevated" which forecasted that, consistent with Defendants' representations of the Hims-Novo partnership and the limited circumstances in which sales of personalized semaglutide was permissible, personalized semaglutide would not form a large portion of Hims' future weight loss offering:

> A key question on the call was whether HIMS will be allowed to personalize compounded semaglutide even when the company partners with Novo. ***Our take is the option will exist for patients who truly will need personalization because of nausea, vomiting, muscle loss, etc., but it will not be a large portion of HIMS' weight loss offering.***

98.     The same day, Leerink Partners published an analyst report which stated that the recent earnings call provided more clarity into Hims' sale of personalized semaglutide, in particular, that Hims and Novo agreed that personalized doses would remain available via the Hims platform but only the limited circumstance where a physician determined a patient had a clinical need for personalization:

> Given all the questions around the partnership with NovoCare and the roll-off of patients on commercial dosages, the 2Q earnings call left us somewhat more clear on the path to continue offering personalized semaglutide going forward.

*       *       *

***HIMS and NVO agreed to continue to allowing HIMS to offer personalized semaglutide to patients that have proven clinical need for personalization.***

99.     On May 8, 2025, with Hims securities trading near record highs, Hims announced its intention to offer $450 million in aggregate principal amount of zero-interest convertible senior notes in a private offering. The same day, the Company announced the offering was increased to $870 million. After lenders exercised their right to purchase an additional $130 million in notes, the total issuance totaled $1 billion. The zero-interest convertible bonds were due in 2030. Certain terms of the notes, including their convertibility to common stock, were based upon the last-traded price on May 8, 2025, of $51.40 per share. Hims stated that the debt proceeds would be used for general corporate purposes, including developing AI tools.

100.    On May 13, 2025, Defendants again assured investors that the Hims-Novo partnership was rooted in a firm alignment between the companies on the sale of GLP-1s via Hims' platform.   On May 13, Truist Securities published an analyst report titled "Let's Play Q&A: Dissecting the Moving Parts" which contained a summarized transcript of its interview with Hims' management.[4]  In the call with management, which Defendants knew or should have known would be republished and widely circulated, Truist sought further clarification regarding Novo's recent statements that they do not support "mass personalized compounding."  In response, Defendants dispelled concern of a disagreement between the companies, and reinforced the false impression that Novo and Hims were in alignment that, while "mass personalized compounding" was not permitted under the partnership, Hims was allowed to continue its marketing and selling compounded semaglutide where individual patients demonstrated the clinical necessity for "personalized doses."   Defendants also falsely represented that Novo did not expect current patients receiving personalized semaglutide to transition to Wegovy, which they knew conflicted with Novo's stated position:

> Question: We wanted to follow-up on a few things on your new partnership with Novo.  First, on the company's ability to keep compounding Semaglutide, I understand HIMS does not interfere with how providers perceive with what is clinically necessary.  However, on Novo's earning call, there was discussion around HIMS and Novo's updated thought process on personalized compounding post their telehealth collaboration announcements.  Novo noted that they do not support mass personalized compounding and fully expect FDA to enforce the law on May 22.  Any reaction to that comment?
>
> Answer: ***Novo was talking about mass personalized compounding, so Novo was likely referring to compounding from 503B facilities, which is no longer an option in a post shortage world.  In HIMS view, Novo sees a place for personalized compounding in the market, as Novo talked about patients on compounded medications transitioning to branded, but did not think those on personalized doses would do so.***  HIMS feels good about the breadth of solutions that it would have as it moves into a world where there is more durability and clarity.

101.    Notably, Defendants declined to answer multiple additional questions from Truist seeking clarity as to the extent to which Hims was permitted under the partnership to sell

---

[4]    Truist states that "[t]he answers are not verbatim, but we put the company's answers in their proper context in a give and take format."

1  personalized semaglutide, and the impact on Hims' lucrative weight loss business. For example,

2  when asked to address the changes in the marketing that Hims had made post-agreement with

3  Novo, Hims management declined the opportunity to identify any changes. When Truist sought

4  specificity regarding Hims' recent disclosure in the 1Q25 SEC Form 10-K that a "significant

5  majority" of weight loss patients were on personalized doses, Hims declined the opportunity to

6  provide a more precise figure. Finally, Hims refused to comment on whether it expected

7  personalized semaglutide sales would decline from 1Q25 to the second quarter of 2025 ("2Q25")

8  following the Novo deal.

9      102.    The statements set forth in the Company's interview with Truist concerning Novo's

10 purported stance on mass compounding and Novo's view of personalization were materially false

11 and misleading when made, and furthered Defendants' fraudulent scheme, because Defendants

12 knew or were deliberately reckless in disregarding and failing to disclose the information set forth

13 in ¶93(a)-(g), above.

14     103.    Following the Truist report publishing Hims' materially false and misleading

15 statements and omissions, on May 13, 2025, the price of Hims stock continued to increase to

16 $64.00 per share on May 13, 2025, from $55.21 per share on May 12, 2025, an increase of nearly

17 16%, on inflated volume of 77 million shares traded. On May 16, 2025, Hims stock closed at a

18 Class Period high of $64.65 per share. Similarly, the price of HIMS ETFs rose from $41.12 per

19 share on May 12, 2025, to $54.16 per share on May 13, 2025, closing at a Class Period high of

20 $54.46 per share on May 16, 2025. That same day, the prices of Hims stock options and other

21 derivatives also appreciated substantially, many reaching record highs.

