ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL J. PFEFFERBAUM (248631)
ALEX N. JILIZIAN (362307)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
dpfefferbaum@rgrdlaw.com
ajilizian@rgrdlaw.com

*Lead Counsel for Lead Plaintiff James A.
Schalter and Common Stock Class*

SAXENA WHITE P.A.
DAVID R. KAPLAN (SBN 230144)
EMILY R. BISHOP (SBN 319383)
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA  92075
Telephone:  858/997-0860
dkaplan@saxenawhite.com
ebishop@saxenawhite.com

*Lead Counsel for Lead Plaintiff Shuo-Hsien
Wang and Derivatives Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re HIMS & HERS HEALTH, INC. SECURITIES LITIGATION | ) ) ) ) |

Case No. 3:25-cv-05315-JD

<u>CLASS ACTION</u>

LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

4903-0004-4200.v1

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | BACKGROUND AND STATEMENT OF FACTS | 1 |
| III. | LEGAL STANDARD | 4 |
| IV. | ARGUMENT | 4 |

A. Defendants Do Not Seek to Dismiss the Scheme Liability Claims ........................ 4

B. The Complaint Sufficiently Pleads Material False Statements and Omissions .......... 5

    1. False and Misleading Statements and Omissions Concerning the Sale of Wegovy on the Hims Platform .......... 5

    2. False and Misleading Statements and Omissions Concerning Hims' Alignment with Novo on the Personalization Exception .......... 8

    3. False and Misleading Statements Concerning the Novo Partnership and Future Deals with Major Drug Makers .......... 9

    4. The Alleged Misrepresentations and Omissions Were Highly Material to Investors and Not "Puffery" .......... 10

    5. The Alleged Misrepresentations and Omissions Are Actionable Even if Analyzed as "Opinions" .......... 13

    6. The Safe Harbor Does Not Immunize Defendants' False and Misleading Statements and Omissions .......... 14

C. The Complaint Pleads a Strong Inference of Scienter .......... 15

    1. Defendants Had Actual Knowledge of the Truth as Participants in the Fraudulent Scheme .......... 15

    2. Defendants' Statements and Admissions Support Their Scienter .......... 16

    3. The Core Operations Doctrine Supports Scienter .......... 17

    4. The Temporal Proximity of the Announcement and Termination of the Novo Partnership Supports Scienter .......... 18

    5. Defendants' Offering of Senior Convertible Notes Supports a Finding of Scienter .......... 18

V. THE DERIVATIVES CLASS HAS STANDING TO BRING SUIT .......... 19

VI. CONCLUSION .......... 20

LEAD PLS.' OPPOSITION TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:25-cv-05315-JD

- i -

4903-0004-4200.v1

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Baker v. SeaWorld Ent., Inc.*,
423 F. Supp. 3d 878 (S.D. Cal. 2019)........................................................................11

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ................................................................................6, 18

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975)..............................................................................................19, 20

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ......................................................................................6

*Casella v. Webb*,
883 F.2d 805 (9th Cir. 1989) ....................................................................................13

*Curran v. Freshpet, Inc.*,
2018 WL 394878 (D.N.J. Jan. 12, 2018) ..................................................................19

*Deutschman v. Beneficial Corp.*,
841 F.2d 502 (3d Cir. 1988)......................................................................................19

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023) ......................................................................................8

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ....................................................................................11

*Fin. Sec. Assurance, Inc. v. Stephens, Inc.*,
500 F.3d 1276 (11th Cir. 2007) ................................................................................20

*Foman v. Davis*,
371 U.S. 178 (1962)...................................................................................................20

*Garbaccio v. Starbucks Corp.*,
809 F. Supp. 3d 1261 (W.D. Wash. 2025)..................................................................7

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ....................................................................................11

*Homyk v. ChemoCentryx, Inc.*,
2023 WL 3579440 (N.D. Cal. Feb. 23, 2023) ..........................................................14

*In re Adobe Sys., Inc. Sec. Litig.*,
139 F.R.D. 150 (N.D. Cal. 1991)........................................................................19, 20

LEAD PLS.' OPPOSITION TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:25-cv-05315-JD

- ii -

4903-0004-4200.v1

**Page**

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ...............................................................................................5, 15

*In re Apple Comput. Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) .................................................................................................11

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) .........................................................................16

*In re Capacitors Antitrust Litig.*,
2017 WL 897340 (N.D. Cal. Mar. 7, 2017)...............................................................................5

*In re: CCIV / Lucid Motors Sec. Litig.*,
110 F.4th 1181 (9th Cir. 2024) .........................................................................................19, 20

*In re Facebook, Inc. Sec. Litig.*,
87 F.4th 934 (9th Cir. 2023) .....................................................................................................7

*In re Galena Biopharma, Inc. Sec. Litig.*,
117 F. Supp. 3d 1145 (D. Or. 2015) .........................................................................................4

*In re Portal Software, Inc. Sec. Litig.*,
2005 WL 1910923 (N.D. Cal. Aug. 10, 2005) ........................................................................18

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) .................................................................................................14

*In re Sanofi-Aventis Sec. Litig.*,
774 F. Supp. 2d 549 (S.D.N.Y. 2011)......................................................................................17

*In re Semtech Corp.*,
2025 WL 2884810 (C.D. Cal. Oct. 7, 2025)............................................................................19

*In re Splunk Inc. Sec. Litig.*,
592 F. Supp. 3d 919 (N.D. Cal. 2022) .....................................................................................11

*In re STEC Inc. Sec. Litig.*,
2011 WL 2669217 (C.D. Cal. June 17, 2011) ........................................................................10

*In re Synchrony Fin. Sec. Litig.*,
988 F.3d 157 (2d Cir. 2021).....................................................................................................12

*In re Vaxart, Inc. Sec. Litig.*,
576 F. Supp. 3d 663 (N.D. Cal. 2021) ...........................................................................8, 14, 17

LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:25-cv-05315-JD

4903-0004-4200.v1

**Page**

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) ................................................................................................5

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
    2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ...........................................................................12

*Kang v. PayPal Holdings, Inc.*,
    620 F. Supp. 3d 884 (N.D. Cal. 2022) .................................................................................12

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) .......................................................................................4, 5, 9

*Lim v. Hightower*,
    2025 WL 2965692 (6th Cir. Oct. 21, 2025)...................................................................12, 18

*Lorenzo v. SEC*,
    587 U.S. 71 (2019)..................................................................................................................4

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)..................................................................................................................4

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) .................................................................................................6

*Mulligan v. Impax Lab'ys, Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ...................................................................................13

*N.M. Inv. Council v. Ernst & Young LLP*,
    641 F.3d 1089 (9th Cir. 2011) .............................................................................................15

*Newtyn Partners, LP v. All. Data Sys. Corp.*,
    165 F.4th 947 (6th Cir. 2026) ..........................................................................................2, 12

*ODS Capital LLC v. JA Solar Holdings Co., Ltd.*,
    No. 18-cv-12083 (S.D.N.Y. 2023), ECF Nos. 127-1, 131......................................................20

*Okla. Firefighters Pension & Ret. Sys. v. Musk*,
    2026 WL 878962 (S.D.N.Y. Mar. 31, 2026) ........................................................................19