22     104.    On May 22, 2025, the grace period for compounding semaglutide under the

23 shortage exception came to an end. Hims ceased selling compounded semaglutide in

24 commercially available doses to its patients but continued uninterrupted its marketing and sale of

25 personalized compounded semaglutide to existing and new patients – which had made up the

26 substantial majority of its semaglutide sales to date.

27     **C.    The Truth is Disclosed: Novo Terminates the Partnership over Hims'
       Continued Mass Sales and Deceptive Marketing of Compounded**

28     **Semaglutide**

105.    On June 23, 2025 – less than two months after Hims announced its groundbreaking collaboration – Novo stunned the market by abruptly terminating the deal.  On that day, Novo issued a harshly worded press release announcing that it was ending its partnership with Hims, effective immediately, and that Wegovy would no longer be available on the Hims platform. Contrary to Hims' prior claims of alignment with Novo on delivering weight loss treatment and the appropriate use of the personalization exception, Novo declared that it was terminating the partnership because Hims was continuing what Novo described as "mass sales" of compounded semaglutide "under the false guise of 'personalization'" – a practice which Novo declared violated the companies' agreement and was against the law.  Further, Novo claimed Hims disseminated "deceptive marketing that put patient safety at risk."  The press release stated:

> ***Novo Nordisk announced today that the company will no longer be working with Hims & Hers Health, Inc., and that direct access to Wegovy® will no longer be available to Hims & Hers Health, Inc. via NovoCare® Pharmacy.***
>
> In late April, the FDA resolved the Wegovy® shortage based on its conclusion that Novo Nordisk is fully meeting current and projected nationwide demand for this medicine. In support of transitioning patients from knock-off compounded versions to authentic, FDA-approved Wegovy® through NovoCare® Pharmacy, Novo Nordisk began collaborating with telehealth companies. ***Over one month into the collaboration, Hims & Hers Health, Inc. has failed to adhere to the law which prohibits mass sales of compounded drugs under the false guise of "personalization" and are disseminating deceptive marketing that put patient safety at risk.***
>
> "Novo Nordisk is firm on our position and protecting patients living with obesity. ***When patients are prescribed semaglutide treatments by their licensed healthcare professional or a telehealth provider, they are entitled to receive authentic, FDA-approved and regulated Wegovy®***," said Dave Moore, Executive Vice President, US Operations of Novo Nordisk Inc. "We will work with telehealth companies to provide direct access to Wegovy® that share our commitment to patient safety – and when companies engage in illegal sham compounding that jeopardizes the health of Americans, we will continue to take action."

106.    Significantly, Defendants never denied that Hims continued to engage in its mass selling of "personalized" compounded semaglutide despite the agreement's prohibition on mass compounding, nor did Defendants claim that they had reached an agreement with Novo permitting such sales.  Instead, that same day, defendant Dudum took to X (formerly Twitter) and revealed that Hims and Novo were never "aligned philosophically" or shared a "foundational appreciation" for physician independence with respect to the personalization exception, as Dudum had

previously assured investors.  In fact, Novo had been pressuring Hims for weeks since the shortage exception grace period ended on May 22, 2025 to end the sale of all personalized semaglutide, including to patients previously prescribed personalized doses:

> In recent weeks, Novo Nordisk's commercial team increasingly pressured us to control clinical standards and steer patients to Wegovy regardless of whether it was clinically best for patients.  We refuse to be strong-armed by any pharmaceutical company's anticompetitive demands that infringe on the independent decision making of providers and limit patient choice.

107.    Later on June 23, 2025, *Bloomberg* published an article titled "Novo Exits Hims Partnership, Citing Concerns Over Compounded Drugs" which revealed that, despite Defendants' repeated representations that compounded semaglutide would be sold alongside Wegovy, that "Novo sees a place for personalized compounding in the market," that the agreement was a "blueprint" for future deals in which Hims sold name-brand drugs next to their generics, and Hims had agreed to Novo's demand to stop "mass compounding" semaglutide.  Defendants failed to reveal this material fact to investors, or that Novo viewed this agreement as prohibiting Hims from continuing its "personalized" semaglutide compounding business as usual – something that Hims would not abide by.  Novo explained that this agreement was the basis for the termination.  Novo's accusation further undermined Defendants' prior claims that the two companies were aligned on any material aspect of their agreement or that the deal represented the start of a long-term collaboration as compounded semaglutide was at the core of Hims' "personalized" weight loss business:

> Novo Nordisk A/S scrapped a partnership with Hims & Hers Health Inc. after less than two months, saying the US company is using "deceptive marketing" to sell copycat versions of its obesity blockbuster Wegovy.
>
> Hims, a telehealth platform, wasn't stepping back enough from its practice of mass marketing off-brand imitations of the weight-loss medicine, Novo executives said.
>
> ***"The big issue with Hims is that we had an agreement that the mass compounding would stop and unfortunately it didn't stop,"*** said Ludovic Helfgott, executive vice president of product and portfolio strategy at Novo, in an interview. ***"That's why we ended the partnership."***