*Omnicare, Inc. v. Laborers Dis. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015).........................................................................................................13, 14

*Pampena v. Musk*,
    2024 WL 4331811 (N.D. Cal. Sept. 27, 2024) ....................................................................20

LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED
CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:25-
cv-05315-JD

- iv -

4903-0004-4200.v1

**Page**

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ..................................................................................................11

*Purple Mountain Tr. v. Wells Fargo & Co.*,
    432 F. Supp. 3d 1095 (N.D. Cal. 2020) ....................................................................................16

*Reckstin Fam. Tr. v. C3.ai, Inc.*,
    718 F. Supp. 3d 949 (N.D. Cal. 2024) ......................................................................................12

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) .......................................................................................16, 17, 18

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
    845 F.3d 1268 (9th Cir. 2017) ....................................................................................................5

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ....................................................................................................17

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ......................................................................................................9

*SEC v. Richman*,
    2021 WL 5113168 (N.D. Cal. Nov. 3, 2021) ..............................................................................5

*SEC v. Whitworth Energy Res. Ltd.*,
    2000 WL 17770652 (9th Cir. Dec. 1, 2000) .............................................................................15

*Simpson v. AOL Time Warner Inc.*,
    452 F.3d 1040 (9th Cir. 2006), *vacated on other grounds*, *sub nom.*, *Simpson v. Homestore.com, Inc.*, 519 F.3d 1041 (9th Cir. 2008) ...............................................................4

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)......................................................................................................15, 16, 17

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)....................................................................................................................10

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ......................................................................................12

LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:25-cv-05315-JD

- v -

4903-0004-4200.v1

**Page**

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
 §78c(10) ......................................................................................................................19
 §78j(b) ..............................................................................................................5, 19, 20
 §78t(a) .........................................................................................................................5

17 C.F.R
 §240.10b-5 ....................................................................................................................19

Federal Rules of Civil Procedure
 Rule 9(b) .......................................................................................................................4
 Rule 15 ........................................................................................................................20

LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:25-cv-05315-JD

- vi -

4903-0004-4200.v1

## I.    INTRODUCTION

Lead Plaintiffs Schalter and Wang hereby submit this opposition to Defendants' Notice of Motion and [sic] to Dismiss Consolidated Class Action Complaint (ECF 89) ("Motion" or "Mot.").[1] The Complaint sets forth coherent and compelling allegations of securities fraud – namely, that Defendants Hims & Hers Health Inc., its CEO Dudum, and its CFO Okupe misled investors into believing that Hims could continue its lucrative business of selling generic semaglutide via its online platform while simultaneously entering into a purported "long-term" strategic partnership with pharmaceutical giant Novo Nordisk to sell its blockbuster name-brand semaglutide, Wegovy, on the same platform.  Unbeknownst to investors, the strategic partnership did not in any way permit Hims to continue its traditional business model.  Eight weeks later, after Novo discovered that Hims had continued its mass sales of generic semaglutide and was not shifting patients to branded Wegovy, Novo immediately terminated the partnership and publicly accused Hims of violating their agreement and the law.  Defendants' efforts to recast these events as merely a good-faith business misunderstanding – or even more implausibly, a change of heart by Novo after agreeing to imperil its top weight-loss drug – would require the Court to disregard the well-pled facts, misapply the law, and draw improper inferences in Defendants' favor.  The Complaint more than satisfies the applicable pleading standards; the Motion should be denied in its entirety.

## II.    BACKGROUND AND STATEMENT OF FACTS

Hims is a telehealth company that provides remote consultations, prescriptions, and medications through its websites and mobile applications.  ¶44.  In 2023, Hims capitalized on the booming popularity of weight-loss drugs, offering generic compounded semaglutide at a fraction of the price of Novo's name-brand Wegovy.  ¶¶3-4, 46, 50.  Skyrocketing popularity created a shortage of Wegovy, resulting in the FDA permitting compounders to sell generic semaglutide to satisfy unmet demand, even though the drug was otherwise patent-protected.  ¶¶3, 47-48.  Hims touted the safety, efficacy, and low cost of its compounded products as "the future of healthcare" and accused

---

[1]     Unless otherwise noted, internal citations are omitted, and emphasis is added; all capitalized terms not otherwise defined have the same meaning as set forth in the Consolidated Class Action Complaint for Violations of the Federal Securities Laws (ECF 86) (the "Complaint");  and all "¶__" or "¶¶__" citations herein refer to the Complaint.

Novo of being "priced for profits, not patients." ¶¶50, 57-59. Despite aggressive efforts by Novo and other name-brand drug-makers to limit sales of compounded semaglutide by telehealth companies, Hims' strategy was enormously successful, fueling record revenues and sending its stock price soaring. ¶¶5, 50-51, 60-64, 71-72, 136-137.

On February 21, 2025, the FDA announced that semaglutide was no longer in shortage and generic sales must cease within a three-month grace period, by May 22, 2025. ¶65. This sea change jeopardized Hims' surging weight-loss business, which was forecasted to generate $725 million in 2025. ¶51. Hims had planned for this development by selling two-thirds of its semaglutide patients "personalized" doses rather than identical dosages to Wegovy. ¶¶52-55. Personalized drugs had traditionally been reserved for prescriptions on a case-by-case basis for individual patients who demonstrated a clinical need for an alternative to the name-brand option. ¶¶7, 49. Hims tested the boundaries of the exception by mass producing compounded semaglutide for hundreds of thousands of patients and instructing patients to take a "personalized" dose.[2] ¶¶7, 52-55. On March 2, 2025, Hims announced personalized prescriptions would continue, but commercially available doses would stop. ¶69. Novo publicly denounced this "mass personalization" as illegal and demanded that telehealth companies cease *all* compounded semaglutide sales by May 22, 2025. ¶¶60-64, 71-72. Accordingly, in the months preceding the Class Period, Hims stock price declined by more than half, from $66 per share to $28 per share, on questions about its future weight-loss revenue and the overhang of potential legal and regulatory action. ¶¶68, 84.

Defendants were determined not to cave to Novo's demands and refused to alter Hims' lucrative business model of selling "personalized" compounded semaglutide. ¶69. But recognizing the intense pressure its unconventional use of the exception was placing on the Company, Defendants engaged in negotiations with Novo to bring Wegovy to Hims' far-reaching platform. ¶¶7, 52-55, 89. Feigning a change in approach, Defendants agreed to stop selling "mass compounded" semaglutide and transition patients to Wegovy. ¶¶17, 23, 78(b), 86, 93(b), 106-107. Novo expected this to result in the end of nearly all semaglutide sales, save for the rare circumstance

---

[2]    Wegovy was available in doses of 0.25 mg, 0.5 mg, 1 mg, 1.7 mg, and 2.4 mg; Hims typically prescribed compounded semaglutide to be self-administered in "personalized" doses of 0.2 mg, 0.4 mg, 0.75 mg, and 1.25 mg. ¶54.

where a physician determined a patient had a demonstrated clinical need requiring an individually compounded alternative. ¶¶9, 17-18, 72, 78(b). Despite Novo's consistent position against Hims' illegal "mass personalization" and Novo's highly public campaign to shut down hundreds of generic semaglutide compounders, Hims entered into a strategic partnership with Novo without obtaining Novo's consent to continue its mass sales of "personalized" semaglutide in any way, shape, or form. ¶¶60-64, 71-72, 78(a), 93(a). As Dudum later admitted, "there really was no hearty debate" on this foundational dispute. ¶¶19, 24, 115. Instead, Hims deceived Novo into entering the deal on the understanding that such sales would stop, and Hims would transition patients to branded Wegovy. ¶¶78, 93. Accordingly, the deal was virtually certain to fail if Hims refused to stop mass sales of "personalized" semaglutide. ¶¶17-18, 78, 93, 105, 107.