108.    Analyst reaction was swift and negative, noting that the loss of the Novo agreement hurt the outlook for the Company's weight loss revenue, damaged the Company's credibility in comparison to competitors with ongoing big-pharma partnerships, and reintroduced litigation and

regulatory risk. On June 23, 2025, Leerink Partners published an analyst report explaining the importance of Hims' weight loss program to the overall growth potential of the company, and described the termination of the Novo partnership as posing a risk to their revenue stream from GLP-1s:

> As weight loss goes, so goes HIMS' stock. The company's partnership with NovoCare (NVO; Not Rated) seemed to position HIMS for broader growth beyond its personalization efforts, even if the desire to continue to pursue personalization remained somewhat at odds with leveraging the NVO partnership. ***Today's news creates more questions on where the pathway forward for weight loss goes, both for this year and the long-term trajectory***. The revenue split from the NovoCare deal would have provided a different profit stream than personalized sales but still would have been quite additive. This morning's development halts that revenue/profit stream.

109. On June 23, 2025, Needham downgraded Hims in an analyst report titled "FY25 Revenue Outlook Looks Skinnier Without Novo Nordisk; Downgrade to Hold" which stated that Hims was now at a disadvantage to other telehealth companies due to the dissolution of its partnership with Novo:

> [W]e believe HIMS will likely continue to offer personalized GLP-1s under its interpretation of 503A, which reintroduces the risk of litigation or regulatory action. ***As things stand, we believe HIMS is now at a competitive disadvantage as both Lilly and Novo maintain partnerships with HIMS competitors.*** While we don't believe HIMS' weight loss revenue stream goes away overnight, we do believe shares are likely to be range-bound while the legality of HIMS' personalization practices is determined.

110. On June 23, 2025, Truist published an analyst report titled "NVO/HIMS Breakup; Litigation Risk/Overhang Back on the Table" which stated that the partnership had brought "credibility" to Hims which was now gone and the threat of litigation had returned:

> A litigation, if there is one, could drag on for 18-24 months and could remain an overhang on HIMS shares. Near-term, we do not believe branded Wegovy was driving any meaningful subscriber or revenue for HIMS - likely contributing to Novo's decision to end the collaboration. ***Having said that, our understanding is HIMS was likely benefiting from the "credibility" or increased consumer traffic onto their platforms as a result of advertising of Branded Wegovy.*** With the partnership seemingly over, we would anticipate a decline in traffic and adverse impact to HIMS compounding business.

111. On June 23, 2025, Deutsche Bank published an analyst report titled "Power Outage: Novo Pulls Plug on HIMS Partnership" stating that – contrary to its Class Period representations that it was looking to secure more partnerships with major pharmaceutical companies – Hims was

fully committed to its plan to test the limits of the personalization exception, noting that it had trouble even finding a way to obtain the branded Wegovy on Hims' intake forms during the pendency of the agreement:

> **Financially Minimal, Reputationally Significant:** When the two parties first launched collaboration in April, HIMS confirmed again it would continue offering personalized dosages under 503A exemption, while commercial dosages produced under 503B mass-scale production would be rolled off in May. We note the personalized solutions often filled by compounders carry an exemption to bypass FDA-approved pathways, as compounded drugs can be legally prescribed in cases of clinical necessity. ***HIMS appears to be attempting to scale 503A compounding to a scale we have not previously seen, and we have had many questions regarding this scale and capacity.*** Another area of concern was that as we navigated the HIMS decision tree, it was difficult for us to find a pathway that led to the Novo branded product as opposed to the HIMS compounded product (though we cannot call our search exhaustive). While HIMS may stay in its lane providing personalized offerings following FDA rule, a potential litigation with a major drug maker could bring long-term reputational risks.

Deutsche Bank summed up the effect of the eight week partnership on Hims' stock price succinctly:

> ***HIMS shares closed up 23% on the initial partnership news and dropped ~33% on the split news intraday today.*** The news marks the end of the month-old relationship that once seemed promising for HIMS.

112. On these disclosures, the Company's share price fell to a close of $41.98 per share on June 23, 2025, from a close of $64.22 per share on June 20, 2025, (the previous trading day), or 34.6%, on extremely high trading volume of 176 million shares. Also on June 23, 2025, the price of HIMS ETFs fell to a close of $15.81 per share, down from a close of $50.64 per share on June 20, 2025, or 68.8%, on record volume of nearly 19 million shares. The same day, the price of Hims' other derivative securities also suffered substantial price declines.

113. The following day, June 24, 2025, *Forbes* published a scathing article that summed up the "market's brutal reaction to the partnership termination" – calling it an "overnight" disappearance of Hims' "clearest past to revenue growth," and "primary growth catalyst" that raised serious questions about the Company's future viability. *Forbes* described that the deal was "supposed to be a game-changer" for the Company and "fueled much of HIMS's remarkable 150% stock surge earlier this year, as investors bet on a clear pathway to sustained revenue growth." However, as *Forbes* reported, Hims investors incurred a "devastating 35% stock crash" after Novo

1    "abruptly terminated their brief partnership" which lasted "barely two months." *Forbes* concluded

2    that the "fundamental investment thesis" in Hims was now gone and the Company's prospects

3    were bleak and uncertain, underlining that the "***dramatic sell-off reflects not just the immediate***

4    ***loss of a key business relationship, but fundamental questions about the company's long-term***

5    ***viability in the weight loss market***."