The Class Period begins on April 29, 2025, when Hims quelled concern about the future of its weight-loss business by announcing a landmark partnership with Novo. ¶¶11, 20, 74-77. Hims touted its ability to sell Wegovy, in addition to its generic semaglutide, as the "'***first step in a long-term collaboration***.'" ¶¶11, 20, 76. Analysts understood that Hims had resolved its dispute with Novo over the sale of personalized semaglutide and expected a significant portion of Hims' patients to transition to Wegovy after May 22, 2025. ¶¶81-82. The deal was described as a "clear win" for Hims and an "extremely important validation of the HIMS business model." ¶¶79-83. The partnership relieved concern over the sustainability of Hims' weight-loss revenues, as well as the threat of litigation and regulatory action. *Id*. The Novo deal was viewed as the start of an "evolution" for Hims away from generic offerings and towards partnerships with "Big Pharma." ¶80. Hims stock price surged to $35 per share, nearly doubling in value. ¶¶13, 84, 137.

On May 5, 2025, Defendants reinforced the market's false impression by touting the Novo deal as a sign of "trust" and a "blueprint" for future deals. ¶¶14, 86-89. Dudum assured the companies were in "alignment" on the personalization exemption and sales of personalized semaglutide would be "additive," *i.e.*, Hims' focus would be on selling Wegovy. ¶¶14-15, 91. Analysts echoed Dudum's false assertion that the companies were "aligned philosophically" on personalization. ¶¶15, 95, 97. Hims stock price rose another 18% to $49 per share on May 6, 2025, nearly tripling in value since the Class Period start. ¶¶16, 94. On May 8, 2025, Hims capitalized on

the positive market sentiment, raising $1 billion in a zero-interest convertible note offering. ¶99.

However, after entering into the agreement with Novo, Hims made no meaningful effort to sell Wegovy and instead continued to promote and sell its personalized generic semaglutide, which was substantially more profitable for Hims. ¶¶110-111, 119. Following the expiration of the grace period on May 22, 2025, Novo reiterated its expectation to Defendants that Hims' patients be transitioned to Wegovy. ¶106. After Hims refused, on June 23, 2025, Novo terminated the deal and publicly excoriated Hims for continued "mass sales" of compounded semaglutide "under the false guise of 'personalization.'" ¶105. A Novo executive stated, "'we had an agreement that the mass compounding would stop and unfortunately it didn't stop.'" ¶107. The market was stunned, instead of being a "game-changer," the failure of the Novo deal raised "fundamental questions" about Hims' weight-loss business and its long-term strategy of pushing the boundaries of personalized compounding "*to a scale . . . not previously seen*." ¶¶111, 113. Hims' stock price plummeted 35%, from $64 to $42 per share, the largest single-day decline in the Company's history. ¶¶25, 112.

## III.    LEGAL STANDARD

In order to withstand a motion to dismiss, a plaintiff "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011). By specifically alleging the "'who, what, when, where, and how' of the fraud," Plaintiffs' claims meet the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the PSLRA; *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018).

## IV.    ARGUMENT

### A.    Defendants Do Not Seek to Dismiss the Scheme Liability Claims

A scheme liability claim can be based on false or misleading statements or on conduct or transactions that have as "a principal purpose [] creating a false appearance." *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1048-50 (9th Cir. 2006), *vacated on other grounds*, *sub nom.*, *Simpson v. Homestore.com, Inc.*, 519 F.3d 1041 (9th Cir. 2008); *see also Lorenzo v. SEC*, 587 U.S. 71, 80 (2019). Both are adequately alleged here. *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1193 (D. Or. 2015) (noting that scheme liability is not subject to PSLRA pleading requirements). The Complaint alleges that Defendants induced Novo to enter a deal with Hims

LEAD PLS.' OPPOSITION TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:25-cv-05315-JD
4903-0004-4200.v1

- 4 -

without any intention of changing what Novo considered illegal conduct, then falsely touted the companies' purported alignment and the deal's blueprint for future partnerships. This scheme relieved investor concern about Hims' financial, legal, and regulatory risk, and artificially inflated the Company's stock price. ¶¶78, 92-93, 129-130, 136-137. "[M]isleading . . . investors about the strength and sustainability of the company's business model" is sufficient to plead scheme liability. *SEC v. Richman*, 2021 WL 5113168, at *8 (N.D. Cal. Nov. 3, 2021). Defendants do not move to dismiss the scheme liability claims, which must proceed to discovery. *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021). Defendants are precluded from challenging these claims on reply.[3] *In re Capacitors Antitrust Litig.*, 2017 WL 897340, at *1 (N.D. Cal. Mar. 7, 2017) ("[r]aising new arguments in a reply brief is a classic form of sandbagging").

**B.  The Complaint Sufficiently Pleads Material False Statements and Omissions**

A complaint sufficiently alleges falsity when it "'specifi[es] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading.'" *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). A statement is misleading if it would give a reasonable investor an "impression of a state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017). Even a literally true statement "may be misleading if it omits material information." *Khoja*, 899 F.3d at 1008-09.

**1.  False and Misleading Statements and Omissions Concerning the Sale of Wegovy on the Hims Platform**

On April 29, 2025, Hims touted Wegovy as "[a] new offering [that] builds on Hims & Hers' existing suite of weight loss solutions." ¶77. A week later, Dudum stated that, "[b]randed Wegovy will be an additional option for subscribers" and would "complement" its personalized semaglutide offering. ¶¶88, 90. Defendants' statements gave the false impression that Hims' ongoing mass sales of personalized semaglutide was consistent with its deal with Novo when in truth: (i) Hims had agreed to stop "mass compounding" generic semaglutide, which it knew Novo expected to apply to

---

3 The Motion makes no argument in response to the claims under §20(a), other than claiming a lack of underlying §10(b) violation, and thus the control claims also survive.

virtually all of Hims' sales of compounded semaglutide (¶¶17, 23, 78(b), 86, 93(b), 106-107); (ii) Hims had failed to reach an affirmative agreement that it could offer Wegovy while continuing its traditional business practice selling compounded semaglutide after the grace period ended (¶¶17-20, 78(a), 93(a), 105-107); and (iii) Novo expressed dissatisfaction to Hims during the negotiations regarding any continuation of Hims traditional mass sales of generic semaglutide (¶¶19, 24, 115). These undisclosed facts would have revealed to investors that Hims' ongoing sale of "personalized" generic semaglutide after the grace period was in fundamental opposition to Novo's position. Once Defendants "chose to tout" the Novo deal, "they were bound to do so in a manner that wouldn't mislead investors." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008).