6    **VII.    RELEVANT POST CLASS PERIOD EVENTS**

7        **A.    Defendant Dudum Reveals Hims Never Obtained Novo's Agreement
           to Continue Uninterrupted Its Mass Sales of "Personalized"**
8           **Semaglutide**

9        114.    On July 14, 2025, the *Washington Post* published an article titled: "The unlikely

10   pact and breakup of a drugmaker and a telehealth star" which contained new disclosures from an

11   interview with defendant Dudum about the negotiations leading up to the announcement of the

12   Novo deal on April 29, 2025.  In the article, Dudum contradicted his Class Period representations

13   about the scope and depth of Hims' negotiations with Novo about the personalization exception,

14   and their claimed alignment at the time.  The *Washington Post* noted that the deal between Hims

15   and Novo had signaled to investors that the two companies, who had previously appeared adverse

16   with respect to compounding, had reached an agreement on the use of the personalization

17   exception when that was not in fact that case:

18           It was an unlikely partnership from the start. Hims & Hers was selling an
         imitation version of Wegovy – a practice that Novo Nordisk had scorned as illegal
19       and unsafe. ***But both sides appeared to have set aside their differences when they***
         ***announced their deal for Hims & Hers to carry discounted Wegovy on April 29.***
20       Less than two months later, the collaboration blew up.

21                               *        *        *

22           "I was definitely surprised by how quickly the relationship soured," said
         Ryan MacDonald, an analyst for Needham & Co. ***He assumed the companies had***
23       ***worked through their differences before joining forces. "Clearly, that wasn't the***
         ***case," he said***.
24
         115.    The article contained new commentary from an interview with defendant Dudum
25
     revealing that the dissolution of the Hims-Novo partnership was not based on subsequent
26
     developments, but Hims' uninterrupted continuation of its existing personalized semaglutide sales
27
     which Hims knew Novo viewed as unlawful mass personalization.  Far from spending significant
28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:25-cv-05315-JD                                              - 42 -
4914-4994-8811.v1

time finding a resolution to their differing viewpoints, as defendant Dudum had previously assured

investors, Hims and Novo engaged in little substantive debate on the matter.  Moreover, defendant

Dudum knew that Novo was "dissatisfied" with Hims' continued insistence on utilizing the

personalization exception.  These statements revealed that Hims never reached an agreement with

Novo to sell Wegovy alongside Hims' compounded drugs but touted it to investors anyway,

knowing it was likely to be short-lived:

> Dudum, in an exclusive interview with The Washington Post, recounted the tale of the short-lived marriage, from a celebratory dinner in Princeton, New Jersey, to growing tensions in mid-June, to a breakup via press release.

> *     *     *

> On April 11, Dudum and his top lieutenants arrived at Novo Nordisk's U.S. headquarters in Plainsboro, New Jersey. ***They met for a couple of hours*** with Moore and his leadership team, and directly raised the biggest point of friction, according to Dudum: ***Hims & Hers planned to continue offering "personalized" doses of compounded semaglutide*** under a regulation that allows for modifying a prescription drug if clinicians determine it makes a "significant difference" for an individual patient.

> "To be totally honest, there was no pushback," Dudum said.  ***There was "dissatisfaction" among the Novo Nordisk team that Hims & Hers wasn't dropping compounded semaglutide altogether,*** he said, "but we made it very clear and there really was no hearty debate on this issue."

> The two teams then headed out to dinner at Mediterra, an upscale restaurant in Princeton, where Dudum said the deal was sealed.

116.    The *Washington Post* article included a response from Novo stating that Hims was

made aware during negotiations of Novo's position and expectation that mass compounding is

unlawful and could not continue under the personalization exception after May 22, 2025:

> Skrbkova, the Novo Nordisk spokeswoman, said in a statement that Hims & Hers "failed to adhere to the laws prohibiting mass sales of compounded drugs under the false guise of 'personalization'"

> *     *     *

> Novo Nordisk declined to comment on specifics of Dudum's account.  "We don't disclose private business conversations," said Liz Skrbkova, a spokeswoman. ***"Every company we work with is aware of our stance and expectations."***

> In an interview with The Washington Post on April 29, the day the partnership was announced, Moore said Novo Nordisk was partnering with Hims & Hers because more people were seeking care through telehealth.  "That's where the patients are, and that's where we need to be."  As for Hims' practice of

compounding, Moore said, ***"Compounding is illegal except for rare circumstances. We believe everyone will follow the rules."***

### B.    Hims 2Q25 Financial Results Further Confirm that Hims Did Not Alter Its Business Model Following the Novo Partnership

117.    On August 4, 2025, Hims issued a press release announcing its 2Q25 financial results.  The press release reaffirmed the company's full-year 2025 revenue guidance of $2.3 billion to $2.4 billion. The same day, Hims held an earnings conference call.  Despite the rapid dissolution of the Novo deal, Defendants reaffirmed the Company's full year guidance for its weight loss segment at $725 million, specifically pointing to demand for personalized compounded semaglutide.  The announcement further confirmed that the Company never had any intention of, nor took any affirmative steps toward, altering its business model with respect to personalized compounded semaglutide during the Class Period:

> Given the strength of the oral offering and the demand for management of side effects through compounded GLP-1s, we remain confident in our weight loss of specialties ability to deliver at least $725 million of revenue this year.