Moreover, these statements were "misleading when considered in context" because they reinforced Hims' statements – made before the deal was announced – that its personalized semaglutide prescriptions would continue, knowing that Novo had publicly and vociferously stated that these sales were illegal "mass personalization." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Expectedly, the market understood the deal to mean that "***the companies had worked through their differences before joining forces***." ¶114. One analyst emphasized that under the deal, Hims would be "***serving as a front door to access and not using its own compounding facility***." ¶80. Another expected "half of patients could return to this new Wegovy offering." ¶82. Yet another wrote that the deal "mak[es] the company less reliant on generating revenue via its interpretation of the [] personalization exemption in a post-shortage world." ¶83. Analysts' contemporaneous reports demonstrate that Defendants' omissions "create[d] an impression of a state of affairs that differs in a material way from the one that actually exist[ed]." *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

The Motion contends that Defendants' statements concerning the deal were truthful and Defendants cannot be held liable for failing to foresee the ultimate failure of their partnership with Novo. Mot. at 6-8. As an initial matter, Defendants misconstrue the Complaint; Defendants are alleged to have misrepresented and failed to disclose ***current*** material negative facts, which made their statements false and misleading at the time, not the ultimate failure of the partnership. *See, e.g.*, ¶¶17, 78, 93, 130, 142. Furthermore, Defendants' argument is premised on a baseless counter-

factual scenario, *i.e.*, that Hims disclosed to Novo its intention to continue its mass sales of personalized semaglutide, Novo agreed, and Novo later changed its mind. Mot. at 11, 14. Such a factual inference is both improper and implausible at this stage. *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 947-48 (9th Cir. 2023) (court must "accept[] the factual allegations as true and view[] the facts 'in the light most favorable' to the shareholders"). Hims' business model tested the boundaries of the personalization exception and Defendants knew Novo viewed it as illegal "mass personalization." Yet, Defendants now try to argue that, just weeks after the FDA declared the semaglutide shortage over, and days after a federal court upheld that ruling, Novo would privately agree that Hims could engage in mass personalized sales, only to revert back to its strident public position just weeks later. ¶¶65-68, 72-73; Mot. at 11, 13-14. Defendants point to amicable communications during the first weeks of the deal in support of their position. Mot. at 13. This narrative is baseless. The more cogent and compelling inference – supported by the particularized facts alleged–is that Defendants were desperate to relieve pressure on Hims' stock price but unwilling to forgo the lucrative profits from mass sales of generic semaglutide, and agreed to Novo's demands while hiding their true intentions. Any initial positivity was attributable to the grace period, during which time Hims could legally continue its sales of compounded semaglutide; as soon as it expired, Novo immediately reiterated its expectation that Hims sharply curtail its sales of compounded semaglutide. ¶¶60, 72, 100, 106.

Lastly, Defendants' effort to discredit the allegation that Hims agreed to stop mass compounding semaglutide should be rejected. Mot. at 7. "Generally, a plaintiff may rely on statements from . . . newspaper articles to satisfy the PSLRA's pleading requirements." *Garbaccio v. Starbucks Corp.*, 809 F. Supp. 3d 1261, 1284 (W.D. Wash. 2025). Novo's confirmation of Defendants' fraudulent scheme is drawn directly from a June 23, 2025 *Bloomberg* article quoting Ludovic Helfgott, an executive vice president of product and portfolio strategy at Novo. ¶107. The allegation is consistent with Novo's position on compounding before, during, and after the Class Period. ¶¶60-64, 71-72, 100, 105-107, 116. Notably, Helfgott's statement has never been disputed by Hims prior to this litigation. Collectively, these facts are sufficient to plead falsity.

LEAD PLS.' OPPOSITION TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:25-cv-05315-JD
4903-0004-4200.v1

- 7 -

## 2.     False and Misleading Statements and Omissions Concerning Hims' Alignment with Novo on the Personalization Exception

Defendants falsely claimed to be "aligned philosophically" with Novo on the extent to which compounded semaglutide could permissibly be prescribed and sold under the personalization exception. ¶91. Dudum asserted "there is an alignment for what we believe to be blue-chip use of that [personalized] compounding exemption." *Id.* Dudum stated that personalized sales would only occur in circumstances of demonstrable clinical need for a personalized dose due to "intolerable" side effects of a commercial dose, and claimed that. Hims would reduce its reliance on the personalization exception going forward, "***we think of it as relatively additive to the ecosystem* . . . *it's really additive as part of the mix*.**" ¶90; *see* ¶92 ("***within both organizations*** [there is] ***a foundational appreciation for the fact that clinical decision-making is truly independent***"); ¶100 ("Novo sees a place for personalized compounding in the market").

Defendants' statements, properly read in the context of Novo's staunch opposition to the sale of personalized semaglutide by telehealth companies, created a materially false impression that Hims would move away from personalized compounded semaglutide. *In re Vaxart, Inc. Sec. Litig.*, 576 F. Supp. 3d 663, 670 (N.D. Cal. 2021) ("[s]tatements are evaluated through a fisheye, not a telescope"). Analysts reported that "[personalized semaglutide] ***will exist for patients who truly will need personalization* . . . *but it will not be a large portion of HIMS' weight loss offering***." ¶97. Another wrote, "HIMS will continue to offer personalized compounded GLP-1s ***but do so on a case-by-case basis for members who truly need it for clinical reasons***." ¶96. Another reiterated that "[Hims] ***and Novo*** [] ***are aligned philosophically with what their providers believe is clinical necessity***." ¶95. These analysts were equally shocked when the deal collapsed and expressed concern about Hims' compounding-focused future, "***HIMS appears to be attempting to scale*** [personalized] ***compounding to a scale we have not previously seen, and we have had many questions regarding this scale and capacity***." ¶111; *see E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 937 (9th Cir. 2023) (falsity supported where "sophisticated professional analysts were surprised").

As the market reaction demonstrates, Defendants' statements concerning Hims' agreement with Novo on the Company's continued sale of semaglutide under the personalization exception

were false and misleading because defendants failed to disclose that: (i) Hims' ongoing sale of personalized semaglutide was not "additive" but the significant majority of Hims' semaglutide revenue both before and after the Novo deal[4] (¶¶18, 55, 93(d), 118-119); (ii) the companies had not reached an agreement on the appropriate use of the personalization exception and Novo was dissatisfied that Hims sought to sell *any* personalized generic semaglutide under their agreement (¶¶78(a), 93(a), 105-107, 115-116); (iii) Defendants had agreed to end "mass compounding" generic semaglutide and Novo expected Hims to move its patients to Wegovy, which it refused to do (¶¶105-107, 116); and (iv) Novo had not agreed that Hims could continue its sales of personalized semaglutide to existing and future patients (¶¶105-107, 115-116).  In light of these undisclosed facts, investors were misled into believing that Hims' ongoing sale of generic semaglutide was consistent with its agreement with Novo when in fact it was virtually certain that Novo would terminate the deal if it discovered that Hims had not changed its business model after the grace period ended.[5] *Schueneman v. Arena Pharms., Inc*., 840 F.3d 698, 706 (9th Cir. 2016) (defendants must "disclos[e] adverse information that cuts against the positive information [they tout]").