118.    Defendants also revealed that they never had any intention of limiting Hims' utilization of the personalization exception, or that personalized compounded semaglutide would merely be "additive" to sales of name-brand Wegovy, as they had represented on May 5, 2025. Instead, Defendants asserted that doctors on their platform must have complete independence with respect to a patient's drug prescription and Hims would not take any action to steer new or existing patients from personalized compounded semaglutide prescriptions toward Wegovy, as had been expected by analysts and investors:

> [P]roviders have complete independence in decision-making.  We empower providers to exercise their own independent clinical judgment in making clinical decisions during each interaction.  We've implemented multiple safeguards to ensure providers never feel that they've been [coerced] or forced in any way to make clinical decisions for business purposes.

119.    On August 4, 2025, the Company filed its quarterly SEC Form 10-Q for the period ending June 30, 2025, which stated that personalized doses of compounded semaglutide continued to make up the "significant majority" of the companies GLP-1 revenues during both 1Q25 and the first half of 2025 – indicting that the Novo partnership had not impacted their business operations or revenue streams:

Our GLP-1 offerings primarily consist of personalized semaglutide and generic liraglutide, as well as commercial dosages of semaglutide and branded Wegovy for partial periods during the first half of 2025. During the three and six months ended June 30, 2025, our GLP-1 offerings generated approximately $190 million and $420 million, respectively, in Online Revenue, *a significant majority of which came from personalized doses in both periods.* We expect revenue from personalized offerings across the business to increasingly drive Online Revenue growth in the future.

C.    **FDA Issues Warning Letter to Hims for Misrepresenting the Ingredients and Efficacy of Compounded Semaglutide**

120.    On September 9, 2025, the FDA issued a Warning Letter to Hims echoing the claims made by Novo in its June 23, 2025 press release that Hims' marketing of compounded semaglutide violated FDA regulations and called out – as examples – claims that compounded semaglutide contained the same active ingredients as Wegovy and Ozempic and that compounded semaglutide contained "clinically proven ingredients." The letter stated:

*As described below, your claims concerning compounded semaglutide products are false or misleading under §§502(a) and 502(bb) of the Federal Food, Drug, and Cosmetic Act . . . .*

\*        \*        \*

The following claims concerning your compounded semaglutide products appear on your website:

•    *"Same active ingredient as Ozempic and Wegovy"*

•    *"Clinically proven ingredients"*

Compounded drug products are not FDA-approved. *Your claims imply that your products are the same as an FDA-approved product when they are not. As a result, these claims are false or misleading and your products are therefore misbranded. . . .*

*. . . The claims identified in this letter put you on notice of our concerns but do not represent an exhaustive list of misbranding violations*.

D.    **Novo Nordisk Reaches Agreements with Numerous Hims Competitors to Sell Its Recently Approved GLP-1 Pill, but Declines to Partner with Hims**

121.    As analysts expected – when the deal with Novo collapsed, Hims was excluded from future deals with Novo, including a GLP-1 pill – the first approved oral GLP-1 – which was made available through further deals that Novo struck with competitor telehealth companies that

abided by Novo's demands to stop mass compounding of semaglutide.  A January 7, 2026 report from The Capital Forum stated:

> Hims does not appear to have struck oral semaglutide deal with Novo Nordisk. Oral Wegovy (semaglutide), a GLP-1 weight-loss drug made by Novo Nordisk (NVO), hit the U.S. market this week following its FDA approval in December.

> Several telehealth platforms – including Ro, LifeMed (LFMD) and Weight Watchers (WW) – have begun offering the brand-name pill at Novo Nordisk's self-pay price, which starts at $149 a month.  These platforms are listed on Novo Nordisk's site as "independent providers are recognized by Novo Nordisk for legitimate medicine source and patient support."

> Notably, Hims & Hers Health (HIMS), a telehealth company that has previously faced heat from Novo Nordisk, is not on that list.

## VIII.   CLASS ACTION ALLEGATIONS

122.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure on behalf of two separate classes of investors:

(a)    Lead Plaintiff Schalter brings this action on behalf of a class of all persons or entities that purchased or otherwise acquired Hims common stock between April 29, 2025 and June 22, 2025, inclusive, and who were damaged thereby (the "Common Stock Class"); and

(b)    Lead Plaintiff Wang brings this action on behalf of a class of all persons or entities that purchased or otherwise acquired derivative securities referencing Hims common stock, including without limitation: (i) purchasers of HIMS ETFs; (ii) purchasers of call option contracts and sellers of put option contracts for Hims common stock; and (iii) purchasers of call option contracts and sellers of put option contracts for HIMS ETFs, between April 29, 2025 and June 22, 2025, inclusive, and who were damaged thereby (the "Derivatives Class").