### 3. False and Misleading Statements Concerning the Novo Partnership and Future Deals with Major Drug Makers

Defendants repeatedly claimed that the deal to bring Wegovy to the Hims platform did not represent just a commercial arrangement, but a resolution of the companies' profoundly differing viewpoints on compounded drugs that would serve as a model for new partnerships, allowing Hims to capitalize on its far-reaching online platform.  For example, Defendants claimed that *"[t]his*

---

[4] Because Hims could no longer sell commercially available doses of compounded semaglutide after May 22, 2025, and because Hims made no effort to sell Wegovy, personalized doses comprised a *greater* percentage of sales after the Novo deal than before it.  Hims' post-Class Period reaffirmation of its $725 million annual revenue guidance for its weight-loss business supports that Hims never sought to reduce its sales of personalized semaglutide.  ¶¶5, 51, 117.

[5] Defendants selectively seek to rely on certain post-Class Period evidence, including a March 9, 2026 press release announcing a new deal between Hims and Novo to bring Wegovy to the Hims platform.  Mot. at 7 n.3.  But this reinforces that Defendants falsely touted the deal, knowing they had failed to reach an agreement on key terms.  *Id.* ("this recent announcement described specific terms regarding compounded GLP-1 offerings *underscores no such terms existed with the collaboration announced in 2025*").  Reliance on cherry-picked extrinsic evidence is improper, *Khoja*, 899 F.3d at 998, and Defendants omit multiple unfavorable recent developments, including Novo's lawsuit against Hims and the announcement of an ongoing SEC investigation into Hims' compounded semaglutide sales and related business relationships.

*collaboration also signals something important, trust from a major pharmaceutical leader, and it sets the blueprint for future partnerships that can expand both our reach and our relevance.*" ¶88; *see* ¶89 ("*this type of a partnership . . . is a blueprint for what we think the next 5 and 10 years could look like across categories*").  Defendants stressed that Hims and Novo "*share a vision of what consumer-centered healthcare looks like*," and were in "align[ment]" and "*there's real excitement around that shared vision*."  ¶¶75, 89.  And that "[the deal is] *a meaningful validation of our model*."  ¶88.

Analysts understood these statements to mean not just that Hims and Novo had resolved their instant dispute over the sale of compounded semaglutide, but that Hims was making a fundamental change in its business model toward working with (as opposed to against) Big Pharma manufacturers of name-brand drugs.  For example, one analyst stated, "*this is a meaningful evolution of the model too, shifting to a brand sales effort in partnership with an existing manufacturer* . . . this is a *clear win for the company and helps give an updated . . . path forward for the business*."  ¶80.  Another reported that "*[t]oday's announcement also provides further validation of HIMS' direct-to-consumer model as a platform for broader drug partnerships*."  ¶81.  Yet another stated that "'[Eli Lilly] and NVO want to use HIMS as a platform to sell product."  ¶96; *see In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *8 (C.D. Cal. June 17, 2011) ("statements made by analysts underscore the plausibility and reasonableness of the false impression that Plaintiffs allege Defendants' statements conveyed").  These statements were false and misleading because Defendants omitted the same material negative facts identified above, *see* §IV.B.1-2, *supra*, namely that Hims was doubling down on sales of compounded semaglutide via the personalization exception, placing it in direct conflict with Novo and other potential Big Pharma partners.  ¶¶78(d), 93(d)-(e).

### 4. The Alleged Misrepresentations and Omissions Were Highly Material to Investors and Not "Puffery"

Information is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  Here, there can be no genuine dispute that statements and omissions concerning Hims' sales of

compounded semaglutide, its deal with Novo, and the potential for future partnerships with Big Pharma and other branded drug makers were of outsized importance to investors. Compounded semaglutide sales had been Hims' largest revenue growth driver and subsequently presented the greatest risk to its outlook. ¶70 ("[t]he biggest near-term swing factor is still the extent to which HIMS can compound semaglutide beyond May 22nd"). Analysts repeatedly asked Defendants about these very topics, and expressly relied on Defendants' statements in their reports. ¶¶66-67, 70-72, 79-83, 86-92, 95-100, 108-111. *Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 941 (S.D. Cal. 2019) (analyst "coverage supports the materiality of the subject"). Analysts' intense focus eviscerates Defendants' "puffery" argument. *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (materiality "appropriately resolved as a matter of law" only if the statement is "'so obvious that reasonable minds [could] not differ'").

Furthermore, "[d]ramatic price movements in response to an optimistic statement would provide a strong indication that the statement itself was material." *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989). Here, the misrepresentations caused Hims per share price to skyrocket from $28 per share to $35 per share on the April 29, 2025 announcement of the Novo deal; increased above $49 per share on the further details provided on May 5, 2025, and ultimately reaching a Class Period high of $64 per share, before collapsing to $42 per share on the disclosure of the truth. ¶¶88-92, 100, 136-137; *see also* ¶111 ("***HIMS shares closed up 23% on the initial partnership news and dropped ~33% on the split news intraday today***"). In contrast, puffery exists where investors "know how to devalue the optimism of corporate executives," and thus dramatic price movements like these do not occur. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014).

Defendants' efforts to cast the alleged false and misleading statements as mere puffery are easily dismissed. Mot. at 8-9. As noted, statements "made in response to specific questions asked by financial analysts . . . cannot be discounted as mere 'puffery.'" *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 770-71 (9th Cir. 2023); *see* ¶¶89-92, 100-101. Moreover, "'the context in which the statements were made is key' to determining whether they are inactionable puffery." *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 941 (N.D. Cal. 2022). Here, statements

challenged by Defendants concern the alignment of Hims and Novo, and the deal representing a blueprint for future Hims' partnerships, but these statements conveyed to the market an "'evolution'" in Hims' business model, from competing with name-brand drug manufacturers to partnering with them. ¶¶14, 20, 80, 86, 88-90.  As noted, Hims' stock price surged in response.  Defendants' attempt to analyze these statements in isolation is improper.  *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2017 WL 66281, at *17 (N.D. Cal. Jan. 4, 2017) ("'the Court may not assess the statements … in a vacuum, "plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently 'vague' so as to constitute puffery," but rather will examine the entire statement and its circumstances to determine if it is actionable'").