123.    Excluded from all Classes are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

124.    The members of the respective Classes are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

(a)    Lead Plaintiff Schalter alleges that throughout the Class Period, Hims' common stock actively traded on the NYSE.  While the exact number of Common Stock Class members is unknown to Lead Plaintiff Schalter at this time and can only be ascertained through appropriate discovery, Hims common stock traded hundreds of millions of times during the Class Period and Lead Plaintiff Schalter believes that there are at least thousands of members in the proposed Classes.  Record owners and other members of the Common Stock Class may be identified from records maintained by Hims or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions; and

(b)    Lead Plaintiff Wang alleges that throughout the Class Period, Hims' equity derivative securities actively traded on multiple national exchanges, including NASDAQ, NASDAQ OMX, NYSE ARCA, and the CBOE.  While the exact number of Derivative Class members is unknown to Lead Plaintiff Wang at this time and can only be ascertained through appropriate discovery, HIMS ETFs, stock options, and other equity-linked derivative securities traded hundreds of millions of times during the Class Period and Lead Plaintiff Wang believes that there are at least thousands of members in the proposed Classes.  Record owners and other members of the Derivatives Class may be identified from records maintained by Hims, the sponsors of HIMS ETFs, and their respective transfer agents, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

125.    Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes.  Among the questions of law and fact common to the Classes are:

(a)    whether Defendants violated the Exchange Act;

(b)    whether Defendants engaged in a fraudulent scheme by announcing a partnership with Novo without disclosing material terms on which the companies agreed and disagreed;

(c)    whether statements made by Defendants to the investing public during the

1  Class Period omitted and/or misrepresented material facts about the business, operations, and

2  prospects of Hims;

3          (d)     whether Defendants knew or recklessly disregarded that their statements

4  were false and misleading;

5          (e)     whether the price of Hims securities was inflated during the Class Period;

6  and

7          (f)     to what extent the members of the Classes have sustained damages and the

8  proper measure of damages.

9          126.    Plaintiffs' claims are typical of the claims of the members of their respective

10  Classes as all members of the Classes are similarly affected by Defendants' wrongful conduct in

11  violation of federal law that is complained of herein.

12          127.    Plaintiffs will fairly and adequately protect the interests of the members of their

13  respective Classes and have retained respective counsel competent and experienced in class and

14  securities litigation.

15          128.    A class action is superior to all other available methods for the fair and efficient

16  adjudication of this controversy since joinder of all members is impracticable.  There will be no

17  difficulty in the management of this action as a class action.

18  **IX.     UNDISCLOSED ADVERSE FACTS**

19          129.    The market for Hims securities was open, well-developed and efficient at all

20  relevant times.  As a result of Defendants' fraudulent scheme, materially false and/or misleading

21  statements, and/or failures to disclose, Hims securities traded at artificially inflated prices during

22  the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Hims

23  securities relying upon the integrity of the market price of the Company's securities and market

24  information relating to Hims, and have been damaged thereby.

25          130.    At all relevant times, Defendants' wrongful conduct particularized in this

26  Complaint directly or proximately caused or were a substantial contributing cause of the damages

27  sustained by Plaintiffs and other members of the Class.  As described herein, during the Class

28  Period, Defendants engaged in a fraudulent scheme and made or caused to be made a series of

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:25-cv-05315-JD                                                                    - 48 -
4914-4994-8811.v1

1    materially false and/or misleading statements about Hims' current business performance,

2    operations and outlook. This wrongful conduct had the cause and effect of creating in the market

3    an unrealistically positive assessment of the Company and its financial well-being and prospects,

4    thus causing the Company's securities to be overvalued and artificially inflated at all relevant

5    times. Defendants' materially false and/or misleading statements during the Class Period resulted

6    in Plaintiff and other members of the Class purchasing the Company's securities at artificially

7    inflated prices, thus causing the damages complained of herein when the truth was revealed.

8    **X.    NO SAFE HARBOR**

9        131.    The "Safe Harbor" warnings accompanying Hims' reportedly forward-looking

10    statements issued during the Class Period were ineffective to shield those statements from liability.

11    Defendants are liable for any false and misleading forward-looking statement pled because, at the

12    time each forward-looking statement was made, the speaker knew the forward-looking statement

13    was false or misleading and the forward-looking statement was authorized and/or approved by an

14    executive officer of Hims who knew that the forward-looking statement was false.

15        132.    None of the historic or present tense statements made by Defendants were

16    assumptions underlying or relating to any plan, projection or statement of future economic

17    performance, as they were not stated to be such assumptions underlying or relating to any

18    projection or statement of future economic performance when made, nor were any of the

19    projections or forecasts made by Defendants expressly related to, or stated to be dependent on

20    those historic or present tense statements when made. In addition, the forward-looking statements

21    were contradicted by existing, undisclosed material facts that were required to be disclosed so that

22    the forward-looking statement would not be misleading.

23        133.    Hims' purported cautionary language is inadequate to insulate Defendants' false

24    statements under the bespeaks caution doctrine or the statutory safe harbor because each of the

25    disclosures is vague and boilerplate and/or the purported risks were referenced as potential or

26    contingent future outcomes when in fact, the purported risks warned of had already come to

27    fruition and were negatively impacting the Company. In particular, as alleged herein, Defendants

28    knew that their partnership with Novo was at risk for early termination, and not likely to be a long-

1  term collaboration, because Hims had agreed to stop "mass compounding," while Hims and Novo

2  had failed to reach an agreement regarding, among other things, Hims' continued marketing and

3  sale of compounded semaglutide under the personalization exception, what constituted clinical

4  necessity for personalized semaglutide, and Hims' efforts to steer weight-loss patients to Wegovy.