Defendants' heavy reliance on *Lim v. Hightower*, 2025 WL 2965692, at *10 (6th Cir. Oct. 21, 2025), is misplaced.  Mot. at 9.  There, the court found aspirational statements concerning a partnership "'too squishy' to be important to a securities-investment decision."  *Lim*, 2025 WL 2965692, at *10; Mot. at 9.  *Lim* lacks the context present here, namely, a long-running dispute between two companies that threatened to eliminate sales of one company's most important product and posed an imminent and existential threat to its long-term viability.  Indeed, that the companies were purportedly "aligned philosophically" on personalized compounding eliminated the most significant risk facing Hims weight-loss business.  Thus, statements concerning "trust," "validation," and "blueprints" were understood by the market to mean the dispute was resolved, the threat of litigation and regulatory enforcement was eliminated, and Hims scored a "clear win" that opened a new "path forward for the business."[6]  This is hardly the type of information that is so "'exaggerated

---

[6]    Defendants' other citations in support of their puffery defense suffer from the same flawed analyses as the cases either involve partnerships lacking the context as the present matter or language that is historical in nature.  *See In re Synchrony Fin. Sec. Litig.,* 988 F.3d 157, 170 (2d Cir. 2021) (statements did not relate to presently announced partnership, but that defendant was "'pretty positive'" about the prospect of renewing future partnership, which court found to be "vague positive statements" unrelated to their business affairs); *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 899 (N.D. Cal. 2022) (alleged false statements which centered on "alignment" were speculations that practices were "'aligned'" with the law, not representations of partnership terms that they personally negotiated)*; Reckstin Fam. Tr. v. C3.ai, Inc.*, 718 F. Supp. 3d 949, 982 (N.D. Cal. 2024) (defendant's "claim that its partnerships have 'vastly' expanded its global reach is unquantifiable given the inherent inexactitude of the descriptor 'vastly,'" whereas Hims' shift from compounded semaglutide to Wegovy is numerically quantifiable); *Newtyn Partners, LP v. All. Data Sys. Corp.*, 165 F.4th 947, 961 (6th Cir. 2026) (involving corporate spinoff where statements were "accurate statements of historical fact"); *Veal v. LendingClub Corp.,* 423 F. Supp. 3d 785, 795-96 (N.D. Cal.

or so vague that a reasonable investor would not rely on it in considering the "total mix" of facts available.'" *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 967 (N.D. Cal. 2014); *see Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("[w]hat might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation").

### 5.    The Alleged Misrepresentations and Omissions Are Actionable Even if Analyzed as "Opinions"

To the extent that any of the alleged misrepresentations are considered statements of opinion, they are nonetheless actionable under all three conditions set forth in *Omnicare, Inc. v. Laborers Dis. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015). The Motion identifies statements that Defendants "think" personalized prescriptions would be "additive" and statements concerning the purported alignment between Hims and Novo as opinions. Mot. at 10 ("I think there's real excitement around that shared vision," "I think this type of partnership … is a blueprint for what we think the next 5 and 10 years could look like").[7]

These statements are actionable because Defendants "misle[d] investors by saying one thing and holding back another." *Omnicare*, 575 U.S. at 192. First, Defendants did not subjectively believe their statements because they knew that Hims refused to alter its business model and was continuing its mass sales of semaglutide via the personalization exception, placing Hims directly at odds with Novo and other major drug makers. *Id.* at 184-85. Second, these statements contain multiple embedded misrepresentations, including that Hims would be reducing its sales of personalized compounded semaglutide and moving those patients to Wegovy, and that Novo and Hims had an agreement to permit Hims' ongoing sale and marketing of compounded semaglutide alongside name-brand Wegovy. *Id.* at 185. Third, as confirmed by the market's reaction, investors understood these statements to "convey facts" about the "speaker's basis" which were false and misleading, for example, that the deal was "an extremely important validation of the HIMS business

---

2019) (alleged false statements concerned general commitments to following the law).

[7]    The Motion (correctly) does not argue that there is an "alignment for what we believe to be blue-chip use of that compounding exemption" is an opinion; as the portion of the statement alleged to be false (*i.e.*, the purported alignment) is not qualified in any manner. Mot. at 10-11.

model," that Hims and Novo were "aligned philosophically with what their providers believe is clinical necessity" and that "[personalized semaglutide] will not be a large portion of HIMS' weight loss offering."[8]  *Omnicare*, 575 U.S. at 190-92.  None of these impressions were accurate.

### 6.    The Safe Harbor Does Not Immunize Defendants' False and Misleading Statements and Omissions

The Motion suggests that various fragments of cautionary language – none of which relate to the fraud alleged here – insulate Defendants' material misrepresentations.  Mot. at 11-13.  These arguments should be rejected, "the safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts."  *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017).  At most, Defendants identify "mixed statements containing non-forward looking statements as well as forward-looking statements, the non-forward-looking statements are not protected by the safe harbor of the PSLRA." *Id.*  For example, the claim that the Novo deal was the "***first step in a long-term collaboration***" and "***sets the blueprint for future partnerships***" created a false impression about the ***current*** state of the deal and omitted ***current*** material adverse facts, *e.g.*, that Hims was expanding compounding, not limiting it.   ¶¶75-76, 88; *Vaxart*, 576 F. Supp. 3d at 671 (statement concerning "merely an agreement to try to reach an agreement" addressed "'the current … state'" of operations).

Further, even if forward-looking, the statements are still actionable because Defendants "concealed adverse facts that gave investors a misleading impression of … the prospective market for" Hims' product and the risks had materialized.  *Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at *18 (N.D. Cal. Feb. 23, 2023).  Because Defendants "warnings" concealed known, existing, adverse facts, including that Novo had not agreed to Hims' continued sale of personalized semaglutide at scale, the safe harbor does not apply.  *Quality Sys.*, 865 F.3d at 1141 (statements fall outside of the PSLRA's safe harbor when the speakers had "actual knowledge" that the statement was false or misleading).

Hims' risk disclosures do not constitute "meaningful" cautionary language.  As an initial

---

[8]    Lastly, the Motion suggests that Defendants were allowed to take a "'generally optimistic view'" of their business dealings and that their statements only turned out inaccurate after Novo changed its position.  Mot. at 11.  However, to accept this implausible factual scenario would require the Court to draw improper and implausible inferences in Defendants' favor.  *See* §IV.B.1, *supra*.

matter, the Motion identifies disclosures that are unrelated to the events which precipitated the alleged fraud.  *See* Mot. at 12 (identifying risk disclosures related to "'labeling requirements'").  More significantly, the Motion fails to disclose any of the concealed facts identified in the Complaint.  ¶¶78, 93; *Alphabet*, 1 F.4th at 703 ("[r]isk disclosures that 'speak[] entirely of as-yet-unrealized risks and contingencies' and do not 'alert[] the reader that some of these risks may already have come to fruition' can mislead reasonable investors").

### C.    The Complaint Pleads a Strong Inference of Scienter

A complaint pleads scienter "by raising a strong inference that the defendant possessed actual knowledge or acted with deliberate recklessness."  *N.M. Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011).  A "'strong inference'" of scienter is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 324 (2007).