5       134.   For example, the Company's 1Q25 SEC Form 10-Q contained the following

6  purported risk warning concerning the Company's ability to expand and maintain the scope of its

7  offerings, like name-brand Wegovy, without disclosing the known facts that its partnership with

8  Novo was at risk of termination and Hims would lose access to selling Wegovy:

> ***If we are unable to expand or maintain the scope of our offerings,
> including the number and type of products and services that we offer, the number
> and quality of Providers serving our customers, and the number and types of
> conditions capable of being treated through our platform, our business, financial
> condition, and results of operations may be materially and adversely affected.***
>
> \*     \*     \*
>
> We provide customers with access to non-prescription products, telehealth-based
> consultations with Providers, and certain prescription medications that may be
> prescribed by Providers in connection with telehealth consultations.  In order for
> our business to continue growing, we need to maintain and continue expanding the
> scope of products and services we offer our customers, including telehealth
> consultations, prescription medication for additional conditions, and non-
> prescription health and wellness products and services.

17      135.   Hims also purported to warn investors of the possibility that Hims could fail to meet

18  the expectations of its "strategic partners" which could harm their reputation; but there already

19  existed facts that this potential future "risk" was already likely to materialize when Novo

20  terminated the partnership upon Hims failing to reduce or stop their sale of personalized

21  semaglutide at scale:

> ***Our brand is integral to our success. If we fail to effectively maintain,
> promote, and enhance our brand in a cost-effective manner, our business and
> competitive advantage may be harmed.***
>
> We believe that maintaining and enhancing our reputation and brand
> recognition is critical to our relationships with existing customers, Providers,
> strategic partners, Pharmacies, Partner Pharmacies, and other suppliers, and to our
> ability to attract new customers, Providers, strategic partners, Pharmacies, Partner
> Pharmacies, and other suppliers. . . .  In addition, any factor that diminishes our
> reputation or that of our management, including failing to meet the expectations of
> our customers, Providers, or partners, could harm our reputation and brand and
> make it substantially more difficult for us to attract new customers, Providers, and
> partners. . . . Additionally, unexpected side effects or safety or efficacy concerns

with our offerings, including compounded injectable semaglutide or GLP-1s as a class, significant changes in demand, litigation or regulatory proceedings and investigations, negative publicity, recalls, pressure from existing or new competitive products, or changes in labeling or pricing for these medications, could materially impact our reputation, which could negatively affect our business, stock price, prospects, and/or our results of operations. ***If we do not successfully maintain and enhance our reputation and brand recognition in a cost-effective manner, our business may not grow and we could lose our relationships with customers, Providers, and partners, which could harm our business, financial condition, and results of operations.***

## XI.  LOSS CAUSATION

136.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.  During the Class Period, as detailed herein, Defendants engaged in a scheme to defraud investors, and made false and misleading statements touting a partnership with Novo to sell Wegovy on Hims' platform, alongside Hims' other weight loss products, including personalized semaglutide, when Defendants knew but failed to disclose, among other things, that Him had agreed to Novo's demand to stop the sale of "mass compounded" semaglutide, that Hims had not obtained Novo's agreement that Hims' could continue uninterrupted its marketing and sale of compounded semaglutide, the appropriate volume of Hims' sale of compounded semaglutide via the personalization exception, or what constituted clinical need under the personalization exception.

137.    These misrepresentations and scheme caused Hims securities to trade at artificially inflated prices throughout the Class Period, including substantial increases of approximately 23% and 46% in the per share prices of Hims common stock and Hims ETF, respectively, on the first day of the Class Period, and a Class Period high close of $64.65 per share of common stock and $54.46 per share of HIMS ETF on May 16, 2025.  By artificially inflating Hims' stock price, Defendants deceived Plaintiffs and the Class causing them to suffer substantial losses, *i.e.*, damages under the federal securities laws when the truth was revealed.  The damages suffered by Plaintiffs and other members of the Class was a direct and proximate result of Defendants' scheme to defraud, including their misrepresentations and omissions, which artificially inflated the prices of Hims' common stock and equity derivatives, and the subsequent significant stock and derivative

1    price declines that occurred when the concealed risks materialized and/or the true state of Hims'

2    business was revealed to the market beginning on June 23, 2025.

3        138.    The prices of Hims' common stock and equity derivatives declined on the

4    disclosures of new and unexpected negative information.  The timing and magnitude of Hims'

5    stock and equity derivative price decline negates any inference that the loss suffered by Plaintiffs

6    and other Class members was caused by changed market conditions, macroeconomic or industry

7    factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

8        139.    The economic loss, *i.e.*, damages suffered by Plaintiffs and other Class members,

9    was a direct result of Defendants' fraudulent scheme and material misrepresentations, which

10   artificially inflated Hims' stock price and equity derivative prices, and the subsequent significant

11   decline in the value of Hims stock and equity derivatives as the true state of the Company's

12   operations, and the risks it faced, was revealed to the market.

13   **XII.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)**

14

15       140.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-

16   market doctrine in that, among other things:

17       (a)    Defendants made public misrepresentations or failed to disclose material

18   facts during the Class Period;

19       (b)    the omissions and misrepresentations were material;

20       (c)    the Company's securities, including its common stock, HIMS ETFs, stock

21   options, and other derivative securities, traded in efficient markets;

22       (d)    the misrepresentations alleged would tend to induce a reasonable investor

23   to misjudge the value of Hims securities; and

24       (e)    Plaintiff and other members of the Class purchased Hims securities between

25   the time Defendants misrepresented or failed to disclose material facts and the time the true facts

26   were disclosed, without knowledge of the misrepresented or omitted facts.