### 1.    Defendants Had Actual Knowledge of the Truth as Participants in the Fraudulent Scheme

Courts find scienter to be sufficiently pled where executives "knowingly and/or recklessly participated in [a] scheme and made misrepresentations and omissions of material fact in the solicitation of investors."  *SEC v. Whitworth Energy Res. Ltd*., 2000 WL 17770652, at *1 (9th Cir. Dec. 1, 2000).  Here, "Dudum and his top lieutenants" were responsible for negotiating the Novo deal.  ¶115; Mot. at 18 ("Defendants participated in negotiations with Novo").  Therefore, Defendants had actual, direct, personal knowledge of true facts alleged in the Complaint.  The Motion concedes Defendants' participation but reverts to the same counter-factual arguments that their statements were not false.  Mot. at 15-17.  First, the allegations that Hims agreed to stop mass compounding must be credited.  *See* §IV.B.1-2, *supra*.  Second, Defendants cannot refute that Hims failed to obtain affirmative agreement that it could continue its mass sale of compounded semaglutide.  Indeed, Dudum admitted that Novo had expressed "dissatisfaction" that Hims would not drop personalized semaglutide entirely and acknowledged that, at best, the issue was not fully explored.[9]  ¶¶24, 115.  Third, Defendants claim that amicable communications between Hims and

---

[9]    To the extent the Motion suggests there was ambiguity in the agreement reached with Novo,

Novo supports a non-culpable inference and that Novo's "'tone changed overnight'" and was "[u]nanticipated." Mot. at 20. But this, too, is factually inaccurate. Novo repeatedly made its position clear, before the Class Period, Novo launched a high-profile public campaign to shutdown Hims and hundreds of other generic semaglutide compounders. ¶¶60-64, 71-72. On May 13, 2025, Dudum was told (again) that Novo expected all mass compounding to stop on May 22, 2025. ¶100. After the grace period, Novo directly reiterated to Hims that its patients must be transitioned to Wegovy. ¶¶100, 106. The most plausible inference is not that Novo made an exception for Hims in its ongoing fight against compounding, but that Hims was unwilling to give up its more-profitable generic offering and deceived Novo into entering an agreement. *See Tellabs*, 551 U.S. at 324 ("inference of scienter" need only be "at least as compelling as any opposing inference").

**2.      Defendants' Statements and Admissions Support Their Scienter**

Scienter is satisfied where Defendants, "later admitted" to their knowledge of facts that rendered the misstatements false. *Purple Mountain Tr. v. Wells Fargo & Co.*, 432 F. Supp. 3d 1095, 1106 (N.D. Cal. 2020). During the Class Period, Dudum stressed that the two companies had been spending significant time together "***really aligning on what we think the future of healthcare looks like***" and they were "***aligned philosophically***" on the use of the personalization exception. ¶¶89, 91. But following the Class Period, Dudum revealed the truth, the negotiations with Novo were just a couple hours, there was "***dissatisfaction***" from Novo that Hims was not dropping its compounding business altogether, Novo expected Hims to transition its patients to Wegovy, and there was "***no hearty debate*** [on the personalization exception]." ¶¶24, 115. Moreover, the suggestion that the Novo deal was a "blueprint" or "first step" in a long-term collaboration, when Hims refused to alter its personalized business model, and there was no "hearty debate" between the companies on this critical issue, lacked any credible basis. ¶¶86, 88-89; *see Apple*, 2020 WL 6482014, at *9 ("the

---

in light of Novo's public statements, Defendants were deliberately reckless in touting the deal without verifying Novo's position with respect to Hims' continued sale of personalized semaglutide to hundreds of thousands of existing patients. Mot. at 7. "'[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort.'" *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014); *see also In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *12 (N.D. Cal. Nov. 4, 2020).

[post-class period] statement plausibly suggests that defendants saw troubling signs [before the alleged misstatement]. Again, the inferences here are not hard.").[10]

### 3.     The Core Operations Doctrine Supports Scienter

The core operations doctrine supports scienter where the "prominence" of the disputed information makes it "'absurd'" to suggest that management did not know of it. *Reese*, 747 F.3d at 576; *see S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008). Here, given the extraordinary importance of generic semaglutide to Hims' success, the Court can readily infer that Defendants knew Novo considered Hims engaged in illegal "mass personalization" and their refusal to change Hims' business model made it virtually certain that the partnership would fail if Novo discovered the truth. ¶¶5, 46, 51, 59, 78(b), 78(d), 93(b)-(c), 93(e). While the Motion demands a communication "unequivocally stating that Hims could not continue prescriber-directed compounding in parallel with a branded offering," a "strong inference" of scienter does not require a "smoking gun." Mot. at 16; *Tellabs,* 551 U.S. at 324. The notion that Defendants were unaware of Novo's position is patently "absurd," indeed Hims ran a Super Bowl ad attacking Novo and other drug makers for putting profits over patients. Mot. at 16; ¶59; *see also Vaxart*, 576 F. Supp. 3d at 673 ("'absurd to suggest that management was without knowledge'" in deficiencies surrounding partnership where "[partner] played such a central role" in defendant's major business opportunity). Furthermore: (i) one month before the Class Period, Novo publicly declared: "***Compounders can't evade federal law under 'the guise of making "personalized" drugs'***" (¶¶71-72); (ii) during the Class Period, Dudum was told of Novo's reassertion that it did "not support mass personalized compounding" (¶¶100-101); and (iii) shortly after the Class Period, Novo confirmed: "'***Every company we work with is aware of our stance and expectations***.'" ¶116.[11]

---

[10]     Dudum's refusal to answer questions about Hims' ongoing sales of compounded semaglutide reinforces the inference that he knew Novo would view Hims' conduct as violating their agreement. ¶¶92, 101, *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 571 n.28 (S.D.N.Y. 2011) (scienter found "where [defendant] was directly nonresponsive to a question" and "may have been avoiding the question and thus by implication avoiding the disclosure of the allegedly material omitted facts").

[11]     In January 2025, Novo announced deals with several other telehealth companies that had agreed to discontinue sales of compounded semaglutide to sell an upcoming oral Wegovy pill. ¶121.

**4.    The Temporal Proximity of the Announcement and Termination of the Novo Partnership Supports Scienter**

"Temporal proximity of an allegedly fraudulent statement or omission and a later disclosure can be circumstantial evidence of scienter." *Reese*, 747 F.3d at 574. Here, the brief period between Defendants' false claims of alignment with Novo, and the subsequent revelation that the two companies had not resolved their fundamental dispute, supports an inference that Defendants were aware the two companies were never aligned and had failed to resolve their fundamental differences over Hims' compounding practices, as opposed to the consequence of any intervening event. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 n.5 (9th Cir. 2008). Defendants encourage the Court to draw the improper and implausible inference that Novo abandoned its public position, privately agreed to Hims' "mass personalization" only to change its position back less than eight weeks later. Mot. at 11, 13-14. But, such an inference is neither warranted at the pleading stage, nor supportable in the face of the Complaint's detailed and contrary facts. *See* §IV.B.1[12]

**5.    Defendants' Offering of Senior Convertible Notes Supports a Finding of Scienter**

On May 8, 2025, Defendants capitalized on Hims' artificially inflated stock price of $51 per share by selling $1 billion of zero-interest convertible senior notes on more favorable terms, before the Company's shares plummeted to $42 per share on the disclosure of the truth. *In re Portal Software, Inc. Sec. Litig.*, 2005 WL 1910923, at *12 (N.D. Cal. Aug. 10, 2005) (secondary offering two months prior to 40% stock drop supported inference of scienter). The timing of Hims' offering between the announcement of the Novo deal on April 29, 2025 (which relieved market concerns), and the ending of the grace period on May 22, 2025 (which raised the risk that Hims' ongoing mass sales would be exposed), supports an inference that Defendants sought to capitalize before the chances of the deal falling apart coalesced. While the Motion seeks to portray the raise of $1 billion in capital as a "'routine corporate objectives,'" courts consider the "tight timeline between the [false] statements, the stock offering, and the [disclosure of the truth]" holistically in assessing scienter.