27       141.    At all relevant times, the markets for Him's securities were efficient:

28       (a)    Hims common stock met the requirements for listing, and was listed and

1  actively traded on the NYSE, a highly efficient and automated market;

2        (b)    HIMS ETFs met the requirements for listing, and were listed and actively

3  traded on the NASDAQ, a highly efficient and automated market;

4        (c)    Hims stock options met the requirements for listing, and were listed and

5  actively traded on multiple public exchanges, including NASDAQ OMX, NYSE ARCA, and the

6  CBOE, all highly efficient markets;

7        (d)    As a regulated issuer, Hims filed periodic public reports with the SEC

8  and/or the NYSE;

9        (e)    Hims regularly communicated with public investors via established market

10  communication mechanisms, including through regular dissemination of press releases on the

11  national circuits of major newswire services and through other wide-ranging public disclosures,

12  such as communications with the financial press and other similar reporting services; and/or

13        (f)    Hims was followed by securities analysts employed by brokerage firms who

14  wrote reports about the Company, and these reports were distributed to the sales force and certain

15  customers of their respective brokerage firms.

16        142.    As a result of the foregoing, the market for Hims securities promptly digested

17  current information regarding Hims from all publicly available sources and reflected such

18  information in Hims securities prices.  Under these circumstances, all purchasers and sellers of

19  Hims securities during the Class Period, as defined in ¶¶121-122 above, suffered similar injury

20  through their purchase of Hims securities at artificially inflated prices and a presumption of

21  reliance applies.

22        143.    A Class-wide presumption of reliance is also appropriate in this action under

23  *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted

24  herein against Defendants are predicated on omissions of material fact for which there was a duty

25  to disclose.  Because this action involves Defendants' fraudulent scheme and failure to disclose

26  material adverse information, positive proof of reliance is not a prerequisite to recovery.

27

28

**COUNT I**

**For Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder Against all Defendants**

144. Plaintiffs incorporate ¶¶1-143 by reference.

145. During the Class Period, Hims and the Individual Defendants engaged in a scheme to defraud and disseminated or approved the statements specified above, which they knew or recklessly disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

146. Hims and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that went beyond their material misstatements and operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Hims securities during the Class Period, and were intended by Defendants to so deceive.

147. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Classes have suffered damages in connection with their respective purchases and sales of Hims securities during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Hims securities and experienced losses when the artificial inflation was released from Hims securities as a result of the disclosures and price decline detailed herein. Plaintiffs and the Class would not have purchased Hims securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' scheme to defraud and false and misleading statements and omissions.

148.    By virtue of the foregoing, Hims and the Individual Defendants have each violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against All Defendants

149.    Plaintiffs incorporates ¶¶1-148 by reference.

150.    Hims and the Individual Defendants acted as controlling persons of Hims within the meaning of §20(a) of the Exchange Act.  By reason of their controlling positions with the Company, the Individual Defendants had the power and authority to cause Hims to engage in the wrongful conduct complained of herein.  Hims controlled the Individual Defendants and all of its employees.  By reason of such conduct, Hims and the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## XIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    determining that this action is a proper Class action, having designated Plaintiffs as Lead Plaintiffs and Class Representatives under Rule 23 of the Fed. R. Civ. P. and appointing Plaintiffs' respective counsel as Lead Counsel;

(b)    awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding such equitable, injunctive, or other relief as deemed appropriate by the Court.

## XIV.    DEMAND FOR JURY TRIAL

151.    Plaintiffs hereby demand a trial by jury.

DATED:  January 29, 2026              ROBBINS GELLER RUDMAN
                                       & DOWD LLP
                                      DANIEL J. PFEFFERBAUM
                                      ALEX N. JILIZIAN

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:25-cv-05315-JD                                              - 55 -
4914-4994-8811.v1

1

2
                                                        _s/ Daniel J. Pfefferbaum_
3                                                      DANIEL J. PFEFFERBAUM

4                                          Post Montgomery Center
                                           One Montgomery Street, Suite 1800
5                                          San Francisco, CA  94104
                                           Telephone:  415/288-4545
6                                          dpfefferbaum@rgrdlaw.com
                                           ajilizian@rgrdlaw.com
7
                                           *Lead Counsel for Lead Plaintiff James A. Schalter*
8                                          *and the Common Stock Class*

9    DATED:  January 29, 2026              SAXENA WHITE P.A.
                                           DAVID R. KAPLAN
10                                         EMILY BISHOP

11

12                                                      _s/ David R. Kaplan_
                                                       DAVID R. KAPLAN
13
                                           505 Lomas Santa Fe Drive, Suite 180
14                                         Solana Beach, CA  92075
                                           Telephone:  858/997-0860
15                                         dkaplan@saxenawhite.com
                                           ebishop@saxenawhite.com
16
                                           *Lead Counsel for Lead Plaintiff Shuo-Hsien Wang*
17                                         *and the Derivatives Class*

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:25-cv-05315-JD                                        - 56 -
4914-4994-8811.v1