---

[12]    Defendants' reliance on *Lim*, 2025 WL 2965692, at *3, is again misplaced. Mot. at 17. Defendants ignore that the grace the period did not expire until May 22, 2025, thus any appearance of agreement during the initial weeks of the partnership was illusory.

LEAD PLS.' OPPOSITION TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:25-cv-05315-JD
4903-0004-4200.v1

Mot. at 19; *In re Semtech Corp.,* 2025 WL 2884810, at *10 (C.D. Cal. Oct. 7, 2025); *see also Curran v. Freshpet, Inc.*, 2018 WL 394878, at *6 (D.N.J. Jan. 12, 2018) (motive to inflate stock price to allow profitable secondary offering supported scienter).

## V.    THE DERIVATIVES CLASS HAS STANDING TO BRING SUIT

Finally, Defendants' argument that Plaintiff Wang lacks standing to assert claims under Section 10(b) because he did not "purchase Hims common stock or any security Hims issued" lacks any merit.  Mot. at 5-6.  Privity is not required for Section 10(b) standing, nor is a corporate defendant required to be the issuer of the underlying securities. *Deutschman v. Beneficial Corp.*, 841 F.2d 502, 506 (3d Cir. 1988) ("plaintiffs need not be in any relationship of privity with the defendant charged with misrepresentation"); *In re Adobe Sys., Inc. Sec. Litig.*, 139 F.R.D. 150, 154-55 (N.D. Cal. 1991) (options traders "have standing to assert Rule 10b-5 claims against companies issuing common stock to which the options are related"; no "fiduciary relationship" required).  The Exchange Act expressly includes a variety of derivative financial instruments in its definition of "security,"  15 U.S.C. §78c(10), and the Supreme Court has long recognized that purchasers of derivative securities have Section 10(b) standing. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 751 (1975) (making clear that "holders of puts, calls, options, and other contractual rights or duties to purchase or sell securities have been recognized as 'purchasers' or 'sellers' of securities for purposes of Rule 10b-5").

Mr. Wang's derivative securities fall within this settled law.  Like stock options and other equity derivative securities that have been the subject of securities class actions for decades, the HIMS ETF is an exchange-traded security whose value is based on the price of Hims common stock. ¶33.  It is undisputed that HIMS ETFs concern a single company, *i.e.*, Hims, and that Defendants' misstatements were "about" Hims. Wang's Section 10(b) standing is established.  *In re: CCIV / Lucid Motors Sec. Litig.*, 110 F.4th 1181, 1186 (9th Cir. 2024) (Section 10(b) standing where plaintiff purchased securities "about which" the alleged misrepresentations were made).

Defendants' suggestion that a corporate defendant must be the issuer or sponsor of the security for Section 10(b) standing is contrary to law.  Mot. at 5; *see, e.g.*, *Okla. Firefighters Pension & Ret. Sys. v. Musk*, 2026 WL 878962, at *2 (S.D.N.Y. Mar. 31, 2026) (certifying Section 10(b)

class of investors in Twitter securities, including options investors, against non-issuer defendants); *Pampena v. Musk*, 2024 WL 4331811, at *1. 7 (N.D. Cal. Sept. 27, 2024) (same); *ODS Capital LLC v. JA Solar Holdings Co., Ltd.*, No. 18-cv-12083 (S.D.N.Y. 2023), ECF Nos. 127-1, 131 (certifying settlement class of investors in JA Solar securities, including swaps investors); *Adobe*, 139 F.R.D. 154 & n.9 (rejecting argument); ECF No. 57 at 5-8 (collecting cases).  Defendants' reliance on *CCIV* for the proposition that Wang did not purchase a security "about which a misstatement was made" (Mot. at 5) ignores that the HIMS ETF at issue is a "single stock" derivative that exclusively references and uniformly tracked the price of Hims common stock, and, moreover, placed Wang with **double** the exposure to Defendants' misstatements compared to a common stock investor.[13]

¶33.  Defendants' assertion that analyzing standing for purchasers of derivatives in a single company would require "endless" case-by-case determinations makes no sense.  Indeed, all of Defendants' cited authorities involved plaintiffs who either purchased no securities or those of a different entity than the corporate defendant.[14]  Defendants cite no case holding that the "bright line" purchaser-seller rule deprives Section 10(b) standing of purchasers of equity derivative securities of the defendant company.  There are none.

## VI.    CONCLUSION

For the foregoing reasons the Motion should be denied.  If the Court is inclined to grant all or part of the Motion, Plaintiffs respectfully request leave to amend to address any deficiencies the Court might identify.  Fed. R. Civ. P. 15; *Foman v. Davis*, 371 U.S. 178, 182 (1962).

DATED:  May 7, 2026

s/ Daniel J. Pfefferbaum
DANIEL J. PFEFFERBAUM

---

[13]     During the Class Period, the price and volume movements of HIMS ETF shares uniformly tracked those of the underlying Hims stock, including massive volume in HIMS ETF shares on the disclosure date when the artificial inflation was removed from the securities' prices.  This caused billions of dollars in damages to investors in Hims securities, including over $300 million to HIMS ETF investors.  ECF Nos. 57 at 9; 74 (Hr'ing Trans.) at 15:11-18. The HIMS ETF market was highly liquid: for every HIMS ETF share that traded on the disclosure date, there were nine shares of Hims stock trading, *i.e.*, damaged HIMS ETF shares represented 11% of the damaged common stock. *Id.*

[14]     In *Blue Chip Stamps*, the plaintiff alleged that defendants' "overly pessimistic" statements caused it not to sell its stock.  421 U.S. at 726-27.  Similarly, in *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1285 (11th Cir. 2007), the insurer plaintiff did not purchase bonds but acquired them "by default."  In *CCIV*, 110 F.4th at 1183, and *Frutarom*, 54 F.4th 82, 86 (2d Cir. 2022), plaintiffs purchased stock in a different entity than the defendant companies.

ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL J. PFEFFERBAUM
ALEX N. JILIZIAN
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
dpfefferbaum@rgrdlaw.com
ajilizian@rgrdlaw.com

*Lead Counsel for Lead Plaintiff James A. Schalter
and Common Stock Class*

DATED:  May 7, 2026

SAXENA WHITE P.A.
DAVID R. KAPLAN
EMILY BISHOP


            s/ David R. Kaplan
        DAVID R. KAPLAN

505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA  92075
Telephone:  858/997-0860
dkaplan@saxenawhite.com
ebishop@saxenawhite.com

*Lead Counsel for Lead Plaintiff Shuo-Hsien
Wang and Derivatives Class*

LEAD PLS.' OPPOSITION TO DEFS.' MOT. TO DISMISS CONSOLIDATED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:25-cv-05315-JD
4903-0004-4200.v1

- 21 -

## CERTIFICATE PURSUANT TO LOCAL RULE 5-1(i)(3)

I, Daniel J. Pfefferbaum, am the ECF User whose identification and password are being used to file this document. Pursuant to Local Rule 5-1(i)(3), I attest that concurrence in the filing of the document has been obtained from each of the other signatories.

Dated:  May 7, 2026

s/ Daniel J. Pfefferbaum
DANIEL J. PFEFFERBAUM